3029578-SRS/DPW

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DARREN SIMS, ) | |
| ) | |
| Plaintiff, ) | No. 1:16-CV-02961 |
| ) | |
| v. ) | Honorable Virginia M. Kendall |
| ) | |
| CITY OF MARKHAM, a municipal corporation, ) | |
| OFFICER CARSON (Star #552) and OFFICER ) | |
| DAVIS (Star #510) in their individual capacity, ) | |
| ) | |
| Defendants. ) | |

## DEFENDANTS' STATEMENT OF MATERIAL FACTS
## PURSUANT TO LOCAL RULE 56.1

NOW COME the Defendants, CITY OF MARKHAM, OFFICER CARSON (Star #552) and OFFICER DAVIS (Star #510), by and through their attorneys, *SmithAmundsen LLC*, and pursuant to Local Rule 56.1 of the Northern District of Illinois, submit the following Statement of Material Facts in Support of Defendants' Motion for Summary Judgment:

### Description of the Parties

1. On April 24, 2014, and at all times relevant to the matters alleged in the First Amended Complaint, Plaintiff Darren Sims ("Plaintiff" or "Sims") was a resident of Cook County, Illinois, located in the Northern District of Illinois, and was a citizen of the State of Illinois. *See* First Am. Compl. ¶ 7(**Ex. A**).

2. Defendant Officers Jerome Carson and Ramon Davis were police officers with the City of Markham Police Department, located in the City of Markham, County of Cook, Illinois, and were serving as Markham Police Officers at the time of the incident alleged in the First Amended Complaint. *Id.* at ¶ 10; Davis Ans. Interrog. No. 2 (**Ex. G**); Carson Ans. Interrog. Nos. 1-2 (**Ex. I**).

3. Defendant City of Markham is a municipal corporation organized and existing under the laws of the State of Illinois. *Id.* at ¶ 8.

## Jurisdiction and Venue

4. Jurisdiction is conferred upon the U.S. District Court for the Northern District of Illinois by 28 U.S.C. §§ 1331 and 1367 because Plaintiff's claims arise under Federal law. *Id.* at ¶¶ 3-4.

5. Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the U.S. District Court for the Northern District of Illinois because the events giving rise to Plaintiff's claims occurred in Cook County, Illinois. *Id.* at ¶ 5.

## Undisputed Material Facts

**I.   The Sequence of Events Occurring on April 24, 2014**

6. In the early morning hours of April 24, 2014, Sims, Devon Welsh and James Beecham were driving around the City of Markham in a gray Infiniti and eventually stopped at a rental center store at the intersection of 159th Street and Kedzie Avenue. *See* Sims Dep. 10:21-12:17, 13:1-7 (**Ex. B**); Pl. Rule 36 Resp., No. 8 (**Ex. E**).

7. Sims, Devon Welsh and James Beecham are all African American males. *See* Photographs (**Ex. M**).

8. At or around 5:42 A.M. on April 24, 2014, Sims entered a vehicle parked at or near 3069 West 159th Street in Markham, Illinois. *See* First Am. Compl. ¶ 11 (**Ex. A**).

9. At or around 5:44 A.M. on April 24, 2014, Markham police units -- which included Officers Carson, Davis, Anderl and Jackson -- were dispatched to a burglary-in-progress at a Rent-A-Center store located at 3069 West 159th Street in Markham, Illinois. *Id.* at ¶ 16; Davis Ans. Interrog. Nos. 5 & 7 (**Ex. G**) Carson Ans. Interrog. Nos. 5 & 7 (**Ex. I**); Anderl Aff. ¶ 2 (**Ex. J**); Jackson Aff. ¶ 2 (**Ex. L**).

10. Officer Anderl arrived at 3069 West 159th Street in Markham and determined that a burglary was in progress because he saw that the storefront window of the Rent-A-Center was "smashed out," and that two African American males were standing next to a gray Infiniti and holding TVs. *See* Anderl Dep. 49:12-15, 52:1-3 (**Ex. K**); First Am. Compl. ¶ 16 (**Ex. A**).

