### Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DARREN SIMS,           )
    Plaintiff,         )
    vs.                ) No. 1:16 CV 2961
CITY OF MARKHAM, a     )
municipal corporation; )
OFFICER CARSON (#552)  )
and OFFICER DAVIS      )
(#510), in their       )
individual capacity,   )
    Defendants.        )

The deposition of OFFICER RAMON DAVIS, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before GINA M. SYLVESTER at 321 North Clark Avenue, Chicago, Illinois, on the 23rd day of January, 2017, at the hour of 2:18 p.m.

Reported by: GINA M. SYLVESTER
License No: 084-004856

### Page 2

APPEARANCES:

ROMANUCCI & BLADIN, LLC, by
MS. BHAVANI RAVEENDRAN
321 North Clark Street
Suite 900
Chicago, Illinois 60654
(312) 253-8606
braveendran@rblaw.net

    Representing the Plaintiff;

SMITH & AMUNDSEN, by
MR. STEPFON R. SMITH
150 North Michigan Avenue
Suite 3300
Chicago, Illinois 60601-7524
(312) 894-3395
ssmith@salawus.com

    Representing the Defendants.

### Page 3

I N D E X
WITNESS                    EXAMINATION
OFFICER RAMON DAVIS
  BY MS. RAVEENDRAN ............04
  BY MR. SMITH ................65
  BY MS. RAVEENDRAN ...........70
  BY MR. SMITH ................71

E X H I B I T S
NUMBER                     MARKED

Exhibit No. 1 ...............60

### Page 4

        (Whereupon, the witness was duly sworn.)
        OFFICER RAMON DAVIS, having been first duly sworn, was examined and testified as follows:
        EXAMINATION
BY MS. RAVEENDRAN:
    Q.  Let the record reflect that this discovery deposition is being taken pursuant to notice and in accordance of the Federal Rules of Civil Procedure and applicable local rules.
        My name is Bhavani Raveendran. I represent the plaintiff in Sims versus the City of Markham which is filed in the Northern District of Illinois Federal Court.
        Can you spell your full name for the record please.
    A.  Sure. Ramon, R-A-M-O-N, middle name Bernard, B-E-R-N-A-R-D, Davis, D-A-V-I-S.
    Q.  Have you ever been known by any other name?
    A.  No.
    Q.  Have you ever given a deposition before today?



**Page 9**

1  A. Illinois.
2     Dixmoor Police Department, Dixmoor,
3  Illinois. The University of Chicago.
4  Q. Anywhere else?
5  A. Cook County Forest Preserve District,
6  and Markham.
7  Q. And you're currently retired; is that
8  right?
9  A. Yes.
10 Q. Did you retire from Markham Police
11 Department?
12 A. Yes.
13 Q. Did you work at the Cook County Forest
14 Preserve District before Markham?
15 A. Yes.
16 Q. Was that generally in order the way you
17 relayed it to us?
18 A. Yes.
19 Q. Fair to say your position with the
20 Phoenix Police Department was your first
21 position as a police officer?
22 A. That's correct.
23 Q. Did you work in any capacity with
24 police departments before you were an officer

**Page 10**

1  with the Phoenix Police Department?
2  A. No.
3  Q. In all of the police departments you
4  worked for, were you always a police officer?
5  A. Yes.
6  Q. Did you have a higher rank in any of
7  those departments?
8  A. Yes. I was a sergeant in Dixmoor.
9  Q. How long were you in the Dixmoor Police
10 Department?
11 A. Four and a half years.
12 Q. How long were you at the Phoenix Police
13 Department?
14 A. About four and a half years.
15 Q. University of Chicago Police
16 Department?
17 A. About two, give or take a minute.
18 Q. How long were you at the Cook County
19 Forest Preserve District?
20 A. I just worked for them for a summer.
21 Q. Were you required to attend the police
22 academy when you first started working with the
23 Phoenix Police Department?
24 A. No.

**Page 11**

1  Q. Have you ever attended the police
2  academy?
3  A. Yes.
4  Q. When was that?
5  A. 1986, Cook County Sheriff's Police
6  Academy.
7  Q. Where were you employed in 1986?
8  A. Dixmoor.
9  Q. How long were you with the Markham
10 Police Department?
11 A. A little over 24 years.
12 Q. Do you have any military background?
13 A. No.
14 Q. Do you have any experience working for
15 security forces other than police departments?
16 A. When you say security forces --
17 Q. Let me rephrase it.
18    Have you ever been in private security?
19 A. Yeah. I worked a detail at a couple of
20 high schools, so I guess that would be
21 considered private security.
22 Q. When you worked details for high
23 schools, were you employed as a police officer?
24 A. Yes.

**Page 12**

1  Q. And you're not currently employed with
2  the City of Markham, is that right?
3  A. That's correct.
4  Q. When did you retire?
5  A. I believe my official date was June of
6  2016.
7  Q. What was your star number with the City
8  of Markham before you retired?
9  A. 510.
10 Q. Do you recall your date of hire with
11 the City of Markham?
12 A. January 17th, 1992.
13 Q. Do you recall if you had a probationary
14 period when you started working with the City of
15 Markham?
16 A. Yes.
17 Q. Were you sent, again, to the police
18 academy when you started working with the City
19 of Markham?
20 A. No.
21 Q. What did the probationary period
22 consist of?
23 A. It was a year probation.
24 Q. Did you receive field training during

1 that year?
2  A. I'm sure I did.
3  Q. Do you recall if you received any other
4 training during your probationary period?
5  A. No.
6  Q. Do you have any or did you hold any
7 certificates or specializations while you were
8 employed with the Markham Police Department?
9  A. No.
10  Q. What rank did you retire at?
11  A. Patrolman.
12  Q. When you finished your probationary
13 period with the City of Markham Police
14 Department, did you become a fully sworn member?
15 Maybe you became a fully sworn member before the
16 probation period?
17  A. Yes.
18  Q. So just for the record, let me ask you
19 again.
20      Did you become a fully sworn member of
21 the City of Markham Police Department before the
22 probationary period?
23  A. Yes.
24  Q. At the end of your probationary period,

13

1 was there any ceremony or anything to indicate
2 you were a fully trained officer?
3  A. No.
4  Q. Would you agree that you were a fully
5 trained officer at that point?
6  A. Yes.
7  Q. When you became a member of the police
8 department, were you given any policies,
9 procedures, or general orders to review?
10  A. Yes.
11  Q. Were you given a copy of the policies,
12 procedures, and general orders of the Markham
13 Police Department to keep for yourself?
14  A. Yes.
15  Q. How were they kept? So as a way of
16 explanation, I'll reask the question. Were they
17 in book form? Were they digital?
18  A. Digital.
19  Q. Were you able to access them from the
20 police station?
21  A. Yes.
22  Q. Were you able to access them from a
23 squad car?
24  A. Me, no.

