IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

DARREN SIMS, )
)
Plaintiff, )
)
vs. ) Case No. 1: 16 CV 2961
)
CITY OF MARKHAM, a municipal )
corporation; Officer Carson )
(#552) and Officer Davis (#510) )
in their individual capacity, )
)
Defendants. )

The deposition of OFFICER JEROME CARSON, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Catherine S. Bradley, Certified Shorthand Reporter, at 321 North Clark Street, Suite 900, Chicago, Illinois, on the 30th day of January, 2017, at the hour of 10:31 a.m.

Reported by: Catherine S. Bradley
License No.: 084-004664

1

APPEARANCES:

ROMANUCCI & BLANDIN, LLC
BY: MS. BHAVANI K. RAVEENDRAN
321 North Clark Street, Suite 900
Chicago, Illinois 60654
(312) 253-8622
braveendrank@rblaw.net
Representing the Plaintiff;

SMITH AMUNDSEN LLC
BY: MR. STEPFON R. SMITH
150 North Michigan Avenue, Suite 3300
Chicago, Illinois 60601
(312) 894-3395
ssmith@salawus.com
Representing the Defendants.

2

I N D E X

| WITNESS | EXAMINATION |
| --- | --- |
| Officer Jerome Carson | |
| Examination by Ms. Raveendran | 4 |
| Examination by Mr. Smith | 117 |

E X H I B I T S

(None marked)

3

(Witness sworn.)

OFFICER JEROME CARSON

having been first duly sworn herein, was examined and testified as follows:

MS. RAVEENDRAN: Can the record please reflect that this discovery deposition is being taken pursuant to notice and in accordance with the Federal Rules of Civil Procedure and any applicable local rules.

EXAMINATION

BY MS. RAVEENDRAN:

Q. My name is Bhavani Raveendran and I represent the plaintiff in Sims v. City of Markham, which has been filed in the U.S. Federal District Court of the Northern District of Illinois.

Can you spell your full name for the record, please?

A. J-e-r-o-m-e. Last name is Carson. C-a-r-s-o-n.

Q. Have you ever been known by any other name?

A. No.

Q. Have you ever given a deposition before today?

A. No.

Q. You're aware that you're here today to

4

Q. Have you ever spoken to anyone other than your attorneys regarding how you would testify today?
A. No.
Q. Have you ever discussed this incident with anyone other than your attorneys?
A. I meant besides when I told you a few years ago, besides that, no.
Q. So a few years ago did you discuss this incident with Officer Davis?
A. Not really. We was all like kind of together that I can recall at the attorney's office, but not really.
Q. Do you know if you spoke to Officer Anderl after the incident occurred?
A. I can't recall if I did or not. I don't seem --
THE REPORTER: Excuse me. Can you say that again?
THE WITNESS: I don't seem like I had much conversation with Anderl about it that I can recall.
BY MS. RAVEENDRAN:
Q. Do you suffer from any conditions or are you on any medications that can affect your ability to testify truthfully today?
A. No.

Q. And this is always a silly question to ask an officer, but I have to ask.
Have you ever pled guilty or been convicted of a felony?
A. No.
Q. I wonder if there will ever be a day that an officer says yes to that and still has a job.
Have you ever pled guilty or been convicted of a crime involving fraud or dishonesty?
A. No.
Q. Where did you attend high school?
A. Tinley Park High School in the south suburbs.
Q. After high school did you receive any additional degrees?
A. Yes.
Q. What was that?
A. Associates degree from Parkland College in Champaign.
Q. What was that associates in?
A. General studies.
Q. Do you have any other degrees other than your associates degree?
A. Yes, a bachelor's degree.
Q. What was that in?

A. Communications.
Q. Where is that from?
A. It's called Fort, F-o-r-t, Hays, H-a-y-s, State University.
Q. Where is that located?
A. It's in Hays, H-a-y-s, Kansas.
Q. Did you receive your BA directly after your associates degree?
A. Yes.
Q. After graduating what was your first job involving law enforcement security or security?
A. After I graduated, probably not until I became a police officer. So August of 2008.
Q. And before August of 2008 did you have any positions in security?
A. No, not that I recall, no.
Q. Were you ever a part of the military?
A. No.
Q. In August of 2008 where were you employed?
A. At that time I was not. I was not employed at the time. I was an entrepreneur, I guess you could say. I was into real estate at that time.
Q. Then you said you became a police officer; is that right?

A. Yes.
Q. Where were you a police officer in August of 2008?
A. Markham. An officer in 2008 in Markham, as a part-time officer.
Q. Have you ever worked for a police department other than Markham Police Department?
A. No.
Q. In August of 2008 when you were hired by the Markham Police Department as a part-time officer did you have to attend the police academy?
A. Yes.
Q. Where did you attend the police academy?
A. NEMRT, which was -- the name of it is NEMRT. It's a class at Triton College.
Q. How long is your --
A. From August of that time to March of 2009.
Q. After March of 2009 were you a fully sworn member of the Markham Police Department?
A. I was still a part-time officer until November 2009. I was sworn in full-time in November 2009.
Q. At any time after August 2008 until November of 2009 did you receive any field training?

A. Yes.
Q. Did you receive any field training after November of 2009?
A. Yes.
Q. Who provided you with field training?
A. Markham Police Department.
Q. Do you know if you had one particular field training officer that would provide your training or is it multiple people?
A. Officer Eric Blohm. I think you spell his name B-l-o-h-m, I think it is.
Q. Was your field training, did that consist of riding along with Officer Blohm?
A. Yes. There was another officer. I can't think of his name. It will come to me. He's no longer with us. It will come to me.
Q. Are you currently still employed with the City of Markham Police Department?
A. Yes.
Q. What is your current rank?
A. Patrol officer.
Q. What's your star number?
A. 552.
Q. Did you have a probationary period when you

started with the Markham Police Department?
A. Yes.
Q. How long was that?
A. It was 12 -- I think it was either 12 months, 12 or 18 months. I can't recall.
Q. Would I be correct to assume that you went through the typical and customary training that all officers at Markham City receive?
A. What do you mean by that?
Q. Is it the regular training that everyone would receive when they became a Markham City Police Department?
A. Yes. Yes. To ride along with someone, yes.
Q. Do you have any certificates or specializations with the Markham Police Department?
A. Yes. I did -- I had a juvenile officer certificate when I first started. We were going through training for that. That may be it.
Q. Are you certified to use a Taser?
A. Yes.
Q. Have you done any specialized firearm training?
A. Special -- we have training. I don't know what you mean by specialized.

Q. Anything else additional that wasn't just the normal course of training?
A. Yes.
Q. Do you have any detective training?
A. No.
Q. During your time at the police academy or during your field training did you receive any policies, procedures and general orders to review?
A. Yes.
Q. Do you still have access to those?
A. Yes.
Q. How would you access them today?
A. On my computer. When I'm on my computer at the job and a hard copy I'm sure somewhere.
Q. Are you able to access the policies and procedures and general orders from your squad vehicle?
A. No.
Q. Do you know if you have any requirement to keep current on the policies and procedures and general orders?
A. Do we have any policies to keep current?
Q. Let me ask that again.
Do you know if you're required to keep current on the policies, procedures and general orders that have

come out since your training?
A. Yes.
Q. Do you know if there's -- strike that.
Are you provided any -- have you been provided any training after the police academy and your field training regarding new policies and procedures as they come into effect?
A. Yes.
Q. How often do you receive training on policies and procedures?
A. It varies. It varies.
Q. Do you have any additional training requirements on a yearly basis for the Markham Police Department?
A. Yes.
Q. What are those?
A. Taser training, shooting range two times out of the year training. Just different things that may come up. Going through buildings, building searches and things like that.
Q. Would you say you received additional training from the Markham City Police Department twice a year? Once a year? What would be your?
A. It will just -- it varied. It just depends

on what's -- you know, it's more than twice a year. It just -- it's just different type of trainings that may come up.
Q. Have you ever had a complaint lodged against you by a citizen of Markham or another civilian?
A. Not that I'm aware of.
Q. Have you ever had a complaint filed against you by a fellow officer, someone else from the Markham City Police Department?
A. No.
Q. Have you ever been disciplined for any actions you took as a Markham City police officer?
A. No. Discipline, no. Maybe a verbal warning for being late or something.
Q. Have you ever been formally reprimanded for any actions you being took as a Markham Police Department officer?
A. No.
Q. Have you ever heard of anyone else having a civilian file a complaint against them -- strike that.
Have you ever heard of another Markham City police officer have a civilian file a complaint against them?
A. Have I heard of it?
Q. Uh-huh.

