## Page 1

```
         IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION
DARREN SIMS,                    )
         Plaintiff,             )
    vs.                         ) No. 1:16 CV 2961
CITY OF MARKHAM, a              )
municipal corporation;          )
OFFICER CARSON (#552)           )
and OFFICER DAVIS               )
(#510), in their                )
individual capacity,            )
         Defendants.            )
```

The deposition of ROBERT ANDREL, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Patricia L. Wangler, Certified Shorthand Reporter in the State of Illinois, at 200 North LaSalle Street, Chicago, Illinois, on June 14, 2017, commenced at the hour of 11:05 a.m., and terminated at the hour of 12:53 p.m.

Reported By: Patricia L. Wangler, CSR
License No.: 084-002417

## Page 2

APPEARANCES:

    ROMANUCCI & BLANDIN, LLC, by
    MS. BHAVANI RAVEENDRAN
    321 North Clark Street, Suite 900
    Chicago, Illinois  60654
    (312) 458-1000
    braveendran@rblaw.net
        Representing the Plaintiff,

    SMITHAMUNDSEN, by
    MS. DANESSA PAGE WATKINS
    150 North Michigan Avenue, Suite 3300
    Chicago, Illinois  60601
    (312) 894-3200
    dwatkins@salawus.com
        Representing the Defendants.

## Page 3

```
                    I N D E X
WITNESS                              EXAMINATION
ROBERT ANDREL
    By Ms. Raveendran                     4
    By Ms. Watkins                       80
    By Ms. Raveendran                    96


                  E X H I B I T S
NUMBER                              MARKED FOR ID

              (No exhibits marked.)
```

## Page 4

(Witness sworn.)

MS. RAVEENDRAN: Let the record reflect that this discovery deposition is being taken pursuant to notice and in accordance with the Federal Rules of Civil Procedure and any applicable local rules of the Northern District of Illinois.

ROBERT ANDREL, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MS. RAVEENDRAN:

Q. My name is Bhavani Raveendran. We met earlier. I represent the plaintiff in Sims v. the City of Markham which is filed in U.S. Federal Court.

Can you spell your full name for the record, please.

A. Sure. Last name is Andrel. That's A-N-D-R-E-L.

Q. And your first name?

A. Robert.

Q. Have you ever been known by any names prior to that?

A. No.

**Page 45**

1  Q. Do you know if you were on patrol on the
2  date of the incident?
3  A. Yes, I was.
4  Q. Were you alone while you were on patrol?
5  A. Yes, I was.
6  Q. So just for this next bunch of questions,
7  please assume that I am referring to April 24th,
8  2014, the date of the incident as the date --
9  A. Okay.
10 Q. -- okay?
11    Do you recall where you were assigned to
12 work on April 24th, 2014?
13 A. I was in Zone 385.
14 Q. Does that zone include the intersection of
15 159th and Kedzie?
16 A. Yes.
17 Q. Have you ever patrolled before in that
18 zone?
19 A. Yes.
20 Q. Were you in uniform?
21 A. Yes.
22 Q. Were you armed?
23 A. Yes.
24 Q. What were you armed with?

**Page 46**

1  A. A Glock 22 which is a 40 caliber.
2  Q. Anything else?
3  A. Baton, OC spray. And that was it in terms
4  of defensive weaponry.
5  Q. Were you in a vehicle that night or
6  morning?
7  A. Yes.
8  Q. What kind of vehicle?
9  A. Dodge Charger.
10 Q. Was it marked?
11 A. Yes.
12 Q. Do you recall the unit number?
13 A. I believe it was 97.
14 Q. Were you in -- strike that.
15    Did you ever leave Zone 385 on
16 April 24, 2014?
17 A. Yes.
18 Q. When did you leave Zone 385?
19 A. During that incident I did because east
20 and west is split between Zone 385 and 386 on
21 159th Street.
22 Q. Okay.
23 A. So during the pursuit, part of the foot
24 chase I was in Zone 386 which border each other.

**Page 47**

1  Q. Other than this incident did you ever
2  leave Zone 385?
3  A. I can't recall.
4  Q. At or around 5:42 a.m. did you receive a
5  dispatch call?
6  A. Yes.
7  Q. What information did you receive over
8  dispatch?
9  A. That there is a burglary in progress at
10 the Rent-A-Center.
11 Q. Okay. Did you receive any information --
12 strike that.
13    So was it your understanding that you were
14 being dispatched about the scene of a property
15 crime?
16 A. Correct.
17 Q. Were you given any other information in
18 the dispatch?
19 A. I believe I was told that there was four
20 to five male black subjects that broke into the
21 Rent-A-Center and were carrying out TVs.
22 Q. Did you receive any information regarding
23 how they broke in or anything like that?
24 A. I don't recall.