11. The gray Infiniti started driving and the two African American male suspects dove into the back, passenger side of the gray Infiniti while still holding TVs. *See* Anderl Dep. 49:12-50:1, 82:19-83:5, 83:10-16 (**Ex. K**).

12. Officer Anderl activated his overhead lights and attempted to initiate a traffic stop, but the gray Infiniti fled eastbound on 159th Street. *Id.* at 49:12-50:3; Anderl Aff. ¶ 4 (**Ex. J**).

13. Sims was inside the fleeing gray Infiniti, which, at times, was traveling at a speed of at least 90 miles per hour. *See* Pl. Rule 36 Resp., No. 12 (**Ex. E**); Anderl Dep. 97:2-7 (**Ex. K**).

14. The gray Infiniti made a U-turn and proceeded westbound on 159th Street, where Officer Carson had blocked off a lane of traffic in an attempt to stop the fleeing Infiniti. Anderl Aff. ¶ 5 (**Ex. J**); Carson Dep. 62:18-24 (**Ex. H**).

15. The gray Infiniti drove around Officer Carson's marked squad car and eventually clipped the raised median barrier, drove through a red light at the intersection of 159th Street and Kedzie Avenue and crashed into a dump truck that was driving through the intersection. *See* Carson Dep. 53:14-20, 62:21-63:2 (**Ex. H**); Davis Dep. 38:23-39:8 (**Ex. F**); Anderl Dep. 52:18-53:12 (**Ex. K**); Pl. Rule 36 Resp., No. 15 (**Ex. E**).

16. The Infiniti's front airbags deployed and hit Plaintiff in the face, causing a laceration that was bleeding. *See* Pl. Rule 36 Resp., Nos. 20-22 (**Ex. E**).

17. Sims, Beecham and Welsh each exited the crashed, gray Infiniti and ran away from the scene of the motor vehicle accident. *See* Pl. Rule 36 Resp., Nos. 23 & 29 (**Ex. E**); First Am. Compl. ¶ 22 (**Ex. A**).

3

18. Officers Davis and Anderl observed four or five African American males exit the crashed, gray Infiniti and flee on foot towards a line of cars stopped at a traffic light. *See* Davis Dep. 39:12-20, 66:7-17 (**Ex. F**); Anderl Aff. ¶ 7 (**Ex. J**).

19. All of the African American male subjects surrounded an red, occupied vehicle that was stopped at the intersection of 159th Street and Kedzie Avenue and attempted to gain entry by banging on the windows and pulling on the driver's and passenger's side door handles. *See* Anderl Dep. 54:19-56:19 (**Ex. K**); Davis Dep. 40:17-41:4 (**Ex. F**).

20. Officer Anderl exited his squad car and verbally ordered the suspects to "get on the ground." Anderl Dep. 55:11-17, 57:7-9 (**Ex. K**).

21. The African American male suspects did not follow Officer Anderl's commands and all ran from the first red vehicle to a second red vehicle that was also occupied and stopped at the intersection's traffic light. *Id.* at 55:15-17, 56:1-3, 57:8-11.

22. Officers Carson, Davis and Anderl witnessed the four or five African American male suspects try to gain entry to the second red vehicle, with one suspect on the hood, while the others were pulling on the driver's and passenger's side door handles. *Id.* at 56:21-57:1, 57:12-21; Davis Dep. 40:17-41:4 (**Ex. F**); Carson Dep. 64:5-23, 65:19-22, 65:24-66:8, 66:13-23 (**Ex. H**).

23. Officer Davis believed the suspects were attempting to "carjack," or highjack, the vehicles stopped at the red light. *See* Davis Dep. 66:24-67:8 (**Ex. F**).

24. Officer Anderl ran towards the second red vehicle and made several verbal orders for the suspects to get down to the ground. *See* Anderl Dep. 58:10-15 (**Ex. K**); Anderl Aff. ¶ 10 (**Ex. J**).

25. Two of the African American male suspects suspended their efforts to gain entry into the second vehicle and fled towards the White Castle situated on the southwest corner of the intersection. *See* Anderl Dep. 58:15-17, 59:8-11 (**Ex. K**).