14

1  Q. Was there any requirement for you to
2 keep current on policies, procedures, and
3 general orders?
4    MR. SMITH: Objection.
5    MS. RAVEENDRAN: Do you want me to clarify
6 the question?
7    MR. SMITH: Could you, please?
8 BY MS. RAVEENDRAN:
9  Q. After you became a member of the
10 Markham Police Department, was there any
11 requirement that if new policies, procedures,
12 and general orders came through, you were to
13 keep current on them?
14  A. Yes.
15  Q. Do you recall if new -- strike that.
16    How would you keep current on the new
17 policies, procedures, and general orders?
18  A. Routinely, the supervisor of the shift
19 would read any new directives at roll call.
20  Q. While working as a Markham City Police
21 Department employee, did you ever have an
22 occasion to review any policies, procedures, or
23 general orders -- strike that.
24    Have you ever had a complaint lodged

15

1 against you for something that you did as a
2 Markham police officer?
3  A. I'm sure I probably did.
4  Q. Any that you recall?
5  A. No.
6  Q. Did you, yourself, as a Markham police
7 officer ever file a complaint or a grievance
8 against another member of the Markham City
9 Police Department?
10  A. Yes.
11  Q. Can you briefly tell me what that was
12 about?
13  A. I was a union steward. And so I filed
14 grievances for different officers and myself.
15  Q. Did you ever file a grievance on your
16 own behalf regarding another officer's display
17 of excessive force?
18  A. No.
19  Q. Did you ever assist another officer in
20 your position as union steward to file a
21 grievance regarding another officer's use of
22 force?
23  A. No.
24  Q. During your time at the Markham Police

16

**Page 17**

1  Department, do you ever recall hearing of an
2  officer being disciplined for use of force?
3      A.  Not that I can recall.
4      Q.  During your time at the Markham City
5  Police Department, did you ever recall hearing
6  of an investigation into an officer's use of
7  force?
8      A.  Not that I recall.
9      Q.  During your time at the Markham City
10 Police Department, do you ever recall hearing of
11 an officer being placed on administrative leave
12 for using deadly force?
13     A.  Not that I recall.
14     Q.  Have you ever witnessed another police
15 officer at the Markham City Police Department
16 using what you would regard as excessive force?
17     A.  No.
18     Q.  During your time at the Markham City
19 Police Department, did you ever hear of an
20 officer being fired or let go because of the use
21 of force?
22     A.  No, not that I recall.
23     Q.  While you were at the Markham City
24 Police Department, did you have a partner?

**Page 18**

1      A.  Rarely.
2      Q.  Did you ever have an assigned squad
3  vehicle?
4      A.  Yes.
5      Q.  When you used your assigned squad
6  vehicle, would you be in the vehicle alone?
7      A.  The majority of the time, yes.
8      Q.  Did you ever have occasion to work with
9  Officer Carson?
10     A.  Yes.
11     Q.  In what capacity would you work with
12 Officer Carson?
13     A.  We were on the same shift quite often.
14     Q.  Do you have any knowledge of Officer
15 Carson being disciplined or reprimanded for a
16 use of force?
17     A.  No.
18     Q.  Have you, yourself, ever been placed on
19 administrative leave from the City of Markham
20 Police Department?
21     A.  No.
22     Q.  In your experience as a retired Markham
23 police officer, were you ever required to
24 provide medical aid to a suspect in any

**Page 19**

1  capacity?
2      A.  Yes.
3      Q.  When would you be required to provide
4  medical aid?
5      A.  Well, if someone was injured, you would
6  call for an ambulance.
7      Q.  Is that if someone complained of an
8  injury?
9      A.  Yes.
10     Q.  Is that also if you observed an injury?
11     A.  Yes.
12     Q.  Would that also include any injuries
13 that were caused by actions of the Markham
14 police officer?
15     A.  Yes.
16     Q.  If a subject or a suspect has been
17 injured, would that change anything about the
18 way a Markham police officer is required to
19 interact with the subject, as far as you know?
20     A.  I don't quite understand what you're
21 asking.
22     Q.  That's fine.  I can ask it better.
23     A.  All right.
24     Q.  If as a Markham police officer you

**Page 20**

1  encounter a subject or a suspect who requires
2  medical aid, does that change the way, in your
3  experience, you would deal with that person?
4      A.  No.
5      Q.  And in your experience, if a person was
6  injured but the arrest still required someone to
7  be handcuffed, would they still be handcuffed?
8      A.  Yes.
9      Q.  As a Markham police officer, were you
10 trained in the use of firearms?
11     A.  Yes.
12     Q.  Were you trained when you can use a
13 firearm?
14     A.  Yes.
15     Q.  And how you can use a firearm?
16     A.  Yes.
17     Q.  This is going to sound like a silly
18 question, but did that include aiming the
19 firearm and target practice?  That kind of
20 thing?
21     A.  Yes.
22     Q.  Can you describe to me what kind of
23 training you received in the actual use and
24 shooting of the firearm?

**Page 21**

1 A. We go to a gun range, fire at targets.
2 We practice standing behind shielded barricades,
3 shooting with your left hand, shooting with your
4 right hand, reloading the weapon.
5 Q. Would those sessions be taught to you
6 by a sergeant or someone like that?
7 A. Yes.
8 Q. Who would generally conduct those
9 sessions?
10 A. We had quite a few range instructors
11 there.
12 Q. I don't need names. I'm just asking
13 the general rank. Was it sergeants? Was it
14 training officers?
15 A. Patrolmen, sergeants, lieutenants,
16 deputy chief.
17 Q. Were you required to be CLEET certified
18 to use a firearm or to have your firearm CLEET
19 certified?
20 A. I'm not familiar with the term.
21 Q. I'm not either.
22 So generally speaking, have you been
23 trained to shoot with accuracy?
24 A. Yes.