A. Yeah. I've heard of it, yes.
Q. Can you tell me what you remember of having heard of complaints filed against other officers?
A. It's really more general. Probably just somebody being rude to someone on a traffic stop.
Q. Can you recall any discipline that occurred based on a complaint against another police officer?
A. We wouldn't be privy to that. We wouldn't know if someone got disciplined for whatever reason. It would be confidential.
Q. During your time at the Markham Police Department have you ever heard a rumor or any discussion regarding complaints of excessive force against a Markham Police Department police officer?
MR. SMITH: Objection, calls for speculation. You can answer.
THE WITNESS: Excessive force, I know one.
BY MS. RAVEENDRAN:
Q. Can you tell me what you remember of the one if you recall?
A. I guess on a traffic stop someone accused one of the officers of being rough with them on a traffic stop is what I recall.
Q. Do you remember any consequences on that?

A. It's still under investigation.
Q. What is your understanding of what an investigation of an excessive force complaint would entail?
A. There hasn't been an outcome of what happened.
Q. I'm just asking generally what your understanding of what the investigation process looks like from a Markham City police officer?
A. Oh, I'm sure I've interviewed the police officer. Interviewed the complainants, victim.
Q. Have you ever known a Markham City police officer to use excessive force from your observations or witnessing something?
A. No.
Q. During your time at the Markham City Police Department have you ever known an officer to be investigated regarding an unlawful use of a firearm?
A. No.
Q. During your time at the Markham City Police Department have you ever known of someone being fired by the department?
A. Fired. Probably wouldn't necessarily fired. Probably had the opportunity to resign, not necessarily

fired.
Q. And are you thinking of one particular instance when you say that?
A. I'm thinking of a few.
Q. Do you know if any of those opportunities to resign were given based on misconduct in the field?
A. Misconduct in the field. Maybe one. Maybe one. It depends what you call misconduct.
Q. Well, the one that you think may apply to that, what happened in that case?
A. In that particular case one of the officers probably had good working relationship with a business in town and -- how shall I say this. She said some things, I don't know, kind of bribe I guess about -- he had somebody that wanted to get into the police academy. She was like, you know, if you pay me some money. You know, this is rumors now. This is speculation from what I understand, but it was along the lines of something like that.
Q. Since you've been -- since you were hired by the City of Markham in August of 2008 have you ever been suspended or terminated for any reason?
A. No.
Q. If we can go back to your training a little



so it's probably more situation.
Q. Would you include every officer that took an active role in the situation?
MR. SMITH: Objection, foundation. You can answer if you understand.
THE WITNESS: Say that again.
BY MS. RAVEENDRAN:
Q. If you were authoring a report of an incident would you include every officer who took an active role in the incident?
MR. SMITH: Same objection.
THE WITNESS: Would take an active role, yes. If I thought they was important to my report I would include them.
BY MS. RAVEENDRAN:
Q. Would you -- if you were authoring a report of an incident would you include any officer that discharged a firearm?
A. Yes.
Q. If you were authoring a report would you include details regarding which agencies or police forces responded to the incident?
A. No. There's been many times where we have an agency assist us and we're not sure who they are and

where they're coming from.
Q. What if one of those police officers from a different agency took an active role in the incident?
A. I'm trying to think of a situation that would warrant that. I guess if -- if they was active I guess you would include them if they had some role as far as what went on.
Q. When authoring reports if a firearm is used is that information that is required to be included in a police report?
A. Yes.
Q. Is the information regarding who used a firearm information that would be included in the incident report?
A. Yes. If you're aware of it, yes.
Q. Would information regarding if anyone was injured and how they were injured be used -- strike that.
Would information regarding whether someone was injured and how they were injured be included in a police report if you were authoring it?
A. Someone was injured, probably a person who was maybe dealing with the injury, probably -- probably include it, if I was dealing with the injury or whoever

was dealing with the injury.
Q. And you mentioned before that you've been trained in the use of firearms; is that right?
A. Yes.
Q. And you said you are required to go to a shooting range twice a year?
A. Yes.
Q. Did you receive any training regarding when firearms can be used -- that was my whole question. I asked it in such a weird way I'm going to repeat it.
Did you receive any training regarding when a firearm can be used?
A. Yes.
Q. Do you know if that was at the police academy?
A. Yes.
Q. Did you receive any subsequent training regarding when a firearm can be used?
A. Yes. When you say -- you mean other training?
Q. Right.
A. Yes. We receive other training, yes.
Q. And in your training for use of firearms did that include how to use a firearm? How to load a

firearm, for instance? Was that included in your training?
A. Yes. Safety, yes.
Q. Was aiming -- aiming a firearm included in your training?
A. Yes.
Q. Was discharging the firearm included in the training?
A. Yes.
Q. Are you required to have any certification to use a firearm?
A. Yes. We have -- yes.
Q. What certification?
A. We have -- once we go to training we have to qualify when we go to the shooting range.
Q. And are you qualified right now?
A. Yes.
Q. Were you qualified in April of 2014?
A. Yes.
Q. If we can talk about your experience being trained at shooting ranges. What does that training consist of?
A. Distance, safety, things like that.
Q. Is there an instructor present?

A. Yes.
Q. What does the instructor -- what does the instructor do during that training?
A. Pretty much give us instructions on what we need to do.
Q. Does that type of training require any target practice?
A. Yes.
Q. Do you know why?
A. Do I know why there's target practice?
Q. Yeah. What does target practice do?
A. For accuracy, proficiency.
Q. Generally speaking if you're holding a firearm and pointing it in a certain direction and the firearm is discharged, in your experience would that bullet go in the direction your firearm is pointed?
A. For the most part.
Q. Would you agree that -- well, strike that.
I think before you testified that you're working on accuracy when you're doing target practice at the shooting range?
A. Yes.
Q. Why is accuracy important as a police officer?

33

A. Because we got to be able to I guess get rid of like the threat. You know, if there's a threat towards us we got to be able to stop the threat.
Q. Would you agree if as a police officer you're aiming at a shot you're trying to hit the target of the shot?
MR. SMITH: Object to the form of the question. You can answer if you understand.
THE WITNESS: Repeat -- repeat that. I'm not sure what you were asking.
BY MS. RAVEENDRAN:
Q. I'll just ask it a different way.
Are you generally trying to hit the target of a shot as a police officer?
A. Yes.
Q. Do you know, have you had any training or in your experience have you learned whether or not warning shots are allowed?
A. They are not allowed.
Q. In your training have you ever been trained to discharge a firearm just to injure a suspect?
A. I mean they -- hitting someone can injure them, you know.
Q. You said before that you had been trained to shoot to stop the threat; is that right?
A. Yes.
Q. In order to shoot to stop the threat is there a certain area of the suspect you would be aiming at?
MR. SMITH: Objection, question calls for speculation.
BY MS. RAVEENDRAN:
Q. Have you been trained to aim for a certain area if you're trying to stop a threat that's coming from a person?
A. In training when we're in the shooting range we're trained to shoot in the center of the body.
Q. Center of the body?
A. Yes.
Q. So that would include the chest? Is that what you were indicating with your hand?
A. Yes.
Q. Why is that?
A. Bigger part of your body, organs and stuff. Bigger part, bigger target.
Q. Is any part of that because it's easier to stop a threat if you shoot towards the center of a person?
A. I don't know if it's necessarily easier.

35

Q. Have you ever been trained to aim at arms or legs of a suspect?
A. The target don't -- they don't have arms or legs on the target.
Q. In your experience have you ever specifically aimed at arms or legs of a target -- well, strike that. I don't really know how to ask that question in a nonconfusing way so I'm just going to skip it.
Have you ever received training on the use of force?
A. Yes.
Q. When have you received training on the use of force?
A. Just throughout my police career from the academy and then get kind of refresher courses.
Q. Do you know how often you receive a refresher course on excessive force training?
A. Probably about once a year. About once a year. I should say specifically training, but as incidents come up there's always talk about the use of force. Put it that way.
Q. When you do -- when you have received training on the use of force who did you receive it from? It's okay. I'm not looking for names, just

36

Case: 1:16-cv-02961 Document #: 63-8 Filed: 09/15/17 Page 7 of 23 PageID #:242

generally.

A. I can't recall the names.

Q. Would you agree it was your superiors at the Markham Police?

A. Yes.

Q. Did you ever receive training from any outside -- strike that.

Did anyone from outside the Markham City Police Department ever provide you training on the use of force after the police academy?

A. I think so, but I can't recall.

Q. During any of your training on the use of force do you ever recall going over any applicable Markham city ordinances?

A. What do you mean?

Q. Do you ever go over any law from Markham City specifically that applies to use of force?

A. I mean we have a policy for the use of force if that's what you're asking.

Q. We'll get to that. I'm asking if you know of any Markham City ordinances that would apply to your use of force that you may have learned about in training?

A. Ordinances. I'm not sure what you mean. I'm

not sure what you mean when you say ordinances like for use of force.