**Page 48**

1  Q. Were you told whether or not the
2  individuals were armed?
3  A. They didn't say. Dispatch did not say.
4  Q. Is there anything else you remember
5  hearing from dispatch?
6  A. I don't recall, no.
7  Q. What did you do in response to the
8  dispatch call?
9  A. I drove my squad car towards
10 Rent-A-Center.
11 Q. Did you activate your lights?
12 A. Not at that time, no.
13 Q. What about your siren?
14 A. No.
15 Q. If we can just go back to the dispatch
16 call very quickly, did you receive any information
17 regarding any civilians or individuals who were
18 present at the scene of the burglary?
19 A. I vaguely remember dispatch stating that
20 someone from I believe Dunkin' Donuts or one of the
21 restaurants over there was the one that called it
22 in.
23 Q. Okay.
24 A. Was the complainant.

```
 1    Q.  Did you arrive at the Rent-A-Center?
 2    A.  Yes.
 3    Q.  While you were driving there, did you
 4  radio any other officers or communicate with anyone
 5  from the police department?
 6    A.  There was another officer dispatched
 7  there. I don't remember which officer it was
 8  though.
 9    Q.  When you arrived, were any other units
10  present?
11    A.  No.
12    Q.  What happened when you got to the location
13  of the Rent-A-Center?
14    A.  I got there, I saw two male black subjects
15  with TVs, standing outside of a -- it was like a
16  blue Infinity SUV. And then there was also a white
17  SUV to the left -- or to the north of that vehicle
18  parked right in front.
19    Q.  And then what happened?
20    A.  They -- two male black subjects then
21  dove into the rear passenger side door of the
22  Infinity.
23    Q.  The --
24    A.  The blue vehicle. I believe it was an
                                                    49
```

```
 1  Infinity, blue or gray. And then they fled
 2  northbound through the parking lot and then
 3  eastbound on 159th Street.
 4    Q.  And what happened to the other vehicle?
 5    A.  It also was traveling eastbound on
 6  159th Street as well I believe.
 7    Q.  Did you see any individuals get into --
 8  well, why don't we just for clarity sake going
 9  forward, there were two vehicles, right?
10    A.  Correct.
11    Q.  And one was you said gray or blue?
12    A.  Yes.
13    Q.  So it was darker?
14    A.  Yeah.
15    Q.  And then there was one that was --
16    A.  It was white.
17    Q.  So you saw the gray or blue, the darker
18  vehicle drive off. And then you saw the second
19  vehicle drive off too? Or were they already --
20    A.  I think -- I vaguely remember the white
21  one went onto 159th initially, and then I never saw
22  it again.
23    Q.  Okay. So it was the white vehicle that
24  disappeared from your view?
                                                    50
```

```
 1    A.  Yes.
 2    Q.  Okay. Did you see any individuals get
 3  into the white vehicle?
 4    A.  No.
 5    Q.  And those two individuals who got into the
 6  gray or blue -- the darker vehicle, did you see
 7  them with any firearms?
 8    A.  I did not see any firearms, no.
 9    Q.  Did you see any other individuals get into
10  the darker vehicle other than the two that you
11  mentioned?
12    A.  No.
13    Q.  Did the two that you saw get into the
14  darker vehicle have dreads?
15    A.  I believe so, yes.
16    Q.  Both of them did?
17    A.  I know one did for sure. I can't recall
18  off the top of my head if the other one did as
19  well.
20    Q.  Okay. Could you see any other individuals
21  in the vehicle?
22    A.  The windows were kind of tinted.
23    Q.  So once this car started moving, what did
24  you do in response?
                                                    51
```

```
 1    A.  I advised dispatch that it was a bonafide
 2  burglary. I saw the front of the business, the
 3  window was smashed out. And then the vehicle
 4  proceeded eastbound on 159th Street. And I advised
 5  dispatch. My lights and sirens were on at that
 6  time.
 7    Q.  Okay. Were you given any other
 8  information regarding officers that may be arriving
 9  at the scene?
10    A.  I don't recall.
11    Q.  Did you then pursue either of the
12  vehicles?
13    A.  Yes. The blue or gray one I did.
14    Q.  And did you -- and you said you no longer
15  could see the white vehicle?
16    A.  No. I don't know where the white one
17  went.
18    Q.  Okay. So what happened after you started
19  pursuing the dark vehicle?
20    A.  The vehicle was going eastbound on
21  159th Street from the Canterbury Shopping Center.
22  I pursued it with my lights and sirens on. It then
23  made a U-turn at approximately 159th and
24  Francisco Avenue. It was at a high rate of speed.
                                                    52
```

1   And then proceeded westbound on 159th Street. As I
2   was pursuing the vehicle, I was radioing in the
3   traffic that it is now westbound, high rate of
4   speed. The vehicle then like clipped the raised
5   median barrier, went through a red light at
6   159th and Kedzie and crashed into a dump truck that
7   was coming through the -- at 159th and Kedzie
8   through the red light.
9       Q.   Did it crash into the truck with the front
10  of the vehicle? Is that --
11      A.   Yes. I think it hit the back tires, the
12  back driver's side tires of the dump truck.
13      Q.   Okay. And once -- were you right on its
14  tail? Were you some distance away when that
15  happened?
16      A.   I was pretty close to it when it happened.
17  Maybe guessing, just guesstimating maybe 30,
18  40 feet behind it.
19      Q.   Okay. And then did you -- what did you do
20  after the crash occurred?
21      A.   I advised that there was a car accident at
22  159th and Kedzie.
23      Q.   Who did you advise, dispatch?
24      A.   Dispatch.
                                                    53