26. Officer Anderl was concerned that the suspects who were still trying to gain access to the red vehicle would become violent and was concerned about the safety of the driver of the red vehicle. *Id.* at 59:24-60:19.

27. Notwithstanding, he decided to pursue the two fleeing suspects on foot toward Sawyer Avenue while giving several verbal commands to "stop running." *See* Anderl Aff. ¶ 12 (**Ex. J**).

28. The other two or three African American male suspects continued their efforts to gain entry to the second red vehicle, and at least one suspect was able to open the rear passenger side door. *See* Carson Dep. 68:4-12 (**Ex. H**).

29. The driver of the red vehicle was driving his car forward and in reverse in an attempt to get the suspects off his vehicle. *Id.* at 66:23-67:3, 69:2-4.

30. Officer Carson gave verbal orders to "stop," but no one complied with his commands. *Id.* at 69:2-8.

31. The red vehicle began driving in reverse towards the direction that Officer Davis was approaching from, and Officer Davis feared he was going to be run over. *See* Davis Dep. 42:20-22, 68:7-16 (**Ex. F**).

32. Officer Davis discharged his firearm at the rear, driver's side tire of the red vehicle in an unsuccessful attempt to disable the vehicle, as well as to protect himself from being run over. *Id.* at 42:18-43:2, 68:7-16.

33. Next, Officer Davis ran around to the front of the red vehicle, saw Officer Anderl running after two of the fleeing suspects and heard a gunshot, the source of which was unknown to him. *Id.* at 43:21-24.

34. Officer Davis ran back to his squad car with the intent of driving to assist Anderl in his pursuit of the two fleeing suspect. *Id.* at 43:20-44:6.

5

35. At this time, Officer Carson was positioned approximately ten to twelve feet away from the rear driver's side of the red vehicle and could see the three suspects that were trying to gain entry to vehicle through the passenger side doors. *See* Carson Dep. 69:20-70:1, 71:3-20 (**Ex. H**).

36. Officer Carson heard one or two gunshots coming from the passenger side of the red vehicle where three suspects were still attempting to gain entry. *Id.* at 69:9-19, 70:15-71:2.

37. Officer Carson ordered the suspects to "stop," "freeze," and, "get on the ground," but the suspects remained noncompliant. *Id.* at 74:11-14.

38. Officer Carson believed the suspects posed a threat to the lives of the driver of the red vehicle, other innocent bystanders in the area and his fellow officers. *Id.* at 72:10-14, 75:7-13.

39. Officer Carson discharged his weapon one or two times, aiming at the three African American male suspects who were still attempting to gain entry to the red vehicle. *Id.* at 73:19-74:7, 75:20-24.

40. While driving to assist Officer Anderl, Officer Davis passed a police officer from another precinct kneeling down beside one of the suspects, who was lying on the ground. *See* Davis Dep. 44:9-23 (**Ex. F**).

41. The unknown officer said "I've got him," and waved Officer Davis on. *Id.* at 44:23-45:2.

42. Officer Carson also saw one of suspects laying on the ground, went to check on the suspect and witnessed a police officer from another precinct putting the suspect in handcuffs. *See* Carson Dep. 82:23-83:1, 91:3-15, 92:14-21 (**Ex. H**).

43. The unknown officer said "I got him, go ahead," and Officer Carson ran to assist Officer Anderl in his pursuit of the two fleeing suspects. *Id.* at 83:2-6, 91:6-15, 92:14-21.

44. Following a pursuit that involved the efforts of Officers Anderl, Jackson, Davis and Carson, the Markham Police apprehended the two fleeing suspect, later identified as Beecham and Welsh. *See* Anderl Aff. ¶¶ 12, 16-23 (**Ex. J**).

45. Officer Anderl identified Beecham as one of the two African American suspects that jumped into the back of the gray Infiniti at Rent-A-Center with a TV in his hands. *See* Anderl Dep. 83:17-20, 84:2-3 (**Ex. K**).