**Page 22**

1 Q. Would you say that shooting a firearm
2 with accuracy is important?
3 A. Yes.
4 Q. Why is that?
5 A. You need to know where the bullet is
6 going when you pull the trigger.
7 Q. Would you say that you've been trained
8 to generally try to hit the target of the shots
9 that you're taking?
10 A. Yes.
11 Q. In your training using firearms with
12 the Markham Police Department, have you ever
13 been trained or taught if warning shots are
14 allowed?
15 A. Yes.
16 Q. Are warning shots allowed from your
17 experience?
18 A. No.
19 Q. Have you ever been trained during your
20 training and experience with the Markham Police
21 Department to discharge a firearm just to injure
22 a subject?
23 A. No.
24 Q. Have you been trained to discharge a

**Page 23**

1 firearm until a threat had been stopped?
2 A. I would say yes.
3 Q. In your training with your firearms
4 training with the Markham Police Department, was
5 there a particular part of the body where you
6 would be aiming at the subject that you had been
7 trained to focus on?
8 A. Center mass.
9 Q. What does center mass mean?
10 A. The torso. The area between the
11 shoulders and the stomach.
12 Q. Do you know why you've been trained to
13 aim at center mass?
14 A. Usually it's the widest target.
15 Q. Does aiming at center mass have
16 anything to do with it being the easiest way to
17 stop a target?
18 A. That sounds reasonable.
19 Q. So I'm really asking, are you being
20 trained to shoot an area of the body because
21 that's the easiest way or the quickest way to
22 stop a threat?
23 A. Yes.
24 Q. Before April 24th, 2014, had you ever

**Page 24**

1 discharged a weapon while on duty as a Markham
2 police officer?
3 A. Yes.
4 Q. Before May 24th, 2014, how many times
5 had you discharged your weapon as a Markham
6 police officer?
7 A. Maybe four, five times.
8 Q. On the four or five times before
9 May 24th, 2014 where you had to discharge a
10 weapon as a Markham police officer, did you ever
11 hit a target or a person?
12 A. A target. Yes.
13 Q. So in those four or five times you were
14 required to discharge your weapon as a Markham
15 police officer, you've never had occasion to hit
16 a person or a suspect?
17 A. No.
18 Q. So would it be fair to say that the
19 four or five times you've discharged a weapon at
20 the Markham Police Department before May, 24th,
21 2014, you were shooting at a target?
22 A. What I would have been discharging my
23 weapon at would have been injured animals.
24 Q. While you were at the Markham City



**Page 25**

1  Police Department, did you ever receive training
2  specifically on the use of force?
3      A.  Yes.
4      Q.  How often would you receive that
5  training?
6      A.  I couldn't give you an exact number.
7      Q.  Was it more than once?
8      A.  I'm sure it was.
9      Q.  Do you know if it was once a year?
10     A.  I can say I'm sure that once I had that
11 review.
12     Q.  Do you remember about when?  And if you
13 can just even tell me if it was the early part
14 of your career at Markham Police Department or
15 the latter part or anything that you remember.
16     A.  It would have been probably toward the
17 latter part of my career.
18     Q.  Do you remember, generally speaking,
19 when force was allowed to be used by a Markham
20 Police Department officer?
21     A.  If your life is in danger or the life
22 of a citizen.
23     Q.  Did that include the use of a gun?
24     A.  Yes.  Or also in the case of any

**Page 26**

1  forcible felony where some citizen's life might
2  be in jeopardy.
3      Q.  Are you currently employed?
4      A.  Yes.
5      Q.  How are you currently employed?
6      A.  I'm a liaison officer for Rich Central
7  Township.
8      Q.  What does a liaison do?
9      A.  It's a glorified name for a security
10 officer.
11     Q.  How long have you been in that
12 position?
13     A.  I've worked for them about nine years.
14     Q.  Fair to say you were working for Rich
15 Central Township simultaneously, at least in
16 part, with your Markham Police Department
17 duties?
18     A.  Yes.
19     Q.  And you've just continued with Rich
20 Central Township?
21     A.  That's correct.
22     Q.  Are there any other positions that you
23 hold now?
24     A.  No.

**Page 27**

1      Q.  Would I be correct to say, assume that
2  on -- strike that.
3          After May 24th, 2014, were you ever
4  required to use or discharge a weapon as a
5  Markham City Police Department officer?
6      A.  No.
7      Q.  Would I be correct that on May 24th,
8  2014, you were an officer with the Markham City
9  Police Department?
10     A.  Yes.
11     Q.  Do you recall where you were assigned
12 on May 24th, 2015?
13     A.  I believe I was Unit 386.
14     Q.  Is there more than one police
15 department office for the Markham City Police
16 Department?
17     A.  No.
18     Q.  So you would have been assigned out of
19 the main department?
20     A.  Yes.
21     Q.  How many other officers were on 386
22 with you?
23     A.  Just me.
24     Q.  Do you mean that was your police

**Page 28**

1  unit?  386?
2      A.  That was my area of patrol.
3      Q.  Do you know what shift you were working
4  around that time?
5      A.  Midnights.
6      Q.  So do you know how many other officers
7  would have been assigned to midnights with you?
8      A.  There were four.
9      Q.  It's okay if you don't know this, but
10 in your estimation, how big is the Markham
11 Police Department?
12     A.  I think we probably had about 45 people
13 at the time.  I'll say between 40 and 50.
14     Q.  When you were working midnights and you
15 say that there may have been four other officers
16 working at the time, does that include
17 sergeants --
18     A.  No.
19     Q.  -- or higher ranked officers?
20     A.  It would have been three other officers
21 besides me.
22     Q.  How long were you assigned to Unit 386?
23     A.  For that night.
24     Q.  Just for that night?