Q. Let's broaden it. Maybe that will help.

During your training on the use of force were you ever trained in the requirements of the law?

A. Yes.

Q. Did that include constitutional requirements?

A. Yes.

Q. Did that include Illinois state law?

A. Yes.

Q. Did that include to your recollection any Markham specific ordinances or laws?

MR. SMITH: Well, I'll object to foundation.

BY MS. RAVEENDRAN:

Q. I'm just asking if you remember going over Markham ordinances. It's a yes or no question. That's okay if you don't.

A. I'm not sure what you mean.

MR. SMITH: I guess does Markham have any?

MS. RAVEENDRAN: I'm not asking if Markham does. I'm asking if he ever went over it in his training from his memory.

MR. SMITH: I'm not trying to be funny. But, you know, I guess the foundational question is does Markham

specifically have any ordinances that pertain to use of force.

MS. RAVEENDRAN: You know, that's me asking him a question that he doesn't necessarily have a foundation to answer. All I'm asking is did they go over any Markham ordinances in his use of force training. He doesn't have to remember that. That's --

MR. SMITH: Does the City of Markham have any ordinances that pertain to use of force, aside from state law, constitutional law?

THE WITNESS: Ordinance? Not that I'm aware of as far as ordinance because I'm not sure what you're asking.

BY MS. RAVEENDRAN:

Q. Is it fair to state you don't know if you -- well, strike that.

Fair to say if you did go over any Markham ordinances you don't remember now if you did?

A. Yes. Right. When you say ordinance there's different -- Markham has different things from, you know, overgrown grass, stuff like that. So when you say ordinances it's kind of coming to mind when you say ordinances, violations, house violations, you know.

Q. All right. Okay. That's fine.

A. Parking.

Q. I'm not trying to quiz you on the ordinances. Just if you have had specific memories of that, that's all.

And you mentioned before that there are Markham policies regarding use of force.

Can you tell me what you remember of those policies from your training?

A. Just when, you know, the main part, the basic part is not to discharge a firearm unless you feel that there's, you know, fear of death or imminent danger or serious injury, serious injury I should say, bodily harm.

Q. When you say you shouldn't use force unless -- well, strike that.

Are you also -- is there any difference if deadly force is going to be applied?

A. If deadly force is going to be applied?

Q. Right. So my earlier question was what do you remember of the policies as they applied to the use of force.

And I'm now asking if there's any difference for a deadly force from what you mentioned earlier?

A. We use the use of force, are you asking

what's the reasons for use of force? If we're in fear of our life or fear of someone else's life is when we can use deadly force. Is that what you're asking?
Q. Yeah.
A. Yeah.
Q. I was just asking if it's the same standard really.
A. Yes.
Q. Do you understand deadly force to include using a gun from your training?
A. Not just a gun. I mean there's deadly forces that can be used, Taser baton, OC spray.
THE REPORTER: Excuse me. What was that after baton?
MS. RAVEENDRAN: OC spray.
THE WITNESS: OC spray. All that's part of use of deadly -- use of force, I should say.
BY MS. RAVEENDRAN:
Q. Would you agree that the use of deadly force should be legally warranted?
A. Legally warranted?
MR. SMITH: Objection to form, foundation. You can answer the question if you understand it.
THE WITNESS: Ask that again.

BY MS. RAVEENDRAN:
Q. Would you agree that it should be legally warranted? And objection is noted.
MR. SMITH: Same objection, form, foundation.
THE WITNESS: Legally -- I'm not sure what you mean when you say legally.
BY MS. RAVEENDRAN:
Q. Would you agree that a use of deadly force should comport with the laws and policy of Markham City Police Department?
A. Yes.
Q. Would you agree that the use of deadly force should be rational and humane?
A. Yes.
Q. In your training have you been taught to consider a firearm -- strike that.
In your training have you been taught to consider the use of a firearm a last resort?
A. Yes.
Q. And from your understanding of your training what does that mean, last resort?
A. Last resort meaning that you view -- if it comes down to, you know, you feel like you're going to be harmed or someone else that you're trying to protect

is going to be harmed, it comes down to that.
Q. Did you in your training for use of force receive any specific training regarding a suspect or subject that's fleeing and using force on that individual?
A. Have we been taught about that?
Q. Yes.
A. Yes.
Q. What's your understanding and training -- strike that.
From your training and your experience when can you use deadly force on an individual who is fleeing the police?
MR. SMITH: Objection, form, foundation. You can answer the question.
THE WITNESS: It would have to meet certain criterias as far as, one, have to be a felony, for one. So it's really situational. It has to meet certain criteria as far as were they being -- like what is the crime, what's going on, what's happening, what's the crime. So certain criterias.
BY MS. RAVEENDRAN:
Q. Would you agree that what we discussed before about when deadly force can be applied also applies to

a suspect that's fleeing?
A. Can deadly force be applied to a suspect that's fleeing?
Q. Yes.
A. Fleeing felon, yes.
Q. So the only -- strike that.
So before you said that deadly force -- and let me know if I'm misquoting you, but my understanding of the testimony that came before was that you said you could only use deadly force if you're in imminent fear of harm to you or another person; is that right?
A. Yes.
Q. Does that rule still apply as far as -- strike that.
From your training and experience does that rule still apply when a suspect is fleeing?
A. Yes.
Q. Okay. And is it that the type of crime that the person is suspected of comes into valuing whether or not there's a danger?
A. Yes.
Q. Can any felon -- strike that.
Can any suspect suspected of committing a felony have deadly force used on them if they are fleeing?

MR. SMITH: Objection. The question calls for speculation. You can answer if you understand the question.
THE WITNESS: Not all fleeing felons would be subject to deadly force. Is that what you're asking? No.
BY MS. RAVEENDRAN:
Q. So what kind of felonies would give an officer -- strike that.
In your experience what are some felonies that would create a threat of danger to others that would require an officer to use deadly force?
MR. SMITH: Object to the form of the question. Felons or fleeing felons?
MS. RAVEENDRAN: Can you read the question back?
(Record read as requested.)
THE WITNESS: Okay.
BY MS. RAVEENDRAN:
Q. So if I could add to that question. When they're fleeing specifically?
A. It could be someone's committing like murder, first degree murder, second degree murder, kidnapping, things of that nature. Those would be some that come to mind that could be as far as a fleeing felon, yes.

45

Q. Would you agree that generally speaking those are felonies that include an element of violence?
A. Yes.
Q. Does whether or not a subject who is fleeing an officer -- does whether or not a subject that is fleeing an officer is armed something that would be considered when determining whether a use of force can be applied?
A. Yes, it would be considered. If he was armed, yes.
Q. And how does that affect the equation?
A. I mean he's, you know, I mean as far as?
Q. As far as using deadly force on a fleeing suspect, whether -- what part does whether or not they're armed come -- strike that. Man, that was a bad question.
So I guess I'm asking what part does that play in the determination of whether or not deadly force can be used if a suspect is fleeing and they are armed?
A. I mean it could play a part. It would just take a second for them to turn around and shoot back at you. So it plays a part.
Q. Have you ever used your firearm in your duties as a Markham police officer?

46

A. Yes. I've discharged my firearm is what you're asking?
Q. Yes.
A. Yes, I have.
Q. Have you ever -- have you discharged your firearm as a Markham City Police Department more than once?
A. No.
Q. So am I correct in assuming that there's only been one incident where you've been required to discharge your firearm during your time with the Markham City Police Department?
A. Yes.
Q. Do you remember the date of that incident that required you to discharge your firearm?
A. I don't know the specific date.
Q. Can you describe to me what occurred?
A. You talking about this situation or?
Q. If this is the only situation?
A. This is the only situation.
Q. Okay. Well, then don't worry about that.
MS. RAVEENDRAN: Take a short break.
(Recess taken.)

47

BY MS. RAVEENDRAN:
Q. Do you have any current assignments at the Markham City Police Department? Are you assigned to a certain area?
A. It varies every day as far as control.
Q. And do you have your own vehicle?
A. We have vehicles that we're assigned to.
Q. So you're assigned to one vehicle at this time?
A. Yes.
Q. Is that the same vehicle you would have been assigned to in April of 2014?
A. No.
Q. Do you currently have a partner?
A. No. We do share cars. We got three shifts. So I share another person on the morning shift. Two of us share a car.
Q. Generally speaking what are your duties?
A. Pretty much patrolling the area of Markham, traffic citations, ordinance violations, answering calls, domestic stuff, serving the community, protecting the community.
Q. Would that include responding to 911 calls?
A. Yes.