1       Q.   At that time were you aware of any other
2   officers that were heading there or coming --
3       A.   I'm sure they were on their way. I don't
4   recall any of the radio traffic though.
5       Q.   Did you -- what did you observe after the
6   accident occurred on the blue vehicle?
7       A.   After that there was about four or five
8   male black subjects that exited the vehicle and
9   then headed like northwest through the interaction
10  at 159th and Kedzie.
11      Q.   Were they running?
12      A.   Yes.
13      Q.   Did you observe any firearms on any of the
14  individuals at that time?
15      A.   I did not.
16      Q.   And you said there were four or five
17  individuals?
18      A.   Correct.
19      Q.   Did you see where all of those individuals
20  ran at that time?
21      A.   All of them went towards a red car that
22  was parked at 159th and Kedzie facing southbound.
23      Q.   Are you sure that all -- strike that.
24          So you recall seeing four individuals or
                                                    54

1   five individuals?
2       A.   It is four to five. I don't recall how
3   many were there.
4       Q.   Okay. And all of the individuals you saw
5   you could account ran from the truck to the second
6   vehicle?
7       A.   Correct. It was a red vehicle.
8       Q.   Is it possible that one or any of those
9   individuals didn't run to the second vehicle?
10      A.   No.
11      Q.   Okay. So where did those individuals go
12  regarding this red vehicle?
13      A.   As I was pulling up, they had basically
14  that first red vehicle surrounded that was stopped
15  at the light. At that point I got out of my car
16  and ordered them to the ground. They ran -- then
17  ran to a second red vehicle that was --
18      Q.   Okay. So if I can stop you real quick.
19  When you say they, do you mean all of the
20  individuals --
21      A.   All of the individuals, yes.
22      Q.   -- left the first vehicle?
23      A.   Yes.
24      Q.   All right.
                                                    55

1       A.   And then all of those suspects then went
2   to a second red vehicle that was parked at the red
3   light at 159th and Kedzie facing southbound.
4       Q.   Okay. And what happened -- well, let's go
5   back to the first vehicle. What were they doing at
6   the first vehicle?
7       A.   I saw people pulling on handles of the
8   door and kind of -- like banging on the window.
9       Q.   Could you see the vehicle was occupied?
10      A.   It was. I know it was occupied.
11      Q.   Was the car moving?
12      A.   No, it was parked.
13      Q.   When you say -- can you describe in more
14  detail where you saw the individuals as far as
15  which door handles, front, the back?
16      A.   That first car they pretty -- there was
17  suspects on the driver's side and passenger side
18  and towards the front of the car. And then that's
19  when I got out of my car.
20      Q.   Okay.
21      A.   And then they run to the second vehicle.
22  And then I saw someone grabbing at the driver's
23  side door. There was people on the passenger side
24  door. And there was someone on the actual hood of
                                                    56



**Page 57**

```
 1  the car at that time too.
 2      Q.  If we can go back to the first red
 3  vehicle, did you hear anyone saying anything at
 4  that first vehicle?
 5      A.  I couldn't -- I had my windows up.  I
 6  couldn't hear anything.
 7      Q.  Once you got out of the vehicle?
 8      A.  No, when I got out of the vehicle, I
 9  started yelling at them to get on the ground.
10      Q.  Okay.  Was there any response?
11      A.  They just ran to the other car.
12      Q.  Okay.  So once they got to the other car,
13  you said that at least one individual was on the
14  driver's side?
15      A.  Uh-huh.
16      Q.  At least one individual was on the
17  passenger side?
18      A.  Yes.
19      Q.  And at least one individual was on the
20  hood; is that correct?
21      A.  Yes.
22      Q.  And at that time did any other officers
23  come to the scene?  Did you observe them?
24      A.  I did not observe anyone else there at
```

**Page 58**

```
 1  that time.
 2      Q.  Was your firearm drawn at that time?
 3      A.  I believe it was.  I can't recall though
 4  if it was or not.
 5      Q.  Did you use your firearm at that time at
 6  all?
 7      A.  Did I shoot it or --
 8      Q.  Yes.  Did you discharge --
 9      A.  No, I did not.
10      Q.  Okay.  All right.  So you see the
11  individuals on the second red vehicle.  What
12  happened then?
13      A.  I then began running towards that vehicle.
14  As I start running towards that vehicle, I was also
15  ordering them down to the ground.  And then two
16  suspects then fled on foot southwest from that
17  location.
18      Q.  Okay.  And of those individuals who are
19  near the driver's side, the passenger side and the
20  hood, do you remember which two fled?
21      A.  I can't say for certain.  I believe that
22  they were both towards the hood and the passenger
23  side though.
24      Q.  So at least one from the hood area?
```

**Page 59**

```
 1      A.  I believe so.  And then one more towards
 2  the passenger side of the car.
 3      Q.  Okay.  So those two individuals began to
 4  run?
 5      A.  Correct.
 6      Q.  And you pursued those two?
 7      A.  Correct.
 8      Q.  And which way did they run?
 9      A.  It would have been southwest.  It was
10  towards the White Castle that's parked right there.
11  It is 15902 Kedzie.  It was what they ran towards.
12      Q.  And they were running in the same general
13  direction?
14      A.  Yes.
15      Q.  Okay.  And so when you started to pursue
16  them, did you look back at all to the second red
17  vehicle?
18      A.  No.
19      Q.  Did you receive any radio dispatch
20  indicating that other officers were assisting the
21  driver of the second --
22      A.  I am sure there was, I don't remember any
23  of it though.
24      Q.  Were you concerned about the individual in
```