46. After apprehending Beecham and Welsh, Officer Anderl returned to the intersection and saw an ambulance, a suspect on the ground and a City of Harvey police officer with the suspect. *Id.* at 65:10-66:2.

## II. Facts Specific to Sims Being Stuck by a Bullet

47. On April 24, 2014, Sims was struck by a single bullet in the back of his forearm. *See* Sims Dep. 31:4-18 (**Ex. B**); First Am. Compl. ¶¶ 29 & 34 (**Ex. A**).

48. Prior to being struck by a bullet, Sims heard police officers order him to "stop" and/or "freeze." *See* Pl. Rule 36 Resp. No. 39 (**Ex. E**).

49. At the moment Sims was struck by a bullet, Sims was running away and was not facing the direction of the person who shot him. *Id.* at Nos. 40 & 48; Sims Dep. 18:9-13, 18:17-20 (**Ex. B**).

50. At the moment Sims was struck by a bullet, Sims does not know how far away he was from the person who shot him. *See* Sims Dep. 42:4-7 (**Ex. B**).

51. After being struck by a bullet, Sims fell to the ground, looked back, and saw an "officer with his hands up." *Id.* at 18:2-3, 15-16, 25:11-14.

52. After Sims was struck by a bullet, he was apprehended and taken by ambulance to Ingalls Memorial Hospital for emergency room treatment. *Id.* at 30:2-12; First Am. Compl. ¶ 33 (**Ex. A**).

7

53. On April 24, 2014, Sims did not see Officer Carson or Officer Davis shoot him. *Id.* at 24:6-25-14 (further testifying he does not know Officer Carson's or Officer's Davis race, height or weight).

54. On April 24, 2014, Officer Anderl did not witness Officer Carson or Officer Davis discharge their firearms, nor did he witness any Markham Police Officer shoot Sims. *See* Anderl Aff. ¶¶ 26-27 (**Ex. J**).

55. On April 24, 2014, Officer Jackson did not witness Officer Carson or Officer Davis discharge their firearms, nor did he witness any Markham Police Officer shoot Sims. *See* Jackson Aff. ¶¶ 6-7 (**Ex. L**).

### III. Facts Regarding Subsequent, Material Events

56. When Sergeant Jones arrived on scene and learned that Markham Police Officers had discharged their weapons, he contacted the Illinois State Police Crime Scene Services Unit and requested the assistance of the Public Integrity Task Force. *See* Jones Aff. ¶ 13 (**Ex. O**).

57. Representatives from both of these entities subsequently arrived to conduct an independent investigation into the Markham Police Officers' discharge of their weapons. *Id.*

58. Pursuant to Markham's standard procedure in officer-involved shootings, Officers Carson and Davis were required to surrender their firearms to investigators. *See* Carson Dep. 108:24-109:24 (**Ex. H**); Jones Dep. 82:12-16 (**Ex. N**).

59. On or about April 4, 2017, the Public Integrity Task Force advised the Markham Police Department that the Cook County State's Attorney's Office had completed its review of the officer-involved shooting on April 24, 2014, involving Officers Davis and Carson, and found no conduct by the Officers that would give rise to criminal charges against the Officers or any other police personnel related to the shooting. *See* ASA and Task Force Declination Letters (**Ex. P**).

60. As a result of the occurrences on April 24, 2014, Sims was charged with Burglary, 750 ILCS 5/19-1(a); two counts of Criminal Damage to Property, 720 ILCS 5/21-1(1)(a); Attempted Vehicular Hijacking, 720 ILCS 5/8-4(18-3(a)); Aggravated Vehicular Hijacking, 750 ILCS 5/18-4(a)(1); and two counts of Aggravated Kidnapping, 750 ILCS 5/10-2(a)(3), and is currently incarcerated at the Cook County Department of Corrections while he awaits trial. *See* Pl. Ans. Interrog. Nos. 2, 8 & 27 (**Ex. C**).