**Page 33**

1  Q. Do you know if 3069 West 159th Street
2  is within Zone 386?
3  A. I believe that is in the shopping
4  center which would be Zone 385.
5  Q. Do you know if you were in uniform on
6  April 24th, 2014?
7  A. Yes.
8  Q. What did your uniform consist of at the
9  time?
10 A. A blue windbreaker with a badge and
11 patches. My blue uniform with the embroidered
12 badge, gun belt, dark blue pants, dark blue
13 shirt, bulletproof vest, and combat boots.
14 Q. Do you know if you were alone on your
15 shift on April 24th, 2014, in your vehicle?
16 A. Yes.
17 Q. Were you armed?
18 A. Yes.
19 Q. What were you armed with?
20 A. A Beretta 92FS 40 caliber.
21 Q. Did you have a Taser on your belt?
22 A. No.
23 Q. Did you have any pepper spray or
24 OC spray?

**Page 34**

1  A. No.
2  Q. Did you have a baton or anything of
3  that nature?
4  A. No.
5  Q. Did you have a flashlight?
6  A. Yes.
7  Q. Can you describe the flashlight for me?
8  A. It's called a Stinger. It's about four
9  and a half inches long. It takes flashlight
10 batteries. I'm sorry. Not flashlight. Photo
11 batteries. They're the small ones, C-123 or
12 something similar to that.
13 Q. Is there anything else on your duty
14 belt that we haven't discussed?
15 A. Handcuffs, walkie-talkie, additional
16 clips. I believe that's it.
17 Q. And you said before that you were
18 driving; is that right?
19 A. Yes.
20 Q. What kind of vehicle were you driving?
21 A. A Ford Escape.
22 Q. And was that marked with any insignia
23 of the Markham Police Department?
24 A. Yes, fully marked.

**Page 35**

1  Q. Did it have lights on top of it?
2  A. Yes.
3  Q. Were you driving as you patrolled?
4  A. Yes.
5  Q. Do you know the unit number of that
6  vehicle? No one ever knows their unit numbers.
7  It's okay.
8  A. I can't believe I can't remember it.
9  Q. At around 5:42 a.m. on April 24th,
10 2014, did you receive a dispatch call?
11 A. Yes.
12 Q. Do you know where you were when you
13 received the dispatch call?
14 A. Somewhere on Kedzie Avenue.
15 Q. When you say you received a dispatch
16 call, do you know what form it came in? Radio?
17 Cell phone? Anything like that?
18 A. It came over the radio.
19 Q. Who did the call come from?
20 A. I believe the dispatch.
21 Q. Do you know who handles dispatch for
22 Markham Police Department?
23 A. The Markham Police Department.
24 Q. What information were you given in the

**Page 36**

1  dispatch?
2  A. That there were people burglarizing the
3  Rent-A-Center in the shopping center.
4  Q. Would you agree that you were sent to
5  the scene of a property crime?
6  A. Yes.
7  Q. Did you receive any other information
8  from the dispatch?
9  A. I don't recall what else came up.
10 Q. I'll just ask you some specific
11 questions. It's okay if you don't remember,
12 since you've already said that.
13    But do you remember being given a
14 number of suspects, for instance?
15 A. Yes. At some point in time.
16 Q. Do you remember how many?
17 A. Four or five.
18 Q. Do you remember being told if any of
19 those suspects were armed?
20 A. No.
21 Q. Do you remember being told the gender
22 or race or anything distinguishing about the
23 suspects?
24 A. I believe they said they were all male,



**Page 37**

1  blacks.
2     Q. Do you know if you received any
3  information through the dispatch call regarding
4  who the call originally came from or where it
5  originated?
6     A. I don't recall.
7     Q. Do you know if you received any
8  information from the dispatch call regarding any
9  vehicles that may be involved somehow?
10    A. No.
11    Q. Once you received the dispatch call,
12 what did you do in response?
13    A. I started making my way to the shopping
14 center area.
15    Q. Were you under the understanding -- did
16 you have the understanding at that time that
17 other officers were similarly coming towards the
18 same location?
19    A. Yes.
20    Q. How did you know that?
21    A. I'm pretty sure I heard them on the
22 radio.
23    Q. Do you know if you particularly were
24 asked to go to the location of this incident or

**Page 38**

1  if all units were asked to go or anything like
2  that?
3     A. I don't recall if I was specifically
4  told to go.
5     Q. When you responded to the dispatch
6  call, did you activate your overhead lights?
7     A. Yes.
8     Q. Once you activated your lights, did you
9  drive to 3069 West 159th Street?
10    A. I headed in that direction. Yes.
11    Q. Did you arrive to that address?
12    A. No.
13    Q. What happened that you didn't quite
14 arrive to the location?
15    A. There was a traffic accident.
16    Q. Did you see the traffic accident occur?
17    A. Yes.
18    Q. What did you -- well, let's take it
19 back a moment.
20       So you were driving towards 3069 West
21 159th Street; is that correct?
22    A. Yes.
23    Q. And before you got to that location,
24 you observed a traffic accident occur; is that

**Page 39**

1  right?
2     A. Yes.
3     Q. What exactly did you observe?
4     A. I saw a vehicle slam into the back end
5  of a dump truck.
6     Q. What kind of vehicle was it?
7     A. I think it was an Infiniti. I'm not
8  sure.
9     Q. Do you recall what color or if it was a
10 car, SUV?
11    A. No.
12    Q. What happened when the Infiniti slammed
13 into the dump truck?
14    A. I saw four or five male, black subjects
15 exit the vehicle.
16    Q. What happened when the four or five
17 subjects exited the vehicle?
18    A. They ran up to two red vehicles that
19 were stopped in traffic southbound on Kedzie at
20 159th Street.
21    Q. When you say they, do you recall seeing
22 every person from inside the vehicle run towards
23 the red vehicles?
24    A. I can't say if all of them ran that

**Page 40**

1  way. But there were at least three or four of
2  them that ran that way.
3     Q. As these individuals were running
4  towards the red vehicles, did you see any
5  weapons on their persons?
6     A. No, I did not.
7     Q. At any time before you observed the --
8     A. Do you mind if I clear that up a little
9  bit? I will say that I did not see any weapons,
10 but I really couldn't even completely see them.
11    Q. At any time before the traffic
12 accident, did you ever see a white SUV?
13    A. I don't think so.
14    Q. Did you see a vehicle hit a divider in
15 the middle of Kedzie?
16    A. No, I did not see that.
17    Q. When you saw at least three or four
18 individuals approach the two red vehicles
19 stopped in traffic on Kedzie, what did you see
20 after that?
21    A. After they approached them, they were
22 trying to get inside of them.
23    Q. Can you go into more detail about what
24 exactly you observed the individuals doing?