48



Q. Does what the 911 call -- strike that.
Does the content of the 911 call ever determine which officer will respond?
A. No.
Q. Are there any certain crimes that the Markham City Police Department may automatically call other police forces in to assist with?
A. Other police forces?
Q. Right. I guess let me just explain why I'm asking you this, but I'm wondering if say there's a murder that occurs.
Would Markham send its police officers and call someone else in addition, say the state police or someone like that?
A. Yes, they do. There's a task force, suburban task force if there's a murder. Sometimes if we -- we share radios with different police departments. We share radios with different police departments. We also have a radio where it's statewide where all departments can hear.
So the times when we need help we have to either, A, on our local radio ask other departments or help us or we have to go on the national radio. The statewide radio rather, not national.

49

Q. When you described your duties earlier would you generally agree that those were the same in April of 2014?
A. Yes.
Q. And you were a patrol officer in April of 2014?
A. Yes.
Q. Were you assigned to any particular area in April of 2014?
A. No.
Q. Were you working on April 24th, 2014?
A. The same day of the incident?
Q. It is the date of the incident, but I mean I can't testify to that for you.
A. If that's the date then yes. Yeah.
Q. Do you know what shift you were working on April 24th, 2014?
A. Overnight shift, from 12:00 a.m. to 8:00 a.m.
Q. Is that the shift that you work every day currently?
A. No. I think -- I think if I can recall -- I can't recall if I was working overtime that night. I can't recall right now. I don't think that was the shift I was working at that particular time. I'm not

50

sure.
Q. What shift do you currently work?
A. The evening shift, 4:00 p.m. to 12:00 a.m.
Q. Do you know what your duties were during the overnight shift on April 24th, 2014?
A. Pretty much the same duties I explained before.
Q. So would you agree that you were patrolling?
A. Yes. Trying to think on that particular day. I might have been the supervisor on that day. I'm not sure. But even as a supervisor you still act as a patrolman.
Q. What designates you -- well, strike that.
Do you act as a supervisor often?
A. No.
Q. When have you been required to act as supervisor?
A. Well, things have changed. Contracts have changed. Back during that time it was more of the senior person who is usually in charge of a particular shift at that time.
Q. So on April 24th, 2014 do you believe you were the senior person on the shift?
A. I wasn't the senior person, but I ended up

51

running the shift if I recall. Don't quote me on that, but if I can recall.
Q. Do you know how many other officers were on shift at that time?
A. Just four of us.
Q. Were any of the four officers a sergeant?
A. No.
Q. If you were acting as the shift supervisor would there have been anyone else on active duty at that time who would have been supervising you?
A. Well, we always have someone that we can call. They wouldn't actually be working but, yeah, we have someone we can call. So there's a chain of command we can contact.
Q. So who would be next in the chain of command up above you?
A. On that particular day probably be -- from that particular night?
Q. Sure.
A. Deputy Chief Walker.
Q. So would it always be a deputy chief would be the next level above whoever is supervising the shift?
A. Yes.
Q. Have you ever worked a shift where there were

52



officers working as well as a sergeant?
A. Have I worked shifts?
Q. Yes.
A. Not ran shifts, but worked shifts, yes. That particular time we didn't have a sergeant at that time. I think that's what it was, on that particular shift.
Q. If we can go back to April 24th, 2014. Were you alone during your shift?
A. No.
Q. Was there someone else in your vehicle?
A. Well, okay. Let's clarify. It was other people working with me, but we patrolled by ourselves if that's what you was asking me.
Q. Yes. On April 24th, 2014 were you patrolling in your vehicle?
A. By myself, yes.
Q. What kind of vehicle was it?
A. It was a Dodge Charger.
Q. Was that a marked Charger?
A. Yes.
Q. Do you know what area you were assigned to on April 24th, 2014?
A. No, no particular area.
Q. You're testifying that you don't remember the

area; is that right?
A. No. It was no particular area. When you're in charge there's no particular area that I recall.
Q. I see.
A. All over. Every area -- either no area or all areas, however you want to say it.
Q. Were you in uniform?
A. Yes.
Q. Were you armed?
A. Yes.
Q. Did you have your duty belt as part of your uniform?
A. Yes.
Q. Can you tell me what was on the duty belt?
A. Two magazine cartridges, handcuffs, OC spray, flashlight. Not sure at the time if I was wearing a Taser. I'm not sure.
Q. Was there a firearm on your duty belt?
A. Yes.
Q. Do you know which firearm?
A. What do you mean?
Q. What kind of firearm it was?
A. Nine millimeter Glock.
Q. Was that issued to you by the Markham City

Police Department?
A. No. I bought that. We pick our own guns.
Q. Was it certified for use by the Markham City Police Department?
A. Yes.
Q. Do you know the unit number of the vehicle you were driving on April 24th, 2014?
A. I think it was 97, I think. I think that was the vehicle. I've only been assigned to two vehicles so it had to be 97.
Q. At or around 5:42 a.m. on April 24th, 2014 did you receive a dispatch call?
A. Yes.
Q. Do you know where you were when you received the dispatch call?
A. I was in our dispatch center.
Q. Why were you at the dispatch center?
A. Just checking on dispatchers overnight, just checking on them.
Q. So did you actually receive a dispatch call or were you present when the dispatch call came in?
A. Present when the dispatch call came in.
Q. So you heard the 911 call?
A. For the most part, yes.

Q. What did you hear in the 911 call?
A. Someone was explaining to the dispatcher there were several subjects breaking and entering into the Rent-A-Center.
Q. Do you know who made the 911 call?
A. I'm assuming -- it sounds like it could have been a passerby or something she was obtaining the information from.
Q. Do you remember anything else that you overheard in the 911 call?
A. No. I just left after that.
Q. And where did you go?
A. To assist.
Q. Why did you leave?
A. Because it was several subjects breaking into the building.
Q. And did you radio any other officers or contact anyone?
A. No. She had already -- by the time I got to my car she's already dispatched units to that area.
Q. So the person at the dispatch center was already -- had already made a radio call; is that right?
A. Yes. She dispatched. There was only four of

us. We was all going to be getting over there. So whether it was dispatched or not I was going, so.
Q. Did you hear what the person at the dispatch center said to the other officers over the radio?
A. Just several male subjects, several subjects, male subjects, something like that, breaking and entering, taking TVs out of the building.
Q. It was your understanding that you were going to the scene of a property crime?
A. I was going to the scene of a burglary crime.
Q. What did you do when you left the dispatch center?
A. Headed to the direction of the store.
Q. Did you head there in your vehicle?
A. Yes.
Q. Did you activate your overhead lights?
A. I can't recall if I did or not.
Q. Do you know if you activated your siren?
A. Can't recall if I did or not.
Q. Was there anything that you remember hearing in either the 911 call in the information that was radioed out to officers regarding whether or not the subjects were armed?
A. I think I remember something about a vehicle

actually went through, through the building.
Q. Was there anything specific about the subjects being armed other than the vehicle that went through the building?
A. Not that I recall at that time.
Q. Is there anything you recall hearing in the 911 call or in the subsequent dispatch over the radio about the subjects committing any acts of violence?
A. They were just in a store taking multiple TVs, tearing up the place pretty much, putting TVs into their vehicles.
Q. You said that you went to the scene of where the dispatch said the incident was occurring; is that right?
A. Yes.
Q. Do you know what the address was?
A. Not offhand. I can get it for you, but I don't know offhand.
Q. Did you drive to the Rent-A-Center?
A. Yes.
Q. And is that in a strip mall or is it an independent building?
A. Strip mall.
Q. Do you know where the strip mall is located,

the intersection?
A. 159th and Kedzie.
Q. Did you approach the strip mall on Kedzie or 159th?
A. Probably from Kedzie.
Q. Did you arrive -- did you go into the parking lot of the Rent-A-Center?
A. Yes.
Q. What happened when you drove into the parking lot of Rent-A-Center?
A. Seen one of my officers activating his lights and was following behind a vehicle.
Q. And then what happened?
A. Behind the vehicle. He was radioing in giving a description of the vehicle, the plates, and I followed -- tried to follow behind him ahead of me and they fled eastbound through the parking lot.
Q. In the vehicle?
A. In the vehicle.
Q. Who was the other officer?
A. Anderl.
Q. Do you remember anything about that -- the vehicle that the subjects were fleeing in?
A. I think it was a SUV, gray or white or

something like that. I can't remember what color it was. It was a SUV.
Q. You mentioned that Officer Anderl was using his radio. Do you recall anything he was saying over the radio?
A. Well, yeah. It was subjects jumped back into the vehicle. They had TVs in the vehicle and he was pursuing the vehicle as it fled away.
Q. Did Officer Anderl mention if he had seen any weapons during that radio call?
A. Not that I can recall.
Q. When you were arriving to the scene did you see anyone with a weapon?
A. No. They were already in their vehicles. He was pursuing by the time I got there and nobody was in the building.
Q. Did you see more than one vehicle other than Officer Anderl's police cruiser when you arrived at the Rent-A-Center parking lot?
A. No, I didn't.
Q. At any time in the dispatch call or any of the radio communications did you hear how many vehicles may be present at the scene of the incident?
MR. SMITH: Objection, form. If you understand

vehicles in terms of police vehicles or civilian vehicles.