**Page 60**

```
 1  the second red vehicle?
 2      A.  I mean, yeah, I was concerned.
 3      Q.  Okay.  I guess I am just trying to
 4  understand why you ran after the two individuals
 5  who were running away?  If you can parse that out.
 6      A.  People fleeing the scene, that's why I
 7  started chasing them.
 8      Q.  Were you concerned that the other
 9  individuals near the red car would be violent in
10  any way?
11      MS. WATKINS:  I just missed the question.
12      MS. RAVEENDRAN:  Was he concerned whether the
13  individuals who were still with the vehicle would
14  be violent.
15      THE WITNESS:  Yes, there was a concern.
16  BY MS. RAVEENDRAN:
17      Q.  Okay.  What was that concern based on?
18      A.  To me it looked like they were trying to
19  gain access to that vehicle.
20      Q.  While you pursued the two individuals who
21  went near the White Castle, did you hear anything
22  behind you?
23      A.  Yes.
24      Q.  What did you hear?
```

```
 1    A.   I heard gunshots.  I believe one to three.
 2    Q.   Did you receive a radio call at that time
 3 explaining the gunshots?
 4    A.   I don't recall.
 5    Q.   Who did you -- strike that.
 6         What was your state of mind as you ran
 7 away?  Who did you think was shooting off a gun?
 8    A.   I did not know.
 9    MS. WATKINS:  Objection.  Calls for
10 speculation, lack of foundation.
11    MS. RAVEENDRAN:  Okay.
12 BY MS. RAVEENDRAN:
13    Q.   At any point while you were pursuing the
14 other individuals, did you observe any Markham
15 Police Department personnel?
16    A.   I don't recall.
17    Q.   Eventually -- strike that.
18         So why don't you tell me what happened
19 from the time that you -- actually strike that too.
20         If we can go back.  You said you heard one
21 to three gunshots.  Was it you heard one gunshot or
22 three together, or was there a distance between
23 them?  Can you describe that a little more?
24    A.   I heard the one, and then I heard one to
                                                   61
```

```
 1 two maybe delayed I guess is the word I would use
 2 after that initial one.
 3    Q.   Did you hear those gunshots right when you
 4 started pursuing the subjects?  Was it sometime
 5 after?  Do you know how long between from you
 6 leaving that red vehicle to the time you heard the
 7 gunshots?
 8    A.   I don't know -- I don't think it was
 9 immediate.  I might have been chasing them for
10 maybe 10, 15, 20 feet before I heard them behind
11 me.
12    Q.   All right.  So what happened after the
13 pursuit began on foot?
14    A.   Can I name the other two guys or --
15    Q.   Yes.  Go ahead.
16    A.   Beacham [phonetic] and Welch, they hopped
17 over this plastic fence that was on the White
18 Castle property.  They hopped over that which was
19 southwest from where we were initially.  I went
20 around the fence.  And then they hopped a wooden
21 fence in the backyard of a residence.  It was the
22 first house on Sawyer Avenue on the east side of
23 the street.  I believe it was 15915.
24    Q.   And then did you pursue them over that
                                                   62
```

```
 1 second fence?
 2    A.   I -- I actually formed a perimeter around
 3 the fence.  And then Officer Jackson eventually
 4 came up there as well.  And we tried ordering them
 5 out.
 6    Q.   And then what happened?
 7    A.   Beacham, then he hopped the fence back
 8 onto Sawyer Avenue.  I was eventually able to take
 9 him into custody after a scuffle.
10    Q.   And then once you took him into custody,
11 what happened?
12    A.   Then Officer Davis -- I radioed that in,
13 that I had him in custody.  Then Officer Davis was
14 coming southbound on Sawyer Avenue from
15 159th Street.  And then we placed Beacham inside
16 the vehicle, his squad car at that time.
17    Q.   Did Officer Davis say anything to you
18 while this was occurring?
19    A.   No.
20    Q.   Did you tell him anything?
21    A.   Not that I can recall.  I believe I said
22 something about the other suspect, about where he
23 was.
24    Q.   So then once you put -- was it Mr. Beacham
                                                   63
```

```
 1 in the vehicle?
 2    A.   Yes.
 3    Q.   What happened?
 4    A.   I heard radio traffic from Officer Carson
 5 that a witness or a concerned citizen reported
 6 seeing another suspect flee the backyard of that
 7 house that I was at Sawyer and go eastbound across
 8 Kedzie Avenue.
 9    Q.   So then what happened?
10    A.   After that myself, Officer Davis, and
11 Beacham, who was in handcuffs, then drove in that
12 direction.  And we eventually got out of the car at
13 Velasquez Motors.  I am not sure what the address
14 is off the top of my head.
15         I got out of the vehicle.  Looked in the
16 general area.  And then I happened to hear a noise
17 come from inside the garbage can, dumpster.  And
18 Officer Carson who was then there with me, he told
19 me to open it up.  I opened it up, and then the
20 defendant Welch was inside.
21    Q.   Did you have your firearm drawn when you
22 opened the dumpster?
23    A.   I can't say for certain.  I would assume
24 so, yes, though.
                                                   64
```



Page 65:

1  Q.  So how did Mr. Welch get out of the
2  dumpster?
3  A.  I pulled him out.
4  Q.  Okay.  And then did you place him in
5  handcuffs?
6  A.  Yes.
7  Q.  And was he also placed in Officer Davis's
8  squad car?
9  A.  Yes.
10  Q.  So then what happened after that?
11  A.  After that myself, Officer Davis, Beacham,
12  and Welch then went back towards 159th and Kedzie.
13  Q.  And did you arrive to that intersection?
14  A.  Yes.
15  Q.  Did you leave the vehicle after you got to
16  that intersection?
17  A.  Yes.
18  Q.  What did you observe once you left the
19  vehicle?
20  A.  I saw a subject on the ground with an
21  ambulance next to them.  I saw bleeding on his arm.
22  Q.  Was that subject -- was he handcuffed?
23  A.  I don't recall.
24  Q.  Were any officers near the subject?