IV. **Facts Regarding the Markham Police Department's Policies and Procedures**

61. Markham's policies and procedures incorporate the Illinois statute governing use of deadly force. *See* Markham's Gen. Order (**Ex. R**); Walker Dep. 111:12-16, 112:15-18, 114:22-115:1. (**Ex. Q**).

62. Markham Officers receive a copy of Markham's policies and procedures when they get hired. *See* Carson Dep. 15:6-9 (**Ex. H**); Davis Dep. 14:7-18 (**Ex. F**).

63. The Markham Police Department is a member of the Police Law Institute, which requires that every Markham Officer receive monthly training recorded with the State of Illinois. *See* Walker Dep. 28:12-21 (**Ex. Q**).

64. Markham Officers also receive field training, which is provided by a field training officer. *See* Walker Dep. 11:24-12:5 (**Ex. Q**); Carson Dep 12:23-13:16 (**Ex. H**); Davis Dep. 12:24-13:2 (**Ex. F**).

65. Upon hire, Markham Officers have a twelve (12) month probationary period. *See* Walker Dep. 26:13-18 (**Ex. Q**); Davis Dep. 12:13-16, 21-23 (**Ex. F**); Carson Dep. 13:24-14:5 (**Ex. H**).

66. Markham Officers are required to keep current on all policies, procedures and general orders; a current version of the policies and procedures is maintained in the Markham Police

9

Station and is available to all Markham Officers. *See* Carson Dep. 15:6-16:2 (**Ex. H**); Davis Dep. 15:9-14, 14:19-21 (**Ex. F**); Walker Dep. 53:3-6 (**Ex. Q**).

67. Markham Officers receive firearm training on various topics, including how to load, aim and discharge a firearm. *See* Carson Dep. 31:17-32:9 (**Ex. H**); Davis Dep. 20:9-21:16, 21:22-22:10 (**Ex. F**).

68. Markham Officers must satisfy yearly qualifications to carry a firearm. *See* Walker Dep. 69:4-20 (**Ex. Q**); Carson Dep. 32:10-19 (**Ex. H**).

69. Pursuant to Markham's Use of Force policy in place on April 24, 2014, a "reasonable belief" is defined as follows: "When facts/circumstances an officer knows or should know are such as to cause an ordinary prudent person to act or think in a similar way under similar circumstances." *See* Markham's Gen. Order (**Ex. R**).

70. Pursuant to General Order 1.3.1: Use of Force: "Sworn officers, acting under the authority granted in the 720 ILCS 5/7-5, will only use the amount and degree of force reasonably believed necessary, based upon the totality of circumstances as reasonably perceived by the officer at that time, to accomplish lawful objectives." *Id.*

71. Pursuant to General Order 1.3.2: Deadly Force:

The Markham Police Department places its highest value on the life and safety of its officers and the public. The department's policies, rules and procedures are designed to ensure that this value guides police officer's use of firearms.

The citizens of Markham have vested in their police officers the power to carry and use firearms in the exercise of their service to society. This power is based on trust and therefore, must be balanced by a system of accountability. The serious consequences of the use of firearms by police officers necessitate the specification of limits for officer's discretion; there is often no appeal from an officer's decision to use a firearm. Therefore it is imperative that every effort be made to ensure that such use is not only legally warranted but also rational and humane.

The basic responsibility of police officers to protect life also requires that they exhaust all other reasonable means for apprehension and control before resorting to the use of firearms. Police officers are equipped with firearms as a means of last resort to protect themselves and others from the immediate threat of death or serious bodily injury.

>Even though all officers must be prepared to use their firearms when necessary, the utmost restraint must be exercised in their use. Consequently, no officer will be disciplined for discharging a firearm in self-defense or in defense of another when faced with a situation that immediately threatens life or serious bodily injury. Just as important, no officer will be disciplined for not discharging a firearm if that discharge might threaten the life or safety of an innocent person, or if the discharge is not clearly warranted by the policy and rules of the department.
>
>Above all, this department values the safety of its employees and the public. Likewise it believes that police officers should use firearms with a high degree or restraint. Officer's use of firearms, therefore, shall never be considered routine and is permissible only in defense of life and then only after all alternative means have been exhausted.
>
>Officers will exhaust all reasonable, available means before resorting to the use of deadly force but may initially utilize deadly force as deemed reasonable by the individual circumstances of an incident. When deadly force is justified, officers will, when practical, give a verbal warning. (Example "Police Officer, Halt")
>
>This General Order pertains to internal use only and does not enlarge an officer's civil or criminal liability in anyway. It should not be construed as the creation of a higher standard of safety or care in an evidentiary sense with respect to any claims.