**Page 41**

1  A.  As they approached it, they were prying
2  the door handles and trying and get inside the
3  last vehicle.  Someone apparently got at least
4  one of doors open on the vehicle.
5  Q.  Was it your understanding that that
6  person that got the door open also got into the
7  vehicle and was able to drive off in that
8  vehicle?
9  A.  I have to tell you, I have no idea who
10 got in there.
11 Q.  Was it your understanding that -- well,
12 strike that.  We'll get to that later.
13     When you observed the traffic accident
14 occur and individuals run out of that vehicle
15 that got into the traffic accident, do you
16 remember what doors of the vehicle they were
17 exiting from?
18 A.  The vehicle that was in the accident?
19 Q.  Yes.
20 A.  I can't say with any certainty.  I just
21 know they were all able to get out.
22 Q.  After you observed some individuals
23 near the two red vehicles that were in traffic,
24 what did you next observe?

**Page 42**

1  A.  You mean after they were trying to get
2  into the car?
3  Q.  Yes.
4  A.  Well, then it would get into me pulling
5  up because I'm still approaching as all of this
6  is going on.
7  Q.  So what did you do?  So while this was
8  occurring, you were pulling your vehicle up to
9  the scene of the accident; is that right?
10 A.  No.  I never made it up to where the
11 accident is.  I'm still on Kedzie.
12 Q.  So you're still driving on Kedzie, but
13 you can observe all this occurring in front of
14 you?
15 A.  Yes.
16 Q.  So as you're observing it, how did you
17 respond?
18 A.  I pulled up.  I exited my vehicle.  I
19 started running up toward the red vehicles that
20 were there.  The vehicle in the rear, the one
21 closest to me, had lunged forward and then it
22 came back in my direction.
23 Q.  So what did you do when this rear red
24 vehicle came back in your direction?

**Page 43**

1  A.  I discharged my weapon at the driver's
2  side rear tire.
3  Q.  Then what happened?
4  A.  I ran around the vehicle on the
5  driver's side around to the front, and I saw
6  Officer Anderl running back behind the White
7  Castle.
8  Q.  So when you discharged your weapon at
9  the rear tire -- was it the rear tire?
10 A.  Yes.
11 Q.  What happened to the vehicle?
12 A.  Nothing.
13 Q.  Do you know if your bullet hit the rear
14 wheel of the back red vehicle?
15 A.  No.
16 Q.  Did that vehicle leave the scene at
17 that time?
18 A.  No.
19 Q.  What happened to that vehicle?
20 A.  When I ran around to the front, the
21 vehicle was still there.  When I saw
22 Officer Anderl taking off, I heard a gunshot,
23 another gunshot.  I do not know where it came
24 from, but I did hear another shot.  And I

**Page 44**

1  started running back toward my vehicle again.
2  And I got in my vehicle, and I was on my way to
3  assist Officer Anderl.
4  Q.  So you started to drive your vehicle
5  towards where Officer Anderl was running?
6  A.  Yes.
7  Q.  Did you catch up to Officer Anderl?
8  A.  Eventually, I did.
9  Q.  Did anything happen in between the time
10 you drove your vehicle towards where
11 Officer Anderl was running and when you caught
12 up with Officer Anderl?
13 A.  Yes.
14 Q.  What happened in between that time?
15 A.  There is a little -- a small mall there
16 with three or four stores in it on the northwest
17 corner.  A currency exchange, a loan store, and
18 something else in there.  And I went to pull
19 through there, and I saw there was a male, black
20 subject laying on the ground.  And there was an
21 officer of whom I had no idea who he was or
22 where he came from.  But there was an officer
23 knelt down besides him.  Because I was getting
24 ready to stop, and he waved me on.  He told me,

**Page 45**

1  I've got him. He said, Go catch up with your
2  officer. So I took off.
3      Q. And then where did you go?
4      A. I started going southbound on Sawyer
5  from 159th Street. And I saw Officer Anderl
6  chasing a male, black subject. And he caught
7  him just as I was pulling up. He tackled him
8  and got him handcuffed and put him in the back
9  of my car.
10     Q. Then what happened?
11     A. We started heading back toward the
12 shopping center.
13     Q. When you say we, who are you talking
14 about?
15     A. Well, Officer Anderl is in the car with
16 me now and one of the suspects that had run from
17 the car.
18         So we started heading in the direction
19 of the shopping center. And another officer, I
20 believe it was Officer Carson, said that
21 somebody told him they saw one of the people
22 running towards the back of the muffler shop in
23 the shopping center. So that's where we drove
24 to. So Officer Carson and Officer Anderl

**Page 46**

1  located the other subject hiding in a dumpster
2  behind the muffler shop.
3      Q. Was that suspect apprehended at that
4  point?
5      A. Yes.
6      Q. Was he handcuffed?
7      A. Yes.
8      Q. What was done with that suspect?
9      A. He was placed in the back of my car
10 too.
11     Q. And you were still behind the wheel of
12 the vehicle?
13     A. Yes.
14     Q. Then what occurred?
15     A. Went back to the little center where
16 the suspect was laying on the ground with the
17 other officer. Well, actually, he was just
18 about in the back of the ambulance by the time
19 we got back.
20     Q. Okay. And what happened when you got
21 back there?
22     A. I stood by with the two guys that were
23 in the back of the car. That's pretty much it.
24     Q. Was the other officer who you didn't

**Page 47**

1  know an officer from the Markham Police
2  Department?
3      A. No.
4      Q. Could you tell from his insignia where
5  he was from?
6      A. I have no idea where that officer came
7  from. I was surprised to see him when I turned
8  the corner.
9      Q. Have you ever seen an officer from Oak
10 Forest?
11     A. At the scene out there?
12     Q. No. Just in general.
13         Have you ever seen an Oak Forest police
14 officer?
15     A. Yes.
16     Q. Would you be able to recognize an Oak
17 Forest police officer by his uniform?
18     A. Yes.
19     Q. Have you ever seen an Illinois State
20 Trooper?
21     A. Yes.
22     Q. Would you be able to identify an
23 Illinois State Trooper by their uniform?
24     A. Yes.