THE WITNESS: Say your question.

THE REPORTER: Excuse me.

THE WITNESS: Say your question. I'm asking say your question again.

BY MS. RAVEENDRAN:

Q. Okay. I'm just going to ask it a different way.

Were there any vehicles -- when you arrived at the Rent-A-Center parking lot were there any other vehicles in the parking lot -- strike that. I already asked that question.

In the dispatch call or in the 911 call that was made to you do you recall hearing if there were more than one vehicle present at the Rent-A-Center where the crime was being committed?

A. I think there was, but I'm not -- I'm not sure. I think there was, but I'm not sure.

Q. When you arrived in the parking lot of the Rent-A-Center, other than Officer Anderl how many subjects did you see?

A. I didn't see any. I just seen him pursuing a vehicle.

Q. Did you also activate your lights after Officer Anderl did?

A. Yes.

Q. And you said you followed behind Officer Anderl's vehicle; is that right?

A. I wasn't closely behind it. I could see him going through the parking lot and trying to catch up with him.

Q. So then what happened when you were driving?

A. As he was -- as the vehicle was fleeing it fled out of the shopping center heading north out the shopping center to 159th Street. The vehicle then proceeded to go eastbound on 159th and as he was radio -- I think he stated the direction they were going, and I don't know if he mentioned Harvey. Harvey was the next town over, to let them know they were coming that way.

And then the vehicle did a U-turn right at 159th and Washtenaw, something like that, and then at that time I was at 159th and Ridgeland.

So the vehicle turned around, started to come my way and I blocked off a lane of traffic hoping the vehicle was going to stop. It went around me, kept going.

Q. Okay. And then --

A. It was heading westbound.

Q. Did you get a look into the vehicle?

A. I was kind of -- didn't know, you know, I was kind of making sure that I'm protected in case there were any weapons in the vehicle and maybe possibly they could fire them. So I was kind of taking cover a little bit to make sure. So I didn't really take a look inside the vehicle, no.

Q. So once it turned westbound on 159th Street what did you see happen?

A. Anderl continued to pursue them going westbound. As he was radioing in the vehicle was going westbound on 159th Street.

Q. Okay. And then what happened?

A. As they approached the intersection I kind of seen some smoke, looked like the vehicle veered to another lane and I seen some smoke. Then I kind of heard a crash.

And as I approached 159th Street there were several subjects that got out of the car trying to attempt to get into other vehicles.

Q. Did you see -- when you approached did you see what had created this sound that you heard?

A. It was an accident. The vehicle had run into a truck, 18-wheeler dump truck.

Q. Had the vehicle stopped?

A. Yeah, it stopped. Airbags was deployed. Seems like it was a pause, a silence. Then everything went quiet and then those guys jumped out the car.

Q. You said there were several people in the car. How many people did you see?

A. Well, several people that got outside the car. Had to be -- I want to say about four or five.

Q. And did you see where each of those four or five people went?

A. Yes. They attempted to try to get into two vehicles that was there at 159th and Kedzie.

Q. Did you see all of the people from the crashed vehicle approach other vehicles?

A. Yes.

Q. You were able to track that each of the individuals that left the vehicle, where they all went before you --

A. Was I able to track all of them? I mean at that time they were all attempting to get into two vehicles at that time, before they scattered.

Q. So I guess I just want to break it down a

little bit.
Did you see an individual leave the front seat of the vehicle that had crashed?
A. No. At that time they were out of the vehicle. By the time I approached the intersection they were actually out of the vehicle and at that time I think all of us had finally got on the scene, given them verbal command to stop, freeze, and they weren't complying at all.
Q. So do you know with certainty that each individual that left the vehicle that crashed proceeded to approach other vehicles and try to get in?
A. Do I know with certainty that those guys that left that vehicle, yes.
Q. You know that every single person --
A. I shouldn't say every single, but the guys that were trying to get in that vehicle was from that particular vehicle.
Q. So fair to say you know individuals who were in that traffic accident were now attempting to get into other vehicles?
A. Yes.
Q. So what did you see -- strike that.
If you had to break it down for me now what

exactly you saw when these other -- when these people from the crash started approaching other vehicles?
A. They were all just trying -- attempting to get into the cars, people that were already in the vehicles.
Q. Was it one car? How many cars were they trying to get into?
A. If I recall it was two cars.
Q. Was it simultaneously two different cars?
A. I'm not sure if it was simultaneously. I just remember one car that they was trying to get in in particular.
Q. So why don't we go with this. You saw some of them approaching one vehicle; is that right?
A. Yes.
Q. What kind of vehicle was approached?
A. It was a red vehicle that I can recall, like a four-door vehicle.
Q. What did you see the individuals from the car accident do once they got to that four-door car?
A. They were attempting to get in from the passenger side, the passenger, the back passenger side.
I recall the guy was on the hood, but the driver of the vehicle was trying to get the guys off the

vehicle and he was going back and forth, trying to move his car back and forth to get the suspects off the vehicle.
Q. So the person on the hood, can you describe to me what they were doing on the hood?
A. I guess he was trying to come across to the driver's side of the vehicle. I just remember him being on top as well. I just assumed he was trying to come to the driver's side of the vehicle.
Q. Was he on his back? Was he on his front?
A. Side.
Q. When you said people were trying to get into the front passenger side?
A. Yes.
Q. Do you know what exactly that person was doing, pulling up the handle?
A. Yes. Pulling up the handle, yes.
Q. And then did you see a person try to get into the front driver's side?
A. I don't think anyone was trying to get -- I think the guy maybe that was coming across possibly was trying to get in because he was coming across the vehicle for whatever reason.
Q. And the passenger side rear door, was someone

trying to open that?
A. Yes.
Q. And the passenger side -- I'm sorry.
A. Actually I think they actually even had the doors open. They were trying to get in, but the guy was going back and forth trying to get the guys from off his vehicle.
Q. Do you remember which door you saw being opened?
A. The back for sure.
Q. Which side?
A. The passenger, back passenger door.
Q. Was there someone on the back driver's side door?
A. No. That I could recall, no.
Q. So fair to say you remember at least three individuals trying to get into the car in different manners, different ways?
A. Like I said, it was about four or five. They were all trying to get in there, so.
Q. Right. But those are the three that you remember specifically what they were doing?
A. I remember one being on the hood and the rest had to be getting on the side, the other side of the

vehicle.
Q. Okay. So the driver was moving the car back and forth is what you said; right?
A. Yes.
Q. Then what happened?
A. As he was trying to -- I can see the look on his face and I was trying to tell him to stop and trying to tell the suspects to stop. No one stopped.
And all the sequence is kind of, you know, together because two other people took off. I heard what I think was a gunshot or two. So, and coming from the area of the vehicle.
Q. The area of which vehicle?
A. From the area, from the area where the vehicle was at, heard a gunshot, gunshot or two.
Q. I'm asking which vehicle, the one that crashed?
A. No. No. No. The one that they were trying to get into, the red vehicle.
Q. Were you -- where were you -- how far away were you from the red vehicle?
A. I probably had to be -- I was toward, probably toward to back of that vehicle maybe -- I don't know -- ten, 12 feet away from the vehicle. Kind

of a little bit, kind of away from the vehicle.
Q. Did you have your gun drawn?
A. I think so at the time, yes.
Q. Could you see, other than the commotion with the red car, could you see any other officers?
A. You know, I was so focused I can't really say what position they were in. I was just kind of focused on, you know, the situation. I can't specifically say where they were.
I know Anderl was south of me. So, yeah, I can't specifically say exactly where they were at.
Q. But you could see what was happening with the car?
A. Yes.
Q. And while you were looking at the scene of the red car and all the people trying to get inside of it you heard a gunshot?
A. Yeah. A gunshot or two, yes.
Q. Where did you hear the gunshot coming from?
A. Just the area, from the area of the vehicle is where I heard the gunshot coming from.
Q. But you could see all the individuals trying to get into the car?
A. Yes. Trying to get into the car, yes.