Page 66:

1  A.  There was a Harvey police officer there I
2  believe.
3  Q.  Okay.  Did you speak to the Harvey police
4  officer?
5  A.  I did not, no.  I don't believe so.
6  Q.  Did you speak to the people from the
7  ambulance?
8  A.  No.
9  Q.  EMTs.
10     Did you approach the subject that was on
11  the ground at all?
12  A.  No.
13  Q.  Did you find out what his name was or
14  anything like that?
15  A.  I believe it is Mr. Sims, your client.
16  Q.  Did you find that out on the date of the
17  incident?
18  A.  I believe so, yes.
19  Q.  Okay.  Do you know if you found that out
20  from the Harvey police officer or anyone on the
21  scene?  Or was it later?
22  A.  I believe it was later on when they had
23  the -- like I said, this was my call.  I had to do
24  the paper on it.  They had the printouts of each

Page 67:

1  subject's driver's license that was taken into
2  custody.
3  Q.  Okay.  So at that time you learned
4  Mr. Sims's name?
5  A.  No.  I didn't know any of their names at
6  that time.
7  Q.  Did you see Mr. Sims placed in the
8  ambulance?
9  A.  I don't think I saw him physically get put
10  in there, no.
11  Q.  Do you know if any -- did you accompany
12  Mr. Sims to the hospital?
13  A.  No.
14  Q.  Do you know if any of the other Markham
15  police officers did?
16  A.  I'm not sure.
17  Q.  When you wrote your incident report, were
18  you aware of any guns that were uncovered from the
19  incident?
20  A.  No.
21  Q.  Did you know -- so was Mr. Sims -- strike
22  that.
23     When you observed Mr. Sims, could you tell
24  he was injured?

Page 68:

1  A.  I saw bleeding from an arm.  I don't
2  recall which arm it was.
3  Q.  Could you tell what kind of wound it was?
4  MS. WATKINS:  Objection.  Lack of foundation.
5  THE WITNESS:  I do not know.  Not for certain.
6  BY MS. RAVEENDRAN:
7  Q.  Was it your understanding that Mr. Sims
8  had been shot?
9  MS. WATKINS:  Objection.  Lack of foundation,
10  calls for speculation.
11  THE WITNESS:  I believed he was, but I didn't
12  know.
13  BY MS. RAVEENDRAN:
14  Q.  Did you speak to Officer Carson or
15  Officer Davis regarding Mr. Sims?
16  A.  I'm sure I did.  I don't remember the
17  conversation though.
18  Q.  Did either -- did Officer Carson inform
19  you that he had discharged his weapon?
20  A.  I believe he did at some point.
21  Q.  Okay.  Did he tell you why or --
22  A.  I didn't ask him that.
23  Q.  Did Officer Davis tell you he had
24  discharged his weapon at the scene of the incident?

## Page 77

1  injured that was near the ambulance?
2     A.  I don't think so, no.
3     Q.  Did you hear him speaking to
4  Officer Carson?
5     A.  No.
6     Q.  Did you hear him speaking to
7  Officer Davis?
8     A.  No.
9     Q.  Did you ever ask Officer Carson or
10 Officer Davis how the individual had been injured?
11    A.  I don't believe I did, no.
12    Q.  Did the state police ever ask you how
13 Mr. Sims had been injured?
14    MS. WATKINS: Objection. Same as before, if
15 this needs to be marked confidential at a later
16 time, we just reserve that right.
17    MS. RAVEENDRAN: So are you objecting to the
18 question or just --
19    MS. WATKINS: Not objection. Just stating for
20 the record that we may need to mark this
21 confidential at some point depending on the task
22 force's communications and files with witnesses are
23 considered confidential.
24    MS. RAVEENDRAN: Okay.

## Page 78

1     THE WITNESS: I think they did ask when I spoke
2  with them.
3  BY MS. RAVEENDRAN:
4     Q.  Do you remember what your response was?
5     A.  I can't exactly remember my response, no.
6     Q.  Do you have any understanding as you sit
7  here today how Mr. Sims was injured?
8     MS. WATKINS: Objection. Lack of foundation,
9  calls for speculation.
10    THE WITNESS: I believe he was shot.
11 BY MS. RAVEENDRAN:
12    Q.  Who do you believe shot him?
13    MS. WATKINS: Objection. Lack of foundation,
14 calls for speculation.
15    THE WITNESS: I don't know who shot him.
16 BY MS. RAVEENDRAN:
17    Q.  Do you know if anyone at the Markham
18 Police Department investigated who shot Mr. Sims?
19    MS. WATKINS: Objection. Lack of foundation,
20 calls for speculation.
21    THE WITNESS: I can't answer that 100 percent.
22 I know that when there is an officer-involved
23 shooting, that typically falls on public integrity
24 and they investigate that.