*Id.*

>72. Pursuant to General Order 1.3.3: Rules Regarding the Use of Deadly Force:
>…
>Rule 1: Police officers shall not discharge their firearms except to protect themselves or another person from imminent death or serious bodily injury.
>
>Rule 2: Police officers shall discharge their firearms only when doing so will not endanger innocent persons.
>
>Rule 3: Police officers shall not discharge their firearms to threaten or subdue persons whose actions are destructive to property or injurious to them but which do not represent an imminent threat of death or serious bodily injury to the officer or others.
>
>Rule 4: Police officers shall not discharge their firearms to subdue an escaping suspect who presents no imminent threat of death or serious bodily injury.
>
>Rule 5: Police officers shall not discharge their weapons at a moving vehicle unless it is absolutely necessary to do so to protect against an imminent threat to the life of the officer or others.
>
>Rule 6: Police officers when confronting an oncoming vehicle shall attempt to move out of the path, if possible, rather than discharge their firearms at the oncoming vehicle.

> Rule 7: Police officers shall not intentionally place themselves in the path of an oncoming vehicle and attempt to disable the vehicle by discharging their firearms.
>
> Rule 8: Police officers shall not discharge their firearms at a fleeing vehicle or its driver.
>
> Rule 9: Police officers shall not fire warning shots.
>
> Rule 10: Police officers shall not draw or display their firearms unless there is a threat or probable cause to believe there is a threat to life, or for inspection.

*Id.*

73. Pursuant to General Order 1.3.4: Prohibited Shooting: "Warning shots will **NOT** be fired. **NO** shots will be fired from or at moving vehicles unless the situation becomes one of the immediate defense of human life." *Id.*

74. Pursuant to General Order 1.3.5: Less Lethal Weapons:
> …
> D. "Use of Force Continuum", starting with verbal commands and progressing to hand control, O/C spray, Taser, baton, and deadly force, is to be utilized, when necessary, to perform any authorized police action. Officers may begin the application of force at any level of the continuum deemed reasonable by the individual circumstances of the individual incident and may move higher in the continuum when it becomes necessary in the continuum to gain control of a suspect in the performance of their duties.

*Id.*

75. Pursuant to Markham's Use of Force policy, Markham Officers shall not discharge their firearms except to protect themselves or another person from imminent death or serious bodily injury. *See* Markham's Gen. Order (**Ex. R**); *See also* Carson Dep. 40:5-13 (**Ex. H**); Davis Dep. 25:18-26:2 (**Ex. F**); Walker Dep. 115:2-16 (**Ex. Q**).

76. Markham Officers may shoot at a moving vehicle if the officer's life or anyone else's life is in danger. *See* Davis Dep. 56:12-17 (**Ex. F)**; Markham's Gen. Order (**Ex. R**).

77. Officer Carson is not aware of any citizen complaints being filed against him since becoming a sworn officer for the City of Markham. *See* Carson Dep. 17:4-6 (**Ex. H**).

78. Other than the subject incident, Officer Carson has never discharged his firearm while on duty as a Markham Police Officer. Carson Dep. 47:9-20 (**Ex. H**).

Respectfully submitted,

/s/Danessa P. Watkins
*One of Defendants' Attorneys*

Stepfon R. Smith (ARDC #6282135)
Danessa P. Watkins (ARDC #6314234)
SMITHAMUNDSEN LLC
150 North Michigan Avenue
Suite 3300
Chicago, Illinois 60601
(312) 894-3200
ssmith@salawus.com
dwatkins@salawus.com

**Attorneys for Defendants**