**Page 48**

1      Q. Have you even seen a Posen police
2  officer?
3      A. Yes.
4      Q. Would you be able to identify a Posen
5  officer by their uniform?
6      MR. SMITH: Objection; form, foundation as to
7  time.
8      MS. RAVEENDRAN: Noted.
9          You can answer the question.
10     THE WITNESS: What was the last one?
11 BY MS. RAVEENDRAN:
12     Q. If you could recognize a Posen officer.
13     A. Yes.
14     Q. Have you ever seen a Midlothian officer
15 in uniform?
16     A. Yes.
17     Q. Would you be able to recognize a
18 Midlothian officer in uniform?
19     A. Yes.
20     Q. Is there any reason, in your
21 experience, an officer from a police department
22 may be at the scene of an incident and that not
23 be recorded in a police report that the City of
24 Markham produces?

```
 1  Officer Anderl.
 2    Q.  And is that because he was the first
 3  officer to report to the scene of the incident?
 4    A.  Yes.
 5    Q.  Did you have any further responsibility
 6  regarding the two suspects in your vehicle?
 7    A.  No.
 8    Q.  Did you have any further responsibility
 9  regarding the suspect who had been taken in the
10  ambulance?
11    A.  No.
12    Q.  Did you perform any pat downs of the
13  two suspects in your vehicle?
14    A.  No, I did not.
15    Q.  Did you do any inventory of the two
16  suspects in your vehicle?
17    A.  No.
18    Q.  Did you do any inventory of the
19  Infiniti vehicle you had seen get into a car
20  accident?
21    A.  No.
22    Q.  Did you do any follow-up investigation
23  as to the red vehicle that drove at you?
24    A.  No.
                                               53
```

```
 1    Q.  Other than Officer Anderl, who you've
 2  mentioned, and Officer Carson, do you know the
 3  names of any other officers that were at the
 4  scene of that incident with you?
 5    A.  I only know of one other, and he got
 6  there pretty much when everything was over.
 7  That was Jackson.
 8    Q.  Is Officer Jackson a police officer?
 9    A.  Yes.
10    Q.  Did any supervisors come to the scene
11  of the incident?
12    A.  The sergeant detective, I believe.
13    Q.  Do you know who the sergeant detective
14  would have been that night?
15    A.  Jesse Jones.
16    Q.  Did you take any statements from anyone
17  present at the incident?
18    A.  No.
19    Q.  Did you follow up with any witnesses
20  yourself?
21    A.  No.
22    Q.  Did you, yourself, give a statement
23  regarding this incident?
24    A.  Yes.
                                               54
```

```
 1    Q.  When you say you gave a statement, does
 2  that mean you made a police report, or you told
 3  another officer what you had seen or something
 4  like that?
 5    A.  I gave a statement to the State's
 6  Attorney's Office.
 7    Q.  Did you relay what had occurred from
 8  your perspective to Officer Anderl?
 9    A.  No.
10    Q.  Did you speak to Officer Anderl while
11  he was creating reports for this incident?
12    A.  No.
13    Q.  Is that common that reporting officers
14  wouldn't give each other information regarding a
15  common incident they responded to?
16    A.  I would say yes.
17    Q.  Did Officer Anderl -- strike that.
18        So it's your testimony that
19  Officer Anderl did not ask you what you had
20  observed at this incident before writing his
21  police report; is that right?
22    A.  To the best of my recollection, no.
23    Q.  While you were at the scene of
24  incident, did you see any of the other Markham
                                               55
```

```
 1  City police officers take statements from
 2  anyone?
 3    A.  No.
 4    Q.  Do you know if the red vehicle that was
 5  driven at you was ever recovered?
 6    A.  I believe it was.
 7    Q.  Do you know if when that red vehicle
 8  that drove at you was recovered there was any
 9  evidence on the vehicle that you had discharged
10  your weapon at its back tire?
11    A.  That, I don't know.
12    Q.  Do you know if there was any rule,
13  regulation, policy, or general order regarding
14  whether a Markham City police officer can shoot
15  at a moving vehicle?
16    A.  If your life is in danger or the life
17  of someone else.
18    Q.  Were you subject to testing of any kind
19  after this incident of April 24th, 2014?
20    A.  No.
21    Q.  Were you subject to any counseling
22  after this incident on April 24th, 2014?
23    A.  No.
24    Q.  Do you know if the chief of police of
                                               56
```



**Page 57**

1 the City of Markham was notified of the incident
2 that occurred on April 24, 2014?
3     A.  No, I don't know.
4     Q.  Do you know if the Public Integrity
5 Task Force was notified regarding the incident
6 on April 24, 2014?
7     A.  Yes.
8     Q.  How do you know -- or what do you know
9 about that?
10    A.  They came out.
11    Q.  Did you, yourself, inform the Public
12 Integrity Task Force about the incident of
13 April 24th, 2014?
14    A.  No.
15    Q.  Do you know why the Public Integrity
16 Task Force came out?
17    A.  I believe they were called out by --
18 no, I can't answer that.  I don't know who
19 called them.
20    Q.  Do you know why the Public Integrity
21 Task Force would have come to the scene of the
22 incident on April 24th, 2014?
23    MR. SMITH:  Objection; question calls for
24 speculation.

**Page 58**

1     You can answer.
2     THE WITNESS:  I'm assuming because someone
3 had been shot.
4 BY MS. RAVEENDRAN:
5     Q.  Is there any reason the Public
6 Integrity Task Force of the Markham City Police
7 Department would respond to an incident where an
8 unknown officer shot an individual that was not
9 a Markham City Police Officer?
10    MR. SMITH:  Same objection; question calls
11 for speculation.
12        You can answer if you know.
13    THE WITNESS:  The Public Integrity are from
14 the state police, not from Markham.
15    Q.  So as far as you know, they respond if
16 there is any officer shooting?
17    A.  Yes.
18    Q.  Did the Public Integrity Task Force
19 ever contact you regarding the incident of
20 April 24th, 2014?
21    A.  No.
22    Q.  Did you ever complete a discharge of
23 firearms report for the incident on April 24th,
24 2014?