Didn't know where it was coming from, but I knew it was coming from that area, the gunshots.
Q. But you could see the entire area, is that what you're saying? Could you see if any of those individuals were armed?
A. No. I couldn't see if they were or not.
Q. Did you see if any -- sorry. Go ahead.
A. Because they are on the other side, so.
Q. Other side of?
A. The vehicle, of the red vehicle.
Q. So you're saying you could see the one side of the red vehicle?
A. The driver's side I could see.
Q. You were on the driver's side?
A. Yeah, on the driver's side.
Q. Okay.
A. I could see everything on the other side. They were attempting to try to get into the vehicle. I didn't see any hands or anything like that. I just know they were trying to get into the vehicle.
THE REPORTER: Excuse me. Can you say that again?
THE WITNESS: I said I see that they were on the other side of the vehicle. I didn't see their hands or anything like, but I know they are trying to get in on

the other side of the vehicle.
BY MS. RAVEENDRAN:
Q. Did you see anyone fire a gun at that time?
A. No.
Q. Fair to say that shot didn't come from your gun at that time?
A. No. No. What I just, you know, when I arrived at the scene you see all these guys trying to get in, the guy being scared. I saw that -- you know, I heard the gunshots. I was in fear of, you know, someone was being shot at, this person in the car being shot at or somebody else is being shot at. You know, that was kind of my thinking like where is these gunshots coming from.
Q. Did you see -- could you see Officer Davis at any time up until this point where you were standing looking at the red car?
A. I know he was there. I'm not sure what -- I think he was on the left side of me to be honest with you. I'm not sure.
Q. How did you know he was there?
A. I just remember seeing him. I just remember seeing him, and Anderl was already there and I just remember seeing him.



Q. In your experience if a police officer from the Markham City Police Department fires a weapon would that have been radioed to the other officers at the scene?
A. It should. It's supposed to be.
Q. Was -- did you --
A. Like it's supposed to be, you know, like shots fired, you know. But I don't recall anybody saying it. They could have. I'm not sure. You know, I didn't -- like I said, just kind of everything was happening so fast, so quick, you know. You just kind of focus on, you know, trying to make sure, you know, people are safe, officers are safe, the person that got in there, trying to stop, you know, what was going on.
Q. Okay. So after you were looking at the red vehicle and the individuals were trying to get into the red vehicle and you heard a gunshot what happened after that?
A. That didn't seem to stop anybody, the suspects from trying to enter the vehicle. So that made me think that shots were coming from somewhere and I discharged my weapon once or twice.
Q. Who -- what were you aiming at when you discharged your weapon?

73

A. I was aiming at on the other side of the vehicle where guys were still trying to get into the vehicle.
Q. You were aiming over the red vehicle --
A. Yes.
Q. -- at the guys on the other side?
A. Yes.
Q. So there was no one on the driver's side of the vehicle?
A. No.
Q. Did you issue any commands before discharging your weapon?
A. Yes. Stop, freeze, get on the ground. Noncompliant.
Q. Where were you when you issued these shots?
A. Like I said, I was still maybe ten or 12 feet from the other side of the red vehicle, from the driver's side toward the back.
Q. Okay. So --
A. So --
Q. You would agree that the subjects that you were aiming at were on the other side of the red vehicle and you were -- are you saying you were at the back corner of red vehicle?

74

A. Yeah. Kind of like -- kind of like an angle.
Q. Who in particular were you aiming your gun at when you discharged those shots?
A. Nobody in particular.
Q. What was the purpose of discharging the shots if you weren't aiming at anyone?
A. Because I thought maybe shots was coming from the other side of the vehicle. So I didn't know who was -- like I said, people were still trying to get in the cars. I was trying to stop. My thinking was if someone is shooting I'm thinking that this guy who is driving the car, his life could be in danger. One of my officer's life could be in danger. So I discharged my weapon once or twice to stop, you know, whatever was going on and I seen all those three guys on the other side of the vehicle, so.
Q. Okay. But I guess I'm just trying to understand what -- where you were trying to -- strike that.
I'm trying to understand what you were shooting at?
A. I was shooting at the guys that were on the other side of the vehicle that were still attempting to get inside the vehicle.

75

Q. So were you shooting at any one of them in particular?
A. Not that I can recall, no, because they were all together.
Q. So you just shot in the general direction of these three people?
A. Yes.
Q. And how close to the red vehicle were you when you discharged your weapon?
A. I don't know. Like I said, about ten, 12 feet away.
Q. So at the time that you discharged your weapon were there three individuals standing in the general area that you were aiming?
A. Yes. Yes, it was. Because I'm not sure -- because two other guys took off. Two of the guys took off, went southbound. So those three guys were still right there in the area and one of the officers took off after them.
Q. And then you said that there was another vehicle that someone was trying to get into; is that right?
A. Yes. I think there was two vehicles that they were trying to get into.

76

Q. Do you know --
A. This particular vehicle they were -- it was a person already in this. This one that I remember was the one that they are trying to get into with the guy that was driving the vehicle.
Q. What did you see regarding subjects approaching another vehicle?
A. I want to say could have been those other two that tried to get in the vehicle and then ended up taking off running, if I can recall, but I'm not sure. I'm not sure about the two.
Q. So because before we were trying to figure out if you saw people getting into two cars simultaneously or if it was the other red car first and then they approached the second car. Is that what you saw happening?
A. I think so. I think it was a car that was behind them at first and then the car that they were trying to get into was in front of that car, if I can recall.
Q. Did they approach the second vehicle before or after you discharged your firearm?
A. They were already at that particular -- the red vehicle with the guy that was in the vehicle.

Q. So are you saying that they went to the -- so there's the red vehicle which is where you discharged your firearm and there was another vehicle.
Did they try to get into that other vehicle --
A. No.
Q. -- before or after?
A. No, not that vehicle. The vehicle where I discharged my firearm, that particular vehicle they was trying to get into. I think before that -- I honestly think it was another red vehicle before that they were trying to get into, but the one I'm talking about is the one where the guy was in the vehicle.
Q. So I'm just asking what you observed. So you observed them in this red vehicle where you discharged your firearm; correct?
A. Right. Yes.
Q. So you didn't actually observe these individuals try to get into any other vehicle at the time?
MR. SMITH: Objection, mischaracterizes the witness's testimony. You can answer the question if you understand.
THE WITNESS: I want to say it was a vehicle. They was trying to get in that vehicle and say the

doors was locked. So they was trying to get in that vehicle and then they moved into a different vehicle. And that was the vehicle where the white guy -- he was an older white Caucasian male in that vehicle.
BY MS. RAVEENDRAN:
Q. So then my question, to be clear, is did you observe these individuals go to the first vehicle before they start -- tried to get into the red vehicle where you discharged your firearm?
MR. SMITH: Object to the form of the question as to the number.
THE WITNESS: Okay. What I'm going to say is I saw them get into that particular vehicle.
BY MS. RAVEENDRAN:
Q. The red vehicle?
A. Right. With the Caucasian male in it.
Q. Okay. So you're still not answering my question.
Did you observe them trying to get into any other vehicles other than the red vehicle with the Caucasian male inside?
MR. SMITH: Object again to the form of the question. We're dealing with five people.
MS. RAVEENDRAN: I'm just asking if he ever

observed these individuals go after another car. It's a very simple question.
MR. SMITH: I agree, but I think the issue with the question is --
MS. RAVEENDRAN: Trying to differentiate the two vehicles.
MR. SMITH: Yeah. The two vehicles and the number of people that were at the red vehicle and the number of people that were at the other vehicle. So he's probably thinking to himself, you know.
MS. RAVEENDRAN: Well, at this point you're totally coaching the witness. So let me just re-ask the question.
BY MS. RAVEENDRAN:
Q. Other than the vehicle we've already discussed, which had between three to five people trying to get inside of it, did you observe these individuals go after any other vehicles at that time?
MR. SMITH: I'm going to object to the mischaracterization of testimony. You can answer it if you understand the question.
THE WITNESS: Say that question again.
MS. RAVEENDRAN: I'm going to lose it.
MR. SMITH: I'm not trying to be difficult.



THE WITNESS: I'm trying to remember that. Okay. I'm trying to -- okay.
BY MS. RAVEENDRAN:
Q. Let's see if we agree on this.
You've testified so far that there was at least one red vehicle or individuals that were trying to get inside of it; is that right?
A. Yes.
Q. Did you see individuals try to get inside of any other vehicle?
A. I'm confusing myself. When I got on the scene -- because they like -- they were like all over the place. There was two, two, like there was two vehicles. See I can't say 100 percent sure he was trying to get into this other vehicle. I'm just -- because everything was happening so fast.
I'm going to just say this one, the vehicle -- the one that I seen where the white guy was at, that's the vehicle they were trying to get into. Did they make any attempts to get into any other vehicles I'm not 100 percent sure. I think right when we first came there was a vehicle behind them they was trying to get into and then they moved up to that red vehicle. But I'm not 100 percent sure. But what I am sure about the one

where they had the guy in the car.
Q. All right.
A. Because they were moving all over the place, you know. I mean there was cars there, you know, so yeah.
Q. So then what made you think that there was a vehicle that was approached before the one that you observed?
A. Because when I came on scene it seemed like -- because it was probably hard to tell with this car going back and forth. So I want to say those doors were locked. It seemed like they came to that vehicle. I don't know if they were initially on that vehicle at first, but they came to that vehicle and it was going back and forth, so.
Q. So after you discharged your firearm what happened?
A. After I discharged my firearm those two guys that had already left and so Anderl went chasing those guys --
THE REPORTER: Excuse me.
THE WITNESS: Officer Anderl had already left. Once I discharged my firearm one of the guys -- one of the guys ended up falling and saying I was shot, is

what happened. One of guys ended up falling.
So I came to him. There was another police officer -- I don't know where he was from. I don't know where he came from. But he told me to go ahead and then I went and followed Anderl that was chasing the other two guys across the street.
BY MS. RAVEENDRAN:
Q. Where exactly did you see the individual who said he'd been shot?
A. Right probably in the -- it was a Currency Exchange so like right -- or right in the parking lot area.
Q. How far away was that from the red car?
A. Four feet, if that.
MR. SMITH: Object to the form, foundation, incomplete hypothetical.
THE WITNESS: I don't know how far.
MS. RAVEENDRAN: Hypothetical? I'm just asking how far away he was. I understand your speculation and form objections, but.
THE WITNESS: I don't know how far it was. Probably -- it wasn't far. Maybe it was -- we were right there on the corner. That's where the lot is at.