## Page 79

1  BY MS. RAVEENDRAN:
2     Q.  Do you know if anyone was placed on
3  administrative leave after this incident at the
4  Markham Police Department?
5     A.  I can't recall.
6     Q.  Did the chief of police ever question you
7  regarding this incident?
8     A.  I don't believe so, no. Did you say
9  question me?
10    Q.  Yes.
11    A.  No.
12    Q.  Or talk to you about it?
13    A.  He might have talked to me about it. He
14 never questioned me though.
15    Q.  Were you present when members of the
16 public integrity task force arrived at the scene of
17 the incident?
18    A.  I believe I was at the police station by
19 then.
20    MS. RAVEENDRAN: I think I might be done. I
21 just want to check one more thing. I think I'm
22 done.
23    MS. WATKINS: Can we just take a quick break.
24    MS. RAVEENDRAN: Yes.

## Page 80

1             (Recess taken.)
2                EXAMINATION
3  BY MS. WATKINS:
4     Q.  This might skip around a little bit so
5  bear with me. Officer Andrel, from the moment
6  where you first pulled up to the Rent-A-Center to
7  when you left the scene, can you estimate how long
8  that time period was?
9     A.  If I was going to estimate, maybe -- you
10 said from the time that I was there until --
11    Q.  When you first saw the Rent-A-Center to
12 the time that you left the scene after everything
13 was over?
14    A.  Maybe half hour, 40 minutes.
15    Q.  And how much of that time would you say
16 that the scene was active? If that's the right
17 terminology.
18    A.  It was still pretty active when I left
19 because there was still evidence in the
20 intersection, there are -- detectives were arriving
21 on the scene. So it was still an active scene when
22 I left.
23    Q.  So I think "active" would have been the
24 wrong term then.

**Page 81**

1    For what amount of time would you say that
2 there were still suspects on scene that were at
3 large?
4    MS. RAVEENDRAN: Objection. Calls for
5 speculation.
6 BY MS. WATKINS:
7    Q.   Let me strike that.
8         At the time that you left the scene, were
9 you aware of any officers currently pursuing other
10 potential suspects?
11   A.   I was not.
12   Q.   You weren't aware of that?
13   A.   No.
14   Q.   As far as you were concerned when you left
15 the scene, was everyone that was involved in the
16 burglary and the car crash, were they under
17 custody?
18   A.   No.
19   Q.   Who was not under custody?
20   A.   I found out at a later time that the
21 second red vehicle that was parked at 159th and
22 Kedzie facing southbound was carjacked.
23   Q.   Okay. Other than that anybody else that
24 was still at large?

**Page 82**

1    A.   Not to my knowledge, no.
2    Q.   So the time you left, Sims, Beacham, and
3 Welch were all in custody?
4    A.   Correct.
5    Q.   And two -- or how many?
6    A.   One to two others.
7    Q.   Okay. What about from the time you
8 arrived at the Rent-A-Center to the time when you
9 took Welch into custody, how long would you say
10 that was?
11   MS. RAVEENDRAN: Objection. Calls for
12 speculation.
13   THE WITNESS: Maybe like 15 minutes, 15 to
14 20 minutes.
15 BY MS. WATKINS:
16   Q.   Okay. So for maybe half the time you were
17 actively pursuing suspects?
18   A.   Yes, I would say that's accurate.
19   Q.   And you said that when you pulled up to
20 the Rent-A-Center you saw two individuals, black
21 males, carrying TVs that jumped into the back of
22 the gray or blue vehicle, right?
23   A.   Correct.
24   Q.   The back seat of that vehicle?

**Page 83**

1    A.   Yeah. It was the passenger side back
2 door.
3    Q.   Okay. What did they do with the TVs that
4 they were holding?
5    A.   They jumped in the car with them.
6    Q.   Okay. I don't mean to laugh. I am just
7 picturing it. I'm picturing a big TV though so.
8         Okay. So safe to say that those two
9 individuals -- well, no strike that.
10        After they jumped in the back, how soon
11 after did that vehicle take off?
12   A.   It started -- if my memory is correct,
13 that vehicle started moving before they actually
14 were inside of it because the back passenger side
15 door was still open initially during the very
16 beginning of the pursuit.
17   Q.   And were you able or are you as you sit
18 here today able to identify either of those two
19 individuals that jumped into the back seat?
20   A.   One of them, yes.
21   MS. RAVEENDRAN: Objection. Calls for
22 speculation.
23   Go ahead.
24

**Page 84**

1 BY MS. WATKINS:
2    Q.   One of them?
3    A.   One of them was Beacham for sure.
4    Q.   So is it safe is to say that Beacham was
5 not the driver of that blue or gray vehicle?
6    MS. RAVEENDRAN: Objection. Calls for
7 speculation.
8    THE WITNESS: Yes.
9 BY MS. WATKINS:
10   Q.   The vehicle was already moving when he
11 jumped into the back seat, right?
12   A.   Yes.
13   Q.   Okay. So if the vehicle was already
14 moving when the two jumped in, then there had to be
15 someone behind the wheel of the car?
16   A.   Correct.
17   Q.   Okay. Did you ever learn who that
18 individual was that was driving?
19   MS. RAVEENDRAN: Objection. Calls for
20 speculation.
21   THE WITNESS: I did not learn, no.
22   MS. RAVEENDRAN: Sorry. You have to let me get
23 my objection.
24   THE WITNESS: I am sorry.