**Page 59**

1     A.  No.
2     Q.  But it is true that you discharged your
3 weapon on April 24, 2014; is that right?
4     A.  That's correct.
5     Q.  Did you ever complete a Use of Force
6 Supplement Report for the incident on
7 April 24th, 2014?
8     A.  No.
9     Q.  Have you ever had occasion to complete
10 a Use of Force Supplemental Report in your work
11 at the Markham City Police Department?
12    A.  No.
13    Q.  Do you know if Officer Carson
14 discharged his weapon on April 24th, 2014, at
15 any time?
16    MR. SMITH:  Objection; question calls for
17 speculation.
18    MS. RAVEENDRAN:  If he doesn't know, he
19 doesn't have to say.
20    MR. SMITH:  Objection; form, foundation.
21        You can answer, if you know.
22    THE WITNESS:  No.  I do not know.
23 BY MS. RAVEENDRAN:
24    Q.  Have you ever talked to Officer Anderl

**Page 60**

1 regarding what happened on April 24th, 2014?
2     A.  No.
3     Q.  Have you ever spoken to Officer Carson
4 regarding what happened on April 24th, 2014?
5     A.  No.
6     MS. RAVEENDRAN:  I'm going to take a short
7 break.
8         (Whereupon, a short break was
9          taken.)
10        (Whereupon, Davis Deposition
11         Exhibit No. 1 was marked for
12         identification.)
13 BY MS. RAVEENDRAN:
14    Q.  I'm going to hand you a copy of what
15 has been marked as Group Exhibit 1.
16        Have you seen those documents before?
17    A.  This looks a little more in depth than
18 the one I saw.
19    Q.  Is that something you recognize?  You
20 can review that before I ask any questions.  But
21 would you agree generally that's the
22 Incident/Offense Report from April 24th, 2014,
23 around 5:44 a.m.?
24    A.  Yes.



**Page 61**

1  Q. And you've reviewed some parts of this
2  before this deposition; is that right?
3  A. Yes.
4  Q. Can you just tell me what you recall
5  reviewing before your dep?
6  A. The reason why this looks so thick is
7  because some of this is doubles. It's the same
8  thing.
9  Q. It should be double sided.
10 A. Yes.
11 Q. So I was asking what part of that you
12 recall reviewing before the deposition.
13 A. The original report.
14 Q. So would that be -- if you look at the
15 bottom right-hand corner, there is 001 to --
16 A. 003. Yeah. And 4. There is nothing
17 on 5 or 6 or 7 or 8 or 9.
18 Q. Nothing that you remember looking at?
19 A. No.
20 Q. If you could turn to page 0030.
21 A. 0003?
22 Q. No. 0030, so 30.
23 A. All right.
24 Q. If you could look at the first

**Page 62**

1  paragraph on 0030 that starts, Reporting
2  investigator.
3      And then if you look at the second to
4  last and third to last sentence of the paragraph
5  starting, Officer Davis informed me.
6      Can you read from there to the bottom
7  of that paragraph out loud for me?
8  A. R/I spoke with Officer R. Davis, #510,
9  and Officer --
10 Q. Oh, no. You don't need to read that
11 much. If you could go down a little bit. The
12 sentence starts, Officer Davis informed me.
13 A. Officer Davis informed me that they had
14 also taken into custody at least three male,
15 black subjects: James L. Beacham, Jr. --
16 Q. You don't have to read the birth date.
17 A. -- Devon Welsh and Darren Sims.
18 Q. And then the next sentence.
19 A. I was informed that Officer Davis,
20 #510, and Officer Carson discharged their
21 weapons during the course of the pursuit, and
22 that Offender Sims was struck in the arm while
23 trying to escape.
24 Q. Thank you. You don't have to read the

**Page 63**

1  rest of it.
2      Can you tell me if you recall giving
3  Officer Anderl this information that you just
4  read?
5  A. Well, this looks like it was written by
6  Detective Jones.
7  Q. I'm not asking if you wrote it. It
8  says Officer Davis informed me. I'm asking did
9  you inform -- well, okay.
10     Did you inform Sergeant Jones of that
11 information?
12 A. I couldn't have informed them of their
13 names because I had no idea who they were. But
14 it's quite possible that all the rest of that
15 came from me.
16 Q. Did you inform Sergeant Jones that you
17 discharged your weapon during the course of the
18 pursuit?
19 A. No.
20 Q. Did you inform Sergeant Jones that
21 Offender Sims was struck in the arm while trying
22 to escape?
23 A. No.
24 Q. Is there any reason that it would be in

**Page 64**

1  this report if you hadn't reported that to
2  Sergeant Jones?
3      MR. SMITH: I'm going to object to form and
4  foundation.
5      MS. RAVEENDRAN: You can still answer the
6  question.
7      THE WITNESS: This particular part of the
8  report, this is the first time I'm seeing this.
9  BY MS. RAVEENDRAN:
10 Q. You can put that aside now.
11     When you shot at the red vehicle that
12 was driving toward you, do you know who the
13 driver was of that vehicle?
14 A. No.
15 Q. And do you know if that was the vehicle
16 that left the scene of the incident?
17 A. Yes.
18 Q. And that was also the red vehicle that
19 was found later having been burned that we
20 discussed earlier?
21 A. To the best of my knowledge, yes.
22     MS. RAVEENDRAN: I don't have anything else
23 right now.
24     MR. SMITH: Okay. Can I talk to my officer



**Page 65**

1 for three minutes?
2 (Whereupon, a short break was
3 taken.)
4 EXAMINATION
5 BY MR. SMITH:
6 Q. Officer Davis, on April 24th, 2014, you
7 were initially called to a burglary; is that
8 correct?
9 A. Yes.
10 Q. And was that a burglary in progress at
11 the Rent-A-Center store at 159th and Kedzie?
12 A. Yes.
13 Q. Do you know the difference between a
14 felony and a misdemeanor?
15 A. Yes.
16 Q. What's the difference between a felony
17 and a misdemeanor?
18 A. Misdemeanor is punishable by less than
19 a year. A felony is more than a year.
20 Q. So the burglary that you were called to
21 at 159th and Kedzie, was that crime -- or the
22 crime scene that you were being called to, would
23 that have been a felony call or a misdemeanor
24 call?