BY MS. RAVEENDRAN:
Q. Okay. So let's go back a little bit. You said, correct me if I'm wrong, that you saw at least two individuals flee the scene and Officer Anderl may have followed or he was also off the scene; is that right?
MR. SMITH: Object to the form. Object, mischaracterization of the testimony. You can answer the question.
BY MS. RAVEENDRAN:
Q. I'm going to re-ask it.
A. Okay.
Q. Before you discharged your firearm is it your testimony today that at least two individuals had left that scene?
MR. SMITH: Object to the form of the question. Object to foundation as well.
THE WITNESS: I'm almost positive -- I think they had already took off. Two guys had already took off before, yeah. Two guys already took off.
BY MS. RAVEENDRAN:
Q. And was Officer Anderl on the scene when you discharged your firearm?
A. I don't think he was.

Q. Okay.
A. I don't think so.
Q. It was your testimony earlier that you discharged your firearm in the direction of three individuals?
A. Yes.
Q. And so now this is where we're missing something, right, because you said there was an individual who had moved towards the Currency Exchange parking lot?
MR. SMITH: Objection, form, foundation.
BY MS. RAVEENDRAN:
Q. Let's start over from here. You discharged your firearm in the direction of three individuals?
A. Yes.
Q. The red car with the Caucasian male inside. What was the very next thing that happened?
A. I mean the very next thing that happened is that one of the guys fell and said he had been shot.
Q. What happened to the other two guys?
A. Well, I know one of the guys -- I think one of the guys -- oh, actually one of the guys kidnapped the guy -- come to find out that he actually got into the vehicle and kidnapped the guy that was the

Caucasian male and one of the other guys took off.
Q. Okay.
A. So it was actually two guys took off. So it was actually -- maybe it was four guys, four or five. So I think one of the other guys took off.
Q. And so you saw the red vehicle -- did you see red -- did you see the red vehicle leave where people are trying to get into it?
A. Did I see it actually leave the scene, no.
Q. Did you approach -- were you at the driver's side rear of the red vehicle when you discharged your firearm?
A. Not directly rear but, yeah, toward the back of it, yes. And probably sounds funny because the car was moving back and forth.
Q. Did you eventually come to the passenger side of that vehicle?
A. Not necessarily the passenger. It was kind of like an angle. I could still see, you know, toward the back of the vehicle angle so I could, you know, I'm looking like right at it.
Q. Okay. And then you said an individual fell?
A. Yes.
Q. Did you see the individual fall?

A. I didn't see him fall. I didn't see him fall.
Q. Was that -- were you standing on 159th Street when you discharged your firearm?
A. I was actually on Kedzie.
Q. You were on Kedzie?
A. Yes. Facing westbound.
Q. Was the individual who fell also on Kedzie?
A. He was somewhat I guess in that parking lot, right at the beginning, like right at the beginning of the parking lot.
Q. So from where you were standing on Kedzie you heard an individual in the Currency Exchange parking lot?
A. He wasn't in the Currency Exchange parking lot.
Q. I'm sorry if you didn't say that.
So where you were standing on Kedzie -- from where you were standing on Kedzie did you hear the individual in the parking lot say something?
MR. SMITH: Object to the form of the question.
MS. RAVEENDRAN: How else am I going to ask him about the individual in the parking lot than to call him the individual in the parking lot? That's all he's

testified to.
MR. SMITH: Well, okay. We can -- I'm trying to figure out what parking lot we're talking about.
MS. RAVEENDRAN: I don't know what parking lot we're talking about.
MR. SMITH: So, yeah. So that's why -- that was the basis of my objection.
MS. RAVEENDRAN: Oh, okay. That's fine. Let's clarify that.
BY MS. RAVEENDRAN:
Q. Do you know what parking lot it was?
A. It was where -- right at 159th and Kedzie.
Q. Do you know if it was the parking lot on the northwest corner?
A. Northwest corner, yes.
Q. The northwest corner?
A. Yes.
Q. Do you know of any of the stores in the northwest corner?
A. There's a Currency Exchange. There's -- at that time because -- I know there was a Currency Exchange, but it's -- those stores come and go. So '14 -- I know that's a Currency Exchange because that's been there for years.

Q. So for clarity's sake will you agree to call that the Currency Exchange parking lot?
MR. SMITH: Object to the form and object to the stipulation at this point, but you can answer the question.
BY MS. RAVEENDRAN:
Q. I'm going to call that the parking lot in the northwest corner.
A. Okay.
Q. Which you have testified that there is a Currency Exchange in; is that right?
A. Yes.
Q. Okay. So you were standing on Kedzie; is that right?
A. Yes.
Q. And you could see an individual in the northwest corner parking lot at Kedzie and 159th Street?
A. You mean after -- I don't get what you're asking me.
Q. Okay. Let's go back to when you discharged your firearm.
A. Yes.
Q. Okay. You testified that there were three

individuals on the passenger side of the red vehicle when you discharged your firearm; is that right?
A. Yes.
Q. That one of those individuals may have gotten into the vehicle; is that right?
A. Right.
Q. And one of those individuals may have left that, left the area right next to the red car?
A. Or could have got in a car also possibly.
Q. And then there was a third individual that you said fell; is that right?
A. Yes.
Q. And that person fell in the northwest corner parking lot of that intersection?
A. Yes.
Q. And you saw this person fall in the northwest parking lot while you were standing in Kedzie?
A. I didn't see him fall.
Q. Okay. So what did you see?
A. I just heard him say he was shot.
Q. And did you look over when you heard him say he was shot?
A. Uh-huh.
THE REPORTER: Yes?

THE WITNESS: Yes. I'm sorry. Yes.
BY MS. RAVEENDRAN:
Q. When you looked over to the northwest corner parking lot and saw the individual who said that he had been shot what did you see?
A. Him laying on the ground. A guy laying on the ground and went over there to, you know, check on him and there was another officer -- still to this day I don't know who this officer was. But he told me just to go ahead because I was worried because Anderl was actually a rookie. So him chasing those -- you know, I was thinking that I don't know if these guys still had guns or anything like that. At that time, you know, I don't know who was shooting. So I ended up catching up with Anderl that was chasing the other two guys.
Q. So you went from where you were on Kedzie over to the northwest parking lot?
A. Yes.
Q. How long did it take you to get from where you were on Kedzie to that corner of the northwest parking lot?
A. It wasn't far, 20 feet or so. It wasn't -- it was like right there.
Q. And at the time -- strike that.

And then when you were at the northwest parking lot you saw another officer; is that right?
A. Right. Yes.
Q. Can you describe to me what that officer had on?
A. I don't know who this officer was or where he came from. Just dark clothes. I just remember him saying just go ahead. I got him. Just go ahead is what he said. I still don't know who this person was, so.
Q. Do you know --
A. I don't know if he was listening on the radio and they came to assist. I don't know.
Q. What about this person made you think he was a police officer?
A. Because I think -- I think he kind of put his hands behind the guy's back and said I got him, go ahead. That's what kind of made me think that, you know, it was a police officer. I'm almost pretty positive it was a police officer. I wouldn't imagine a civilian putting him in cuffs.
Q. Was there anything about the way this person appeared, the way he was dressed that made you think he was a police officer?

A. I just remember dark clothing is what I remember. You know, we wear like dark, all blue. Just remember it being like dark, all dark clothes. I don't know if it was black or blue.
Q. Did you see if this police officer had a firearm?
A. No. I don't know.
Q. Do you remember anything else about his appearance?
A. No.
Q. Do you remember if he had something that said police on his chest or on his hat or anything?
A. No.
Q. Do you know or do you remember if he was in uniform or in civilian clothing?
A. If I -- I would just be speculating or assuming if I said anything else.
Q. Okay. And then is it your testimony that you at that time went in the direction you believed Officer Anderl to have gone?
A. Yes.
Q. What did do you -- were you on foot?
A. Yes.
Q. Where did you go?