**Page 85**

BY MS. WATKINS:
Q. And, in fact, there were -- you said four to five black males jumped out of that vehicle after it crashed into the dump truck?
A. Correct.
Q. So if you saw two jump into the back, then at least two, if not three people were already in that vehicle?
MS. RAVEENDRAN: Objection. Calls for speculation.
THE WITNESS: Correct.
BY MS. WATKINS:
Q. Can a vehicle be used as a weapon?
A. Yes.
Q. From your experience and training would intentionally slamming a vehicle into another vehicle, a person, anything where another human is involved, can that be considered a violent felony?
MS. RAVEENDRAN: Objection. Incomplete hypothetical, calls for speculation, lack of foundation.
THE WITNESS: Yes, it could.
BY MS. WATKINS:
Q. Is carjacking a violent felony?

**Page 86**

A. Yes.
Q. I believe you said that the blue or gray vehicle that you were pursuing was moving at a high rate of speed; is that right?
A. Correct.
Q. Faster than the speed limit?
MS. RAVEENDRAN: Objection. Calls for speculation. Lack of foundation.
THE WITNESS: Yes.
BY MS. WATKINS:
Q. And you know that because you were following them, right?
MS. RAVEENDRAN: Objection. Form.
THE WITNESS: Correct.
BY MS. WATKINS:
Q. Now, you said there could be situations where other police forces need to be called to a scene other than Markham, right?
A. Correct.
Q. And I know you listed a couple off, Harvey, Park Forest, Dalton, CPD, right?
A. We have had everyone in the area in Markham at some point.
Q. All right. Do you know the names of the

**Page 87**

officers of all those different police units?
A. Pertaining to this incident?
Q. No, just in general.
A. No.
Q. Do you know how many Harvey officers were on the scene of this incident?
A. I can't say for certain. I think one to two.
Q. Any officers from any other department besides Harvey that you were aware of?
A. I don't recall seeing any other agency there.
Q. After you started your pursuit in your squad car, who was the first officer that you saw from any police officer in uniform or not in uniform?
A. I don't recall.
Q. If you recall, did you see the first officer?
A. It might have been Officer Carson. I can't say for certain though.
Q. When I say when, I don't mean like what time was it. I mean where were you? Do you remember when you first saw another officer?

**Page 88**

A. As I was approaching that red vehicle, I believe I saw Officer Carson, but I'm not 100 percent certain. He was coming up behind me I believe. There was an officer behind me. I don't know exactly 100 percent who it was so --
Q. In their vehicle or on foot?
A. I think it was on foot.
Q. But you are not sure?
A. I'm not sure.
Q. During some questions about your training, I think you said that you were never taught to shoot at tires of a vehicle?
A. Correct.
Q. Does that mean you were just never taught that, or you were specifically taught not to do that? Can you just clarify that for me.
A. I was just -- I was never taught to shoot at tires. So I can't say I was never told don't shoot at tires but --
Q. Okay.
A. I was never taught to shoot tires.
Q. Got it. Thanks.
Can someone's fists be used as a weapon?
A. Yes.

```
 1  was running towards anyone?
 2      MS. RAVEENDRAN: Objection. Calls for
 3  speculation.
 4      THE WITNESS: No, it didn't.
 5  BY MS. WATKINS:
 6      Q.  Was there any concern that they would be
 7  harming someone that they were running towards?
 8      A.  There is always concern. I would say it
 9  was a very low concern.
10      Q.  In the residential area that you were
11  chasing them in compared to the intersection at
12  159th and Kedzie which would you say was more
13  populated?
14      MS. RAVEENDRAN: Objection. Calls for
15  speculation.
16      THE WITNESS: 159th and Kedzie.
17  BY MS. WATKINS:
18      Q.  Why do you say that?
19      A.  There was rush hour traffic at that time.
20  There was a lot of cars in that intersection and
21  passing through there. And that's also probably
22  the busiest intersection in town.
23      Q.  More potential victims there?
24      MS. RAVEENDRAN: Objection. Calls for
                                                   93
```

```
 1  speculation.
 2      THE WITNESS: Correct.
 3  BY MS. WATKINS:
 4      Q.  More people?
 5      A.  Correct, more people.
 6      Q.  If you recall were there more than just
 7  those two red cars in that immediate area where the
 8  suspects were?
 9      A.  Yes, I know there was more vehicles there.
10      Q.  I believe you said you assume you had your
11  firearm drawn when you were approaching the
12  dumpster where you eventually found Welch, right?
13      A.  Correct.
14      Q.  Why was your firearm drawn?
15      A.  Suspect had fled from me in a vehicle --
16  well, back up.
17          Suspect allegedly was involved in a
18  burglary, fled from me in a vehicle, fled from me
19  on foot. And at that point I was not sure if he
20  had a firearm on him or a weapon on him or meant to
21  do harm to me after he had just been involved in
22  many different crimes.
23      Q.  Did you do any investigation of the scene?
24      A.  No.
                                                   94
```

```
 1      Q.  Did you search for any types of weapons
 2  from the scene?
 3      A.  I did not, no.
 4      Q.  Would it be accurate to say that use of
 5  force is left to the officer's discretion based on
 6  your training with the City of Markham?
 7      MS. RAVEENDRAN: Objection. Lack of
 8  foundation.
 9      THE WITNESS: I would say, yes, discretion does
10  play a role in that, a big role.
11  BY MS. WATKINS:
12      Q.  As you sit here today, could you give me a
13  list running down every time it is and is not
14  appropriate to use your weapon?
15      A.  No.
16      MS. RAVEENDRAN: Objection. Lack of
17  foundation.
18      THE WITNESS: No, I could not.
19  BY MS. WATKINS:
20      Q.  Based on your training -- every training
21  that you have discussed today, SWAT training, just
22  your training in the academy, you are not able to
23  do that?
24      A.  No, based -- a lot of times it is based on
                                                   95
```

```
 1  the totality of the circumstances. So each event
 2  is completely different.
 3      MS. WATKINS: Okay. Thank you, Officer.
 4              FURTHER EXAMINATION
 5  BY MS. RAVEENDRAN:
 6      Q.  Just a few follow-up questions.
 7      A.  Sure.
 8      Q.  Do you know if any police officers pursued
 9  the vehicle that you said was carjacked?
10      MS. WATKINS: Objection. Lack of foundation,
11  calls for speculation.
12      THE WITNESS: I don't know.
13  BY MS. RAVEENDRAN:
14      Q.  At any time during the incident on
15  April 24th, 2014, did you use your -- well, strike
16  that.
17          Do you have a radar gun for speed in your
18  squad vehicle?
19      A.  That one did have a radar, but it was
20  broken. It did not work.
21      Q.  Did you use it on April 24th, 2014?
22      A.  No.
23      Q.  Have you ever been trained in pacing a
24  vehicle to determine the speed?
                                                   96
```