**Page 66**

1 MR. SMITH: Objection to form.
2 THE WITNESS: It would have been a felony.
3 BY MR. SMITH:
4 Q. So a purported felony was taking place;
5 is that correct?
6 A. Yes.
7 Q. Now, you testified earlier that you saw
8 a vehicle, I believe you said an Infiniti, slam
9 into the back of a dump truck; is that correct?
10 A. Yes.
11 Q. What happened again when that Infiniti
12 slammed into the dump truck?
13 A. Four or five male, black subjects
14 exited the vehicle, ran toward two red vehicles
15 that were stopped in traffic on Kedzie Avenue
16 and 159th Street and attempted to gain access
17 inside the vehicles.
18 Q. Now, four male, blacks running from the
19 police trying to gain access to cars on the
20 road, is that a crime?
21 MS. RAVEENDRAN: Objection; mischaracterizes
22 prior testimony, calls for speculation.
23 BY MR. SMITH:
24 Q. Once you saw the four male, blacks

**Page 67**

1 after they exited the Infiniti, were they in the
2 commission of a crime?
3 A. Yes.
4 Q. What crime were they in the commission
5 of?
6 A. They appeared to be attempting to
7 carjack two vehicles that were stopped at the
8 stoplight.
9 Q. Did you notice that these individuals
10 would have had any weapons on them?
11 MS. RAVEENDRAN: Objection; asked and
12 answered.
13 THE WITNESS: I didn't notice any. But they
14 could have.
15 BY MR. SMITH:
16 Q. Is it possible that they had any
17 weapons?
18 MS. RAVEENDRAN: Objection; calls for
19 speculation.
20 THE WITNESS: It's possible.
21 BY MR. SMITH:
22 Q. Now, what was going through your mind
23 when this red vehicle was driving toward you?
24 A. I've seen firsthand what happens if you

**Page 68**

1 get run over by a car. I have a friend of mine,
2 his 20th anniversary is coming up in September
3 when he got run over by a car during a foot
4 pursuit.
5 Q. Was he a police officer?
6 A. Yes, he was.
7 Q. Were you trying to protect yourself
8 when you shot at this vehicle?
9 A. Yes, I was.
10 Q. What was your purpose in shooting at
11 the rear?
12 A. Attempt to disable it.
13 Q. And what was the distance between that
14 vehicle and your body at the time you discharged
15 your weapon?
16 A. Maybe about 10 or 15 feet max.
17 Q. And that vehicle ended up leaving the
18 scene of 159th and Kedzie, correct?
19 A. That's correct.
20 Q. And was there a male, black that ended
21 up escaping with that vehicle?
22 A. That's my understanding.
23 Q. And that vehicle was not originally
24 occupied by a male, black when you first saw it;

**Page 69**

1  is that correct?
2  A. That's correct.
3  Q. Now, as a result of the discharge of
4  your weapon on April 24th of 2014, have you been
5  charged with a crime by the Cook County State's
6  Attorney's Office?
7  A. No.
8  Q. Are you familiar with the 6th District
9  Cook County Courthouse?
10  A. Yes.
11  Q. Where is that courthouse located
12  relative to 159th and Kedzie, the Canterbury
13  shopping mall?
14  A. It's approximately four blocks south.
15  Q. And that is a courthouse that hears
16  criminal and civil cases; is that correct?
17  A. That's correct.
18  Q. And how many police jurisdictions are
19  there in the 6th Municipal District?
20  MS. RAVEENDRAN: Objection; calls for
21  speculation.
22  THE WITNESS: 30 or 35.
23  BY MR. SMITH:
24  Q. So Monday through Friday of the week,

**Page 70**

1  there could be police officers from 30 to 35
2  jurisdictions visiting that courthouse; is that
3  correct?
4  A. That's correct.
5  Q. And that courthouse is about four
6  blocks from where the Rent-A-Center was located
7  that was being burglarized on April 24th, 2014?
8  A. That's correct.
9  Q. On any given day -- and by the way, the
10  courthouse is located on Kedzie, isn't it?
11  A. That's correct.
12  Q. And that's the same street where the
13  Rent-A-Center is located on, correct?
14  A. Yes.
15  Q. In the shopping mall?
16  A. Yes.
17  Q. At 159th and Kedzie?
18  A. Yes.
19  MR. SMITH: I don't have any other questions.
20  FURTHER EXAMINATION
21  BY MS. RAVEENDRAN:
22  Q. Is it your understanding that if an
23  officer that is not from the Markham City Police
24  Department shoots a suspect in the midst of a

**Page 71**

1  Markham City Police Department investigation or
2  scene of a crime, that would not have been
3  documented in any Markham City Police Department
4  reports?
5  MR. SMITH: Objection; question calls for
6  speculation, incomplete hypothetical.
7  THE WITNESS: I would assume they would file
8  a police report.
9  MS. RAVEENDRAN: That's it.
10  FURTHER EXAMINATION
11  BY MR. SMITH:
12  Q. One last question, Officer Davis.
13  Are you aware of what you can do as a
14  police officer when confronted with a fleeing
15  felon?
16  A. Yes.
17  Q. What can you do based on Supreme Court
18  decisions?
19  A. You are allowed to shoot a fleeing
20  felon if they have placed the life of a citizen
21  or you or another officer in jeopardy.
22  MR. SMITH: No further questions.
23  MS. RAVEENDRAN: I'm good.
24  MR. SMITH: Officer Davis, this is the point

**Page 72**

1  where you can waive signature, which means that
2  our court reporter here took down everything
3  accurately, which I'm sure she did. Or you can
4  reserve signature, and you can have an
5  opportunity to review your transcript and then
6  you can sign it, make any changes on the errata
7  sheet.
8  What would you like to do?
9  THE WITNESS: What would be the customary
10  thing to do? Review it?
11  MR. SMITH: I think in a case like this --
12  you know, we'll reserve signature. I'll take
13  it, and we'll take a look at it.
14  (Proceedings concluded at 3:56 p.m.)