93

A. We went southbound through the parking lot of White Castle's is where I seen him chasing the guys, two other guys.
And there was a house on the corner and I just happened to look over at the house and I see both of the two guys trying to hide and I'm trying to give them commands to stop and also radio Anderl that the guys are in that yard.
So they didn't stop. One guy jumped the fence and he head southbound behind another strip mall, head the other direction and I went after that guy while Anderl was chasing after the one suspect.
Q. You said it was a White Castle parking lot?
A. Yes.
Q. Do you know which corner of the street that was on?
A. That's on the southwest side.
Q. So is it fair to say that you walked from the edge of the northwest parking lot back to the southwest parking lot?
A. No. I ran. I ran.
Q. But you went from the northwest parking lot and then you ran to the southwest parking lot?
A. Yes.

94

Q. Could you see Officer Anderl at the time that you got to the southwest parking lot?
A. No.
Q. And just so we can try to map this, which of those four parking lots belonged to that Rent-A-Center?
A. Neither -- that would be considered the southeast side.
Q. So after you observed the two individuals go in the yard at the edge of the southwest parking lot what did you do?
A. Again giving them several commands to stop, freeze, don't move. They ignored all those commands. One guy jumped a gate and I radioed to Anderl to that the guys are in the yard, you know, be careful and then I went after the other guy that took off behind one of the strip malls.
Q. And then what happened?
A. I saw them cross the street. I ran across the street. I lost sight of them and a passerby flagged me down and said, you know, he went over and jumped in a dumpster.
So as I ran over there towards the dumpster Anderl and -- Officer Anderl and Officer Davis got the other guy in custody and they came up in another vehicle and

95

met with me right when I got to the garbage can, the can. So we searched the can and the guy was in the can. We put him in cuffs.
Q. You said it was a can. Was it a dumpster?
A. I'm sorry. It was a dumpster.
Q. This was just for me to understand if this guy went into a tiny garbage can.
A. No. It was a dumpster.
Q. So did you apprehend the suspect that you found in the dumpster?
A. Yes, we did.
Q. Did you handcuff him?
A. Yes. I want to say Anderl handcuffed him, yes.
Q. And then where was he taken?
A. Both Anderl and Officer Davis put both those guys in the back seat and they took them back to the police station to lock up.
Q. At what point after you saw the individual jump the fence did Officer Anderl -- well, strike that.
By the time you had arrested this individual both Officer Anderl and Officer Carson -- yeah. Sorry. No. Officer Davis were present?
A. Say that again.

96

A. Yes.
Q. Is it possible those were the shots you heard discharged -- strike that.
You heard shots being fired at some point before you discharged your weapon; is that right?
A. Yes.
Q. Is it possible that the shots you heard being discharged were Officer Davis's shots?
A. I'm not sure. I'm not 100 percent.
Q. Did you ever see Officer Davis pointing his weapon on April 24th, 2014?
A. Can't recall. I don't think so, no.
Q. Have you been trained in when a Markham City police officer has the authority to shoot at a vehicle?
A. Have I been trained? You mean in conjunction with the use of force?
Q. Sure. Well, in conjunction with anything, have you received training on when it's appropriate to shoot at a vehicle?
A. I'm not --
THE REPORTER: Excuse me. You have to speak up.
THE WITNESS: I'm thinking as she's telling me. I'm sorry. Say that again. Ask me again.

105

BY MS. RAVEENDRAN:
Q. In your training were you ever taught when it's appropriate to shoot at a vehicle?
A. Not that I can recall.
Q. If we can go back to when you discharged your weapon.
How many times did you discharge your weapon?
A. Once, maybe twice. One or two times.
Q. Did you take a bladed stance when you discharged your weapon?
A. I can't recall.
Q. Do you know if -- are you left-handed or right-handed?
A. Right-handed.
Q. Do you know if you would have taken the shots with your right hand?
A. Yes.
Q. Do you know if the individual who claimed to have been shot in the northwest parking lot was indeed shot?
A. Do I know that 100 percent?
Q. Yes.
A. No.
Q. In your review of the police reports from

106

April 24th, 2014 did you find out whether he had been shot?
A. Reports, I'm not sure.
Q. Do you know if the individual who was shot in the northwest parking lot was eventually arrested by Markham City Police Department?
A. Yes.
Q. Was he booked by the Markham City Police Department?
A. Yes.
Q. Do you know if he was searched by members of the Markham City Police Department?
A. I'm not sure.
Q. Do you know if a weapon was ever found on his person?
A. I'm not sure. I don't think so.
Q. When you heard the individual that was shot in the northwest parking lot what exactly did he say?
A. Just that he'd been shot.
Q. Did you say anything in response?
A. I don't think I said anything because there was someone -- like I said, there was somebody right there on the scene.
Q. Did you say anything to that person who was

107

right there on the scene?
A. No. He just said go ahead. Go ahead. I got this. Go ahead. I got this. Go help the other officer.
Q. Did you ever make any physical contact with the individual that had been shot in the northwest parking lot?
A. No. Just when I came over probably for that second or two, you know, that was it.
Q. Did you observe anything about possible injuries?
A. No.
Q. Did anyone ever speak to you about the condition of the person in the northwest parking lot who claimed to have been shot?
A. No.
Q. Did you complete a use of force report after April 24, 2014 regarding this incident?
A. Not that I recall.
Q. Were you put on administrative leave after April 24th, 2014?
A. Administrative leave, no. I don't think I was put on administrative leave.
Q. Were you -- did you take some --

108

A. Took some days off, yeah.
Q. Why did you take days off?
A. I think that's like standard procedure when, you know, your firearm is discharged I think that's standard procedure. Because they -- I know what it was. My gun -- my weapon was taken for an investigation. That's what it was.
Q. Were you told what was being investigated?
A. Just the shooting.
Q. What did you mean by just shooting?
A. I'm saying the discharge of a firearm.
Q. Oh, okay. I'm sorry. You said the shooting, not just shooting?
A. No. Yeah. That's just kind of protocol.
Q. Yeah.
A. Firearm discharged.
Q. Who took your firearm?
A. Detective Jones.
Q. Who told you to take -- strike that.
Did you voluntarily take a few days off?
A. Yes.
Q. Did anyone suggest that you take a few days off?
A. I think it was suggested. I think so.

Q. Were you required to fill out any reports regarding your use of a firearm?
A. Not that I can recall.
Q. Did anyone follow up with you after you took your days off?
A. I think so.
Q. Do you know who followed up with you?
A. Maybe my chief of police. I'm not sure.
Q. Did anyone tell you what they were investigating specifically regarding the shooting?
A. No.
Q. Did any state agencies respond to the scene on April 24th, 2014?
A. Yes. I think the Illinois, the state police.
Q. Do you know why they responded?
A. I think again that's protocol, any type of protocol when an officer discharges his firearm.
Q. Do you know if they were investigating at all how someone got shot at the scene on April 24th, 2014?
A. I'm assuming they probably investigate -- I'm assuming.
Q. Did anyone ask you if you shot any individuals on April 24th --
A. No.

Q. -- 2014.
Were you required to talk to a psychologist during your days off?
A. No.
Q. I'm going to go back to that officer that you didn't know.
Did you see this unknown officer fire a weapon at any time?
A. No.
Q. Did that officer tell you he had fired a weapon?
A. No. I had no contact with him.
Q. Before you discharged your weapon were you aware that that other officer was present at the scene?
A. No.
Q. Do you know if the Public Integrity Task Force responded to the scene of this incident?
A. I think so. I think. I'm not sure.
Q. Did you ever speak to anyone from the Public Integrity Task Force?
A. Not that I can recall.
Q. Did you ever complete or review a discharge of firearms report for this incident?
A. Not that I recall.

Q. Did you ever discuss this incident with the chief of police?
A. No.
Q. Do you know if the chief of police was notified that the incident had occurred?
A. He usually is, yes.
Q. Do you know if the unknown officer that you saw was mentioned in any of the police reports?
MR. SMITH: Objection, asked and answered. You can answer.
THE WITNESS: Not that I'm aware of.
BY MS. RAVEENDRAN:
Q. Do you know of any reason the unknown officer would not be included in the police reports?
A. No.
Q. Do you know if Officer Jackson discharged his weapon on April 24th, 2014?
A. Not that I'm aware of.
Q. Do you know if Officer Anderl discharged his weapon on April 24th, 2014?
A. Not that I'm aware of.
Q. Did you ever discuss the presence of the unknown officer with any other Markham City Police Department officers?