**Page 97**

1  A.  Yes.
2  Q.  Did you use pacing during the incident on
3  April 24th, 2014?
4  A.  I wasn't necessarily pacing the vehicle.
5  I know I looked down and I was going approximately
6  90 miles an hour and they were still very far ahead
7  of me.
8  Q.  But to be clear, you weren't using the
9  pacing method to determine the speed of the
10 vehicle?
11 A.  Correct.
12 Q.  Have you ever as a Markham police officer
13 shot into a crowd of people?
14 A.  No.
15 Q.  Have you ever been trained to shoot into a
16 crowd of people?
17 A.  No.
18 Q.  Have you ever been trained that you
19 shouldn't shoot into a crowd of people?
20 A.  Yes.
21 Q.  Have you ever shot at more than one person
22 at one time as a Markham police officer?
23 A.  Can you rephrase that. Shoot at more than
24 one person at one time?

**Page 98**

1  Q.  Yes.
2  A.  Meaning what exactly?
3  Q.  Have you ever --
4  A.  Like multiple people to shoot like this on
5  or --
6  Q.  Have you pointed your gun in the direction
7  of multiple people, not aiming at any one of them
8  individually?
9  A.  I can't say for certain that I have. I
10 may have before depending on the call that I have
11 been sent to.
12 Q.  It was my understanding that you had never
13 shot your firearm --
14 A.  No.
15 Q.  -- as a Markham police officer?
16 A.  Correct.
17 Q.  So that would also not include shooting at
18 more than one person at once?
19 MS. WATKINS:  I think your question was
20 pointing the weapon.
21 THE WITNESS:  You said pointing.
22 BY MS. RAVEENDRAN:
23 Q.  Oh, I am sorry. I apologize. What I
24 meant was did you discharge your firearm?

**Page 99**

1  A.  No.
2  Q.  Have you ever been trained to discharge
3  your firearm while aiming at more than one person
4  at a time?
5  A.  Yes.
6  Q.  Can you describe to me how you have been
7  trained in that.
8  A.  If you have multiple subjects with -- that
9  are posing deadly force, a threat, if there are two
10 subjects pointing two guns at me, then I would have
11 multiple targets to shoot.
12 Q.  Okay. But would you target one and then
13 the other, or would you just shoot in the general
14 direction? According to your training?
15 A.  I would target one and then the other.
16 Q.  Why is that?
17 A.  Because you want to shoot at the threat.
18 So I would aim at the threat and try to neutralize
19 that and then try to neutralize the other threat.
20 It might not necessarily be I am going to shoot
21 this one and only focus on him until he drops. It
22 might be a mix. It just kind of depends. It is
23 not a static thing.
24 Q.  Right. But you would agree that aiming at

**Page 100**

1  individual targets is part of that training?
2  A.  Yes.
3  MS. RAVEENDRAN:  I don't have any more
4  questions.
5  MS. WATKINS:  Nothing. So you have the option
6  of getting a copy of the transcript. You can't
7  make any substantive changes. You can't change a
8  no to a yes.
9  THE WITNESS:  I can't highlight it?
10 MS. WATKINS:  Yeah, you can draw pictures, do
11 whatever you want but --
12 THE WITNESS:  Put whiteout over it?
13 MS. WATKINS:  But you can correct any
14 misspellings, grammatical errors, not that I think
15 she would make any. But most people waive
16 signature. It is really up to you.
17 THE WITNESS:  I'm okay on that.
18 MS. WATKINS:  Okay, we will waive. Thank you.
19                (Deposition concluded at
20                 12:53 o'clock p.m.)