James Walker 07/06/2017

1         IN THE UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF ILLINOIS
3            EASTERN DIVISION
4 DARREN SIMS,          )
5       Plaintiff,    )
6  vs.           ) No. 16 CV 2961
7 CITY OF MARKHAM ET.AL,   )
8      Defendants.   )
9     The deposition of JAMES WALKER, called
10 For examination pursuant to the Rules of Civil
11 Procedure for the United States District Courts
12 Pertaining to the taking of depositions, taken
13 Before MARY ELLYN D'ANDREA, at 321 NORTH CLARK
14 STREET, Illinois, on July 6, 2017, at the hour
15 of 1:05 p.m.
16
17
18
19
20
21
22 REPORTED BY: Mary Ellyn D'Andrea
23 LICENSE NO:084-002317
24

                          1

---

1 APPEARANCES:
2     ROMANUCCI & BLANDIN, by
3     BHAVANI K. RAVEENDRAN,
4     321 NORTH CLARK STREET
5     SUITE 900
6     CHICAGO, IL, 60602
7     312-458-1000
8     Braveedran@rblaw.net
9       Representing the Plaintiff;
10
11     SMITH AMUNDSEN LLC, by
12     DANESSA WATKINS,
13     150 NORTH MICHIGAN AVENUE
14     SUITE 3300
15     CHICAGO, IL, 60601
16     (312) 894-3200
17     Dwatkins@salawus.com
18       Representing the Defendants;
19
20
21
22
23
24

                          2

---

1         I N D E X
2 WITNESS             EXAMINATION
3 JAMES WALKER
4   By MS. RAVEENDRAN      4, 129
5   By MS. WATKINS      111, 131
6
7
8
9
10
11         E X H I B I T S
12 NUMBER         MARKED FOR ID
13 WALKER Deposition Exhibit
14   Exhibit No. 1 (retained)    104
15   Exhibit No. 2 (retained)    111
16
17
18
19
20
21
22
23
24

                          3

---

1         JAMES WALKER,
2 called as a witness herein, was examined and
3 testified as follows:
4      DIRECT EXAMINATION
5 BY MS. RAVEENDRAN:
6   Q.  Thank you for being here today. We
7 just met a moment ago. My name is Bhavani
8 Raveerdran. I represent the Plaintiff in Sims
9 v. The City of Markham and some other named
10 defendants.
11     You understand that you are here today
12 to testify regarding that matter, is that
13 correct?
14   A.  I do.
15   Q.  And as a 30(b)(6) witness?
16   A.  Yes.
17   Q.  Can the record reflect that this is a
18 discovery deposition taken pursuant to Notice
19 and according to the Federal rules of civil
20 procedure.
21     Can you spell your full name for the
22 record, please?
23   A.  James, J-a-m-e-s, Walker, W-a-l-k-e-r.
24 I am employed with the City of Markham Police

                          4

```
1      A.   Dunbar Vocational High School.
2      Q.   And did you attend University or
3  college after that?
4      A.   I did.
5      Q.   And what did you attend?
6      A.   Harold Washington College, also the
7  Professional Career Development Institute, and
8  Northwestern University.
9      Q.   Did you receive degrees from these
10 programs?
11     A.   Certifications.
12     Q.   And what were your certification?
13     A.   Paralegal certification.
14     Q.   From Harold Washington?
15     A.   No, just general classes.  Paralegal
16 certification, and staffing command -- police
17 staffing command from Northwestern University.
18     Q.   Did you work as a paralegal?
19     A.   Briefly.
20     Q.   Not for everyone, right?
21     A.   No.
22     Q.   Do you have any Associate Degrees or
23 Bachelor's Degrees other than what we have just
24 discussed?
                                                9
```

```
1      Q.   When did you attend the Police Academy?
2      A.   1995, '96 -- '96, yeah, so long ago.
3      Q.   Where did you attend?
4      A.   Chicago Police Training Academy.
5      Q.   Was that in preparation for your work
6  with Housing Authority?
7      A.   Correct.
8      Q.   Did you receive any formal training at
9  the Kankakee Police Department once you
10 transferred there?
11     A.   I didn't stay long enough.  I got hired
12 by Markham, so I didn't stay that long to really
13 accept the field training.
14     Q.   So you got a little bit of field
15 training?
16     A.   Correct.
17     Q.   After you attended the Academy in 1996,
18 how long were you with the Housing Authority?
19     A.   Two years, until I got hired by
20 Kankakee and then Markham.
21     Q.   Did you receive any additional training
22 when you began as a police officer at Markham?
23     A.   Yes.
24     Q.   What additional training did you
                                                11
```

```
1      A.   No.
2      Q.   After graduating with your
3  certificates, what was your first job that
4  involved police or security work?
5      A.   I was a police officer for the Chicago
6  Housing Authority Police Department.  That was
7  my first police job, and then Kankakee Police
8  Department, and finally Markham Police
9  Department where I have been since.
10     Q.   What was your highest rank with the
11 Kankakee Police?
12     A.   Patrol officer.
13     Q.   And what was your highest rank with
14 Housing Authority of Chicago?
15     A.   Patrol officer.
16     Q.   When did you first begin working at the
17 Markham Police Department?
18     A.   1998.
19     Q.   And did you begin as a patrol officer?
20     A.   I did.
21     Q.   Did you attend the Police Academy when
22 you began at Markham, or did you attend it
23 previously?
24     A.   Previously.
                                               10
```

```
1  receive at Markham?
2      A.   Field training.
3      Q.   Was that provided by a field training
4  officer?
5      A.   Yes.
6      Q.   Did you have more than one field
7  training officer?
8      A.   Yes.
9      Q.   Do you recall who they were?
10     A.   Officer Quinlan, Sergeant Wright, and I
11 think that is it.
12     Q.   Do either Officer Quinlan or Sergeant
13 Wright still work at --
14     A.   No.
15     Q.   -- the Markham Police Department?
16          Just try to let me finish my whole
17 question --
18     A.   Okay.
19     Q.   -- just so the record is clear what you
20 are saying yes or no to?
21     A.   Okay.
22     Q.   How long were you -- strike that.
23          Did you ever change ranks from a police
24 officer at the City of Markham?
                                               12
```

| | |
|---|---|
| 1    A.   Yes. | 1    Q.   What are your primary duties? |
| 2    Q.   When did that happen for the first | 2    A.   To supervise and manage the Patrol |
| 3   time? | 3   Division, Investigation, Traffic and Canine |
| 4    A.   I was an investigator. That is not | 4   Unit. |
| 5   really a rank, it is an assignment. If you are | 5    Q.   And do you have any administrative |
| 6   talking about rank, I was promoted to Sergeant, | 6   duties as well as that? |
| 7   as a temporary appointed Sergeant, the first | 7    A.   Oh, absolutely, whatever comes about, |
| 8   time was in 2000, and I was also promoted Civil | 8   things of nature of like depositions or anything |
| 9   Service Sergeant in 19 -- I'm sorry, 2007, I | 9   dealing with day to day operations. |
| 10   believe it was. | 10    Q.   Does that include -- well, strike that. |
| 11    Q.   Okay. | 11      Do you have any role in employing |
| 12    A.   Yes '7 or '8, I can't remember. Either | 12   police officers for the Markham Police |
| 13   2007 or '8, I can't remember exactly. | 13   Department? |
| 14    Q.   That's okay. And then from there? | 14    A.   No. |
| 15    A.   2011, June 1st, Deputy Chief. | 15    Q.   Do you know who handles that? |
| 16    Q.   And have you served under the same | 16    A.   That is the Police and Fire Commission. |
| 17   Chief as Deputy Chief? | 17    Q.   Do you have any role in disciplining |
| 18    A.   Yes. | 18   your officers? |
| 19    Q.   From that time? | 19    A.   Yes. |
| 20    A.   Yes. | 20    Q.   What is your role in discipline? |
| 21    Q.   Who was it? | 21    A.   First level, make recommendations based |
| 22    A.   Max Sanders. | 22   upon the discipline that was brought to me from |
| 23    Q.   Are there any other Deputy Chiefs? | 23   maybe a supervisor or if I view it myself, and |
| 24    A.   Yes. | 24   then I make recommendations either give the |
|               13 |               15 |
| 1    Q.   How many others? | 1   discipline if it's minor myself or recommend |
| 2    A.   One. | 2   further discipline to the Chief. |
| 3    Q.   And that is your current position with | 3    Q.   Are there certain types of conduct you |
| 4   the City of Markham? | 4   might be made aware of that you would refer |
| 5    A.   It is. | 5   immediately to the Chief? |
| 6    Q.   Do you supervise anyone in your | 6    A.   Any acts of police malfeasance, |
| 7   capacity as Deputy Chief? | 7   absolutely. |
| 8    A.   I do. | 8    Q.   And what do you mean by malfeasance? |
| 9    Q.   Who do you supervise? | 9    A.   Anything that could be considered |
| 10    A.   As Deputy Chief my responsibilities | 10   detrimental to the Police Department, any overt |
| 11   include supervision of the Patrol Division, | 11   acts of criminality or anything like that, so |
| 12   Investigations Division, the Canine Unit and | 12   yeah. |
| 13   Traffic Division. | 13    Q.   Okay. So, is there any distinction |
| 14    Q.   Does your fellow Deputy Chief also | 14   between the types of conduct that you would |
| 15   supervise the same divisions? | 15   specifically provide discipline for and not |
| 16    A.   No. There is different assignments for | 16   report to the Chief; are there more minor forms |
| 17   both Deputy Chiefs. | 17   of discipline that you would meet out without |
| 18    Q.   And then who do you report to? | 18   having to run past the Chief? |
| 19    A.   Chief Sanders. | 19    A.   Yes. |
| 20    Q.   So Chief Sanders is your supervisor | 20    Q.   What kind of misconduct would you |
| 21   then? | 21   discipline? |
| 22    A.   Correct. | 22    A.   Being late for work, not showing up for |
| 23    Q.   Do you have any other supervisors? | 23   assignments, not reporting reports correctly, |
| 24    A.   No. | 24   things of that nature. |
|               14 |               16 |

James Walker 07/06/2017

1  things you might be responsible for disciplining
2  is if an officer doesn't author a report
3  properly, is that right?
4      A.   Correct.
5      Q.   Do you have any role in reading over or
6  checking police reports on a day to day basis?
7      A.   Not on a day to day basis, occasionally
8  or if the need arises for me to screen a report
9  or to look at a report that might be incorrect,
10  yes, I would, but that is not an every day
11  function that I do.
12      Q.   How would you know if the need had
13  arisen for you to review the report?
14      A.   It's flagged for review or a supervisor
15  brings it to my attention.
16      Q.   And what kind of reports would be
17  flagged for your review?
18      A.   It could be anything from a barking dog
19  all the way up to anything, so --
20      Q.   Is there any particular -- strike that.
21      Is there anything in a report that
22  you've instructed or trained Sergeants to flag
23  for your review if they see it in a report?
24      A.   Grammatical mistakes, mistakes that

21

1  does not meet the actual crime or whatever is
2  being reported.  If it does not have the right
3  UCR Code, Uniform Crime Reporting Code, spelling
4  mistakes, things of that nature.
5      Q.   So any mistake could be brought to your
6  attention?
7      A.   Correct.
8      Q.   Have you ever had a police report
9  brought to your attention for inaccuracy?
10      A.   Oh, yes.
11      Q.   Have you -- maybe I should be more
12  specific.  Have you ever had a police report
13  that was brought to your attention because a
14  Sergeant believes that what had been written may
15  not be what actually occurred?
16      A.   I wouldn't say to that level, no.
17  Inaccuracies as far as statements that might not
18  have been transferred correctly based on that
19  Sergeant being there or something like that, but
20  nothing to the level of what you just stated.
21      Q.   Okay.  Have you ever experienced a
22  situation where a police report indicated that
23  one officer -- strike that.  I'll ask this in a
24  clearer way.

22

1      Have you ever been asked to review a
2  police report based on a supervisor believing
3  that a statement within a police report had
4  never been made in the first place?
5      A.   I don't recall ever, no.
6      Q.   Do you have any role in detaining
7  suspects that are brought to the Markham Police
8  Department --
9      A.   No.
10      Q.   -- after an arrest?
11      MS. WATKINS:  As Deputy Chief?
12  BY MS. RAVEENDRAN:
13      Q.   Yes, as Deputy Chief.
14      A.   No.  If I arrest my own person, then
15  yes.
16      Q.   Do you assist in patrol as Deputy
17  Chief?
18      A.   On occasion.
19      Q.   So you have had to make arrests in the
20  capacity as Deputy Chief in the past?
21      A.   It has been awhile.
22      Q.   What kind of circumstances require you
23  to take part in arresting or detaining
24  individuals?

23

1      A.   Oh, if the need arises.  If a person
2  needs to be arrested and they need assistance, I
3  am there, and I will make the arrest.
4      Q.   So, is it fair to say that police
5  officers at Markham can look to you for
6  assistance if there are no other officers
7  available?
8      A.   Oh, yes.
9      Q.   So, with that in mind, do you have --
10  do your duties also include those of a full
11  police officer if called upon?
12      A.   I am a full police officer, oh yeah.
13      Q.   So you have -- you don't patrol, do
14  you?
15      A.   Not generally, no.
16      Q.   So if called upon, then you can go
17  assist other officers?
18      A.   I do.
19      Q.   We talked about discipline that may
20  arise from officer conduct.  Do you have any
21  role in investigating officer misconduct?
22      A.   The investigative part usually ends
23  with me for my recommendation unless I do the
24  investigation myself, which I hardly ever do

24



1  anymore. I usually assign those to supervisors
2  or investigators.
3      Q.  Do you only review investigations of
4  misconduct that occurred on the divisions that
5  you supervise?
6      A.  No.
7      Q.  Are you the one who reviews all of
8  those investigations?
9      A.  Correct, yes.
10      Q.  So is that an additional role that you
11  play?
12      A.  That is part of my responsibility.
13      Q.  And does the other -- let's give them a
14  name, what is the other Deputy Chief's name?
15      A.  Deputy Chief Genius.
16      Q.  Does he also, as far as you know,
17  review investigations of officer misconduct?
18      A.  He can.
19      Q.  So is that a role you share?
20      A.  It is a role, but I am the person that
21  is responsible for registering the complaints or
22  the case numbers for each individual officer
23  complaint or whatever.
24      Q.  Do you have a particular shift that you
                                                    25

1  work?
2      A.  Day shift.
3      Q.  Day shift. Does Deputy Chief Genius
4  also work the day shift?
5      A.  Correct.
6      Q.  So, if something occurs at night that
7  may require your assistance, are you called?
8      A.  I'm called.
9      Q.  Are you on call all the time?
10      A.  24 hours.
11      Q.  What is your Star Number?
12      A.  It is 309.
13      Q.  When you started with the Markham
14  Police Department in 1998, did you have a
15  probationary period?
16      A.  I did.
17      Q.  How long was that?
18      A.  One year.
19      Q.  And after the probationary period ended
20  were you a fully sworn officer of the Markham
21  Police Department?
22      A.  I was fully sworn --
23      Q.  Immediately.
24      A.  -- immediately, just a probationary
                                                    26

1  officer, so to answer your question, yes.
2      Q.  What was the distinction between being
3  an officer during the probationary period and
4  after?
5      A.  Probationary period just means that you
6  are being assessed, your level of training is
7  being observed and, of course, you don't have
8  the Union protection, so --
9      Q.  So only after the probationary period
10  do you -- is your assessment finished, is that
11  accurate?
12      A.  Well, your assessment as far as being
13  not on probation anymore, but you are always --
14  as an officer, we are always being assessed, we
15  always, you know, strive for improvement on
16  anything that we find that might be lacking of
17  anything that we can improve upon, so yeah.
18      So, it's constant. That's constant.
19      Q.  Was your probationary period, the
20  period of time in which you received the most
21  training as a Markham police officer?
22      A.  I would say no. Over the years we do
23  receive training. I give training classes. We
24  attend training classes. I have attended
                                                    27

1  several training classes. I have assigned other
2  people for several training classes.
3      So training is continuous. So it's
4  kind of hard to say that -- during the field
5  training part or the probationary period you are
6  learning certain things about the city,
7  policies, procedures and things like that.
8      Afterwards you learn things about other
9  specializations or other things that police
10  officers, patrol officers, tactical officers or
11  whatever might need to know.
12      Q.  Do you have any yearly requirement for
13  training?
14      A.  Yes.
15      Q.  What is that?
16      A.  We have -- we are members of the Police
17  Law Institute, and every month we complete a
18  training course that is Illinois Law Enforcement
19  Training and Standards Board Certified, so every
20  officer receives this training, and it's
21  recorded with the State.
22      Q.  Do your officers at Markham -- strike
23  that.
24      Are your new recruits at Markham Police
                                                    28

1  Department given policies, procedures and
2  general orders to review?
3       A.   Yes.
4       Q.   What form are those given to them in?
5       A.   A diskette that's PDF form, and we also
6  have a hard copy, our manual copy for review in
7  the Sergeant's office.
8       Q.   Is that something you also received
9  when you began at Markham Police Department?
10      A.   We did, but it wasn't, of course, the
11  same manual that they receive now, so it's a
12  different manual, but yes, a particular manual.
13      Q.   And you received it in a physical copy?
14      A.   Yes.
15      Q.   Do you have any -- we talked about some
16  of your certificate programs and stuff like
17  that, but do you have any specializations or
18  certificates specific to your work as a police
19  officer at Markham?
20      A.   Yes.
21      Q.   What do you have?
22      A.   I am a State Certified Evidence
23  Technician, State Certified Investigator, State
24  Certified Firearms Instructor and Rifle
                                              29

1  Instructor, Arson, Basic Arson, Internal Affairs
2  Investigator, Sex Crimes Investigator.  I think
3  that is it.
4       Q.   Can you briefly go through the process
5  of what occurs if a civilian lodges a complaint
6  against a member of the Markham Police
7  Department.
8       A.   A written complaint.
9       Q.   Yes.
10      A.   A written complaint is given to the
11  person, they fill out the written complaint,
12  it's returned, it should be -- it should work
13  its way back to me.  Once it's worked to me I
14  register it as a citizen complaint, and either
15  based on the circumstances I review it, if it's
16  something that can be handled on -- with me
17  without assigning an investigator depending on
18  how serious it is, it gets assigned to an
19  investigator if it's more than what I believe it
20  can be handled by me on that level, so --
21      Q.   So once it's assigned to either you or
22  an investigator, what is the investigatory
23  process?
24      A.   They interview, I am sure they
                                              30

1  interview the complainant, try to obtain any
2  information or evidence towards the
3  substantiation of the allegation, witness
4  statements, things of that nature.
5       Q.   Is the officer who is involved in a
6  complaint also interviewed?
7       A.   Yes.
8       Q.   Do you have a certain process by which
9  you interview officers such as witnesses first,
10  officer last, anything like that?
11      A.   Different investigators do it different
12  ways, some first, some last.
13      Q.   Is there any -- is an officer put on
14  notice that they are being investigated?
15      A.   Yes.
16      Q.   How are they put on notice?
17      A.   They are either told in writing or
18  asked to submit a memorandum of the incident.
19      Q.   If a complaint is lodged against a
20  civilian, I'm sorry, strike that.
21           If a complaint is lodged against an
22  officer by a civilian, is the officer asked or
23  offered administrative leave?
24      A.   No.
                                              31

1       Q.   So that is only a precaution taken if a
2  firearm is used?
3       A.   Or something of that type of nature,
4  could be a car accident, it could be anything
5  that results in someone might need some
6  counseling or time off for decompression or
7  something like that.
8       Q.   Are there -- do you have different
9  categories for the end of an investigation into
10  a complaint against an officer?
11      A.   I'm sorry, I don't understand your
12  question.
13      Q.   Yeah, I am trying to figure out how to
14  ask this.  You know, in some departments once
15  they finish the investigation they determine if
16  the complaint is unfounded or sustained.  Do you
17  have certain categories like that at the end of
18  an investigation?
19      A.   There is.
20      Q.   And what does Markham use?
21      A.   Founded, unfounded, exonerated or
22  nonsustained.
23      Q.   Who makes the determination regarding
24  an investigation whether it be founded or
                                              32

James Walker 07/06/2017

1    A.    That was -- what is his name?  It will
2  come to me in a second, one of our new officers,
3  that is why I am having a hard time with his
4  name, Cordell Clemment.
5       Q.    After the incident in November or
6  December of 2016, was Officer Wright provided or
7  given administrative leave?
8       A.    He sure was.
9       Q.    Was he given a month of administrative
10 duty?
11      A.    He sure was.
12      Q.    Was he offered counseling?
13      A.    He sure was.
14      Q.    Do you know if Officer Wright took the
15 offer of counseling?
16      A.    He did.
17      Q.    And was he provided any additional
18 training?
19      A.    We all have training.  Police law
20 institute, we instituted that training where use
21 of force is one of the curriculum requirements,
22 or whatever, so that is part of training.
23      Q.    But was Officer Wright given additional
24 training due to the incident that he was

                                              49

1  involved in?
2       A.    No.
3       Q.    And then for Officer Clemment, same
4  question, was he also given the three days of
5  administrative leave?
6       A.    Yes.
7       Q.    Also given a month of administrative
8  duties?
9       A.    Yes.
10      Q.    And was he offered counseling?
11      A.    Yes.
12      Q.    Do you know if he took up on the
13 counseling?
14      A.    I am not sure.
15      Q.    Would it be fair to say that you are
16 required to know the policies and procedures and
17 general orders of Markham Police Department as
18 the Deputy Chief?
19      A.    Yes.
20      Q.    Do you have any role in drafting
21 procedures, general orders or policies for
22 Markham Police Department?
23      A.    Limited.
24      Q.    What is your limited role in drafting?

                                              50

1       A.    Input.
2       Q.    And who was that input given to?
3       A.    The Chief of Police.
4       Q.    Does the Chief of Police issue the
5  policies, procedures and general orders?
6       A.    Yes.
7       Q.    Are there any particular policies and
8  procedures that you told the Chief that you
9  thought would be a good idea that have been
10 implemented?
11      A.    Our body-worn cameras.
12      Q.    When was that implemented?
13      A.    February of 2017.
14      Q.    Have you made any suggestions to the
15 use of force policy at the Markham Police
16 Department?
17      A.    No.
18      Q.    When you were appointed as Deputy
19 Chief, did you have any additional training?
20      A.    Yes.
21      Q.    What additional training did you
22 receive?
23      A.    I was sent to Northwestern University's
24 police staffing command.

                                              51

1       Q.    So that is when you attended
2  Northwestern?
3       A.    Correct.
4       Q.    What kind of topics were covered in
5  that training?
6       A.    Everything from resource allocation all
7  the way to officer discipline.
8       Q.    So it's a broad course?
9       A.    Yes.
10      Q.    Did you receive any additional training
11 when you were appointed as Deputy Chief on
12 Markham's police policies and procedures?
13      A.    No.
14      Q.    Did you receive any training on how to
15 explain or teach policy and procedure to your
16 subordinate officers?
17      A.    No, just use the manual, read it
18 verbatim.
19      Q.    Are your police officers at Markham
20 Police Department required to know the
21 applicable law that applies to their work as
22 police?
23      A.    Yes.
24      Q.    Are they required to know the policies

                                              52

1  and procedures of the Markham Police Department?
2      A.  Yes.
3      Q.  Is there any specific requirement for
4  them to keep current on general orders, policies
5  and procedures?
6      A.  Yes.
7      Q.  Is there any way that you and the
8  administration can check that officers are
9  keeping current?
10     A.  They are -- any new policies or
11  anything that goes out is read at roll call by
12  the Watch Commander, so any -- any drafts or
13  policy changes or any memorandums are read at
14  the daily roll call briefing so all officers can
15  review it, and it's in a book that can be
16  reviewed at their leisure at any time, but it's
17  read by the Watch Commander of each shift.
18     Q.  So it's reviewed with the police
19  officers, is that right?
20     A.  The Sergeant or the officer in charge
21  reads it and explains it, answers any questions
22  about it, and then it's left in the book for
23  review.
24     Q.  Which they have access to?

                                            53

1      A.  Absolutely.
2      Q.  Would you describe the general orders
3  of the Markham Police Department as mandatory?
4      A.  Mandatory as far as?
5      Q.  Well, let me rephrase that.  It might
6  be easier to answer.
7          Do you think -- strike that.
8          As Deputy Chief, do you consider the
9  general orders for the Markham Police Department
10  as rules?
11     A.  Well, they are the policy and
12  procedure.  That is the guideline that we use
13  for the management of the department.  That
14  along with the Collective Bargaining Agreement.
15     Q.  When you said guideline, does that mean
16  that there is flexibility within the general
17  orders?
18     A.  Well, if you look at any policy or any
19  book, there is always going to be some
20  flexibility, nothing is what it is, it's always
21  going to be something that can be changed,
22  improved upon, learned from experiences that
23  might be different, so it's not -- if we notice
24  there is something might not be in the best

                                            54

1  interest of the citizens or the public and we
2  make an improvement upon it, that's -- it's an
3  improvement because that particular policy or
4  whatever was not to the standard of what we
5  believed it should be, or could be.
6      Q.  Are police officers at Markham Police
7  Department trained that they are required to
8  follow the general orders?
9      A.  Yes.
10     Q.  You mentioned before that you help with
11  training police officers on occasion, is that
12  right?
13     A.  Correct.
14     Q.  What kind of training do you handle;
15  you mentioned firearms -- well, strike that,
16  that is your certification.
17         But what kind of training do you
18  handle?
19     A.  I have given driving under the
20  influence classes before.  I have given report
21  writing classes.  That is about it.
22         Use of force type deals with scenario
23  based, building clearances, things like that, so
24  that's those.

                                            55

1      Q.  So you have run scenario based use of
2  force training?
3      A.  Correct, and use simulators, and things
4  like that.
5      Q.  What do you mean by use of force
6  simulators?
7      A.  There is a simulator we used to have
8  access to which is no longer available.  It's a
9  use of force, shoot-no-shoot scenario based
10  trailer, and we used to have access to that and
11  we would use that as training.
12     Q.  When did you stop having access to the
13  simulator?
14     A.  It has been about two years maybe.
15     Q.  Did you find that the simulator with
16  the no shoot, shoot scenarios was helpful to
17  train officers?
18     A.  Yes.
19     Q.  What did it help train officers on?
20     A.  Shoot-no-shoot scenarios, making
21  decisions, being abreast of making wrong
22  decisions, you know, because shot back issues,
23  balls back issues; so if you are not correct,
24  you would get the balls shot at you, so it was

                                            56

1   A.   No.

2   Q.   Are there certain number of -- is there

3   -- strike that.

4        Is there a yearly requirement for

5   firearms training?

6   A.   Yes.

7   Q.   How much training is required in one

8   year for firearms?

9   A.   A minimum of two.

10  Q.   Two hours --

11  A.   No, no, two training sessions. We

12  primarily do some type of night shoot or some

13  type of night simulation or movement simulation,

14  and then we do the firearm qualification. And

15  before the firearm qualification obviously you

16  can engage on practicing and drawing from the

17  weapon, drawing from the holster, engaging the

18  target, and then we have annual qualification

19  where you have to qualify with a minimum score,

20  which is regulated by the State.

21  Q.   And what makes up that score, is there

22  a test?

23  A.   Yeah.  You have to fire -- you have to

24  shoot a target, and you have to have a certain

69

1   amount of distance and times and everything.

2   Q.   So is that a test that looks at aim and

3   accuracy?

4   A.   Well, all those things come into play,

5   because you are being timed.  You have to have a

6   certain amount within the body of the target

7   within a certain amount of rings, so you have to

8   have accuracy, speed.  You have to have

9   fundamentals of marksmanship, so you have to

10  practice and certify -- get qualified on those.

11  Q.   Is there a certain part of the body

12  that officers are trained to aim at?

13  A.   Center mass, but if you are moving

14  it's, you know -- we train for center mass.

15  Unless you are doing what is called a body armor

16  drill, which is if you shoot center mass and

17  obviously you can determine if someone is

18  wearing body armor, that is not going to work,

19  so you have to go some place that does not have

20  body armor, either the head or legs or something

21  like that or a lower extremity where a vest

22  wouldn't be.

23  Q.   Is there any requirement that Markham

24  police officers be proficient in the use of

70

1   guns?

2   A.   You want everybody to be proficient in

3   the use of firearms.  Whenever we have them,

4   that is why we train, and that is why we certify

5   every year to insure that our officers have the

6   best chance of engaging themselves in a

7   situation where they need to use their firearm.

8   Q.   If we can go back to -- for a second,

9   you mentioned center mass.  Is there any reason

10  that center mass is -- strike that.

11       Is there any reason that Markham police

12  officers are trained to aim if possible at

13  center mass?

14  A.   Because that is the largest part of the

15  body, so you want to -- the reason that you are

16  engaging anyone with the use of force is to stop

17  that person from being a threat that they

18  obviously are, and you have the better chance of

19  stopping that threat if you are aiming at the

20  largest part of the body.

21  Q.   According to Markham policy and general

22  orders, are warning shots ever allowed?

23  A.   No.

24  Q.   Why is that?

71

1   A.   Because what goes up comes down, and

2   you can't -- you want to be aiming at a specific

3   thing whenever you engage your firearm.  So that

4   is reckless to shoot a warning shoot.

5   Q.   Are officers according to Markham

6   policy and general orders allowed to shoot to

7   injure suspects?

8   A.   Well, obviously whenever you press the

9   trigger you are injuring or you are attempting

10  to injure someone, but what you are trained to

11  do is to stop the threat from continuing

12  whatever felonious act that they are doing, so

13  you are going to injury someone if you strike

14  them with a weapon.

15       So, the ultimate goal is to stop them

16  from continuing doing what they were doing,

17  which is the -- more likely something that

18  resulted in them having to be fired upon in the

19  first place.

20  Q.   Do you provide any training to Markham

21  police officers, or are you aware of any

22  training for Markham police officer to shoot at

23  motor vehicles?

24  A.   No.

72



James Walker 07/06/2017

| | |
|---|---|
| 1  the officer uses or not is their discretion. | 1      MS. RAVEENDRAN:  I'm done. |
| 2      Q.  Okay. | 2              CROSS EXAMINATION |
| 3          And then in the next paragraph says | 3  BY MS. WATKINS: |
| 4  when any officer sustains a serious injury in | 4      Q.  Since we have this document in front of |
| 5  the line of duty, the Deputy Chief of Police or | 5  you, we will stick with this exhibit. |
| 6  operations shall, and this time it's underlined, | 6      A.  Okay. |
| 7  contact psychological services; have you in your | 7      Q.  Look at the very first Page 1-10 Bates |
| 8  experience understood why there is a | 8  numbered Markham production 0094, Section 1.3.1 |
| 9  differentiation between the two? | 9  use of force; do you see that at the bottom |
| 10      A.  I have no idea why that shall is | 10  there? |
| 11  underlined and the other one is not.  Maybe | 11      A.  Yes. |
| 12  that's a typo or something, or they forgot to | 12      Q.  Sworn officers acting under the |
| 13  take the underline out. | 13  authority granted in the 720 ILCS 5-7-5.  Are |
| 14      Q.  And I'm sorry to go back, if you could | 14  you familiar with that statute that is listed |
| 15  turn to Page 1-20, Markham produced 0104. | 15  there? |
| 16          And if I could direct your attention, | 16      A.  Yes. |
| 17  am I right that in the middle of the page there | 17      MS. WATKINS:  Can you mark this as Exhibit 2, |
| 18  is a general order number 1.3.16, reporting | 18  please? |
| 19  requirements, slash, force reports? | 19              (whereupon, WALKER Deposition |
| 20      A.  Yes. | 20              Exhibit No. 2 was marked for |
| 21      Q.  So, is it right that in this paragraph | 21              identification.) |
| 22  it states officers are required to file use of | 22  BY MS. WATKINS: |
| 23  force supplemental report in the following | 23      Q.  So Exhibit 2, does this appear to be |
| 24  instances, and then it lists some instances, is | 24  the statute that we just discussed? |
| 109 | 111 |

| | |
|---|---|
| 1  that right? | 1      A.  Yes, 720 ILCS 5-7-5. |
| 2      A.  Yes. | 2      Q.  How are you familiar with this statute? |
| 3      Q.  Is the use of force supplemental report | 3      A.  It's a part of the Illinois compiled |
| 4  that is being mentioned in this section, is that | 4  statutes. |
| 5  what you were discussing before where you said | 5      Q.  When did you first review this statute? |
| 6  supplemental report may be written describing | 6      A.  I'm sure in the Police Academy. |
| 7  the use of force? | 7      Q.  And have you reviewed it since the |
| 8      A.  Well, this -- the word supplemental is | 8  Academy? |
| 9  -- I don't know if that's -- how that should be. | 9      A.  Yes. |
| 10  The report is the general offense report. | 10      Q.  In your capacity as Deputy Chief? |
| 11  Supplemental reports are anything that is done | 11      A.  Yes. |
| 12  by investigators or anything like that, but the | 12      Q.  Do you use this statute at all as -- in |
| 13  initial report is the discharge of the firearm | 13  performing your duties as Deputy Chief? |
| 14  report, or the report for us to get everything | 14      A.  Yes. |
| 15  rolling. | 15      Q.  How do you use it? |
| 16          So it's usually the initial report.  I | 16      A.  It's the guideline and it's the law for |
| 17  know it says supplemental report.  Supplemental | 17  police officers use of force, and make an |
| 18  reports means anything other than original | 18  arrest. |
| 19  report. | 19      Q.  Do you provide any type of instruction |
| 20      Q.  And is this report that is being | 20  on -- to other officers on this particular |
| 21  referred to in 1.3.16 something that is written | 21  statute? |
| 22  by the officer who used the force in the | 22      A.  This is covered -- the Police Law |
| 23  incident or by another officer? | 23  Institute Training and also probably was covered |
| 24      A.  Usually it's by another officer. | 24  by officers at the roll call training. |
| 110 | 112 |



1    Q.   The roll call training that occurs at
2  the beginning of shifts?
3    A.   Yes.
4    Q.   Just read along with me here.  Well,
5  first the Section 7-5 is entitled police
6  officers use of force in making arrest, correct?
7    A.   Yes.
8    Q.   I am going to skip down to -- do you
9  see where it says however?
10   A.   Yes.
11   Q.   Nine lines down.  Okay.  However, he is
12 justified in using force likely to cause death
13 or great bodily harm only when he reasonably
14 believes that such force is necessary to prevent
15 death or great bodily harm to himself or such
16 other person, or when he reasonably believes
17 both that, one, such force is necessary to
18 prevent the arrest from being defeated by
19 resistance or escape, and two, the person to be
20 arrested has committed or attempted a forcible
21 felony which involves the infliction or
22 threatened infliction of great bodily harm, or
23 is attempting to escape by use of a deadly
24 weapon, or otherwise indicates that he will

113

1  endanger human life or inflict great bodily harm
2  unless arrested without delay; did I read that
3  right?
4    A.   Yes.
5    Q.   So number two there, there are a lot of
6  ors; is your understanding that any of those
7  descriptions there in combination with number
8  one would warrant use of deadly force?
9    A.   Yes.
10   Q.   Can a vehicle be used as a deadly
11 weapon?
12   A.   Yes.
13   Q.   Is carjacking a forcible felony?
14   A.   Yes.
15   Q.   Kidnapping?
16   A.   Yes.
17   Q.   What about attempted carjacking, is
18 that a forcible felony?
19   A.   I am not sure.
20   Q.   I am not asking you to give a legal
21 opinion.
22        All right, and this statute is
23 incorporated into the guidelines for Markham
24 police officers?

114

1    A.   Yes.
2    Q.   Let's look back at Exhibit 1 and that
3  same section on the first Page 1.3.1 use of
4  force.  So sworn officers acting under the
5  authority granted in the -- and then the
6  statute, will only use the amount and degree of
7  force reasonably believed necessary based upon
8  the totality of circumstances as reasonably
9  perceived by the officer at that time to
10 accomplish lawful objectives; did I read that
11 right?
12   A.   Yes.
13   Q.   So this seems to be -- or seems to
14 grant discretion to Markham officers in the use
15 of force, is that correct?
16   A.   Yes.
17   Q.   Is there anything in the general
18 orders, policies, procedures from Markham that
19 provides a list of appropriate times when an
20 officer can use deadly force versus
21 inappropriate times?
22   A.   I don't believe it is.
23   Q.   And I am saying very literally, black
24 and white, the dos and don'ts?

115

1    A.   No, no.  We discussed that earlier, the
2  totality of circumstances.
3    Q.   And we also discussed earlier the
4  reasonable person standard; do you remember
5  that?
6    A.   Yes.
7    Q.   This Section 1.3.1, this seems to be
8  more directed at what the officer perceives at
9  the time -- I'm sorry, I'm looking at the first
10 page again.
11        Right down here, the 1.3.1?
12   A.   Oh, I see, okay.
13   Q.   So that line I just read it says as
14 reasonably perceived by the officer at that
15 time.  That seems to be more directed at that
16 officer as opposed to what is reasonable, is
17 that correct?
18   A.   Correct.
19   Q.   Could you flip the Page 1, now I'm
20 looking at Section 1.3.2, or actually it shows
21 up at the bottom but flip the page continues on
22 to the next page?
23   A.   Got you.
24   Q.   And let's look at the third paragraph

116

1   down.  Says the basic responsibility of police
2   officers to protect life also requires that they
3   exhaust all other reasonable means for
4   apprehension and control before resorting to the
5   use of firearms; did I read that right?
6        A.  Yes.
7        Q.  Would it be considered -- and I know
8   this is going to be circumstantial, but just
9   generally speaking -- would a reasonable mean
10  for apprehension and control be engaging the
11  lights and sirens on a vehicle, on the March
12  vehicle?
13       MS. RAVEENDRAN:  Objection, calls for
14  speculation.
15       THE WITNESS:  Could you say that again,
16  please?
17       MS. WATKINS:  Sure.
18  BY MS. WATKINS:
19       Q.  So it says that officers are required
20  to exhaust other reasonable means of
21  apprehension and control before using a firearm,
22  right?
23       A.  Yes.
24       Q.  And I understand this is going to be

117

1   case-by-case and circumstantial, but would one
2   example of a reasonable mean of apprehension and
3   control be turning on the siren, turning on the
4   lights of a vehicle?
5        A.  Yeah.
6        MS. RAVEENDRAN: Same objection.
7        THE WITNESS: You could try, yes.
8   BY MS. WATKINS:
9        Q.  Okay.  Ordering the suspect to stop?
10       A.  Yes.
11       MS. RAVEENDRAN: Same objection.
12  BY MS. WATKINS:
13       Q.  Pursuing the suspect in a marked
14  vehicle?
15       A.  Yes.
16       MS. RAVEENDRAN:  Same objection.
17  BY MS. WATKINS:
18       Q.  Foot pursuit of the suspect?
19       MS. RAVEENDRAN:  Same objection.
20       THE WITNESS: Yes.
21  BY MS. WATKINS:
22       Q.  What about drawing the weapon?
23       MS. RAVEENDRAN: Same objection.
24       THE WITNESS: Yes.

118

1   BY MS. WATKINS:
2        Q.  Then if you read down six paragraphs.
3        A.  Okay.
4        Q.  officers will exhaust all reasonable
5   available means before resorting to the use of
6   deadly force but may initially utilize deadly
7   force as deemed reasonable by the individual
8   circumstances of an incident.
9        In reading this policy, would it be
10  correct to say that there may be circumstances
11  where deadly force can be the initial force
12  used?
13       A.  Yes.
14       MS. RAVEENDRAN:  Objection, calls for
15  speculation.
16  BY MS. WATKINS:
17       Q.  So given the circumstances, the fact
18  that an officer doesn't yell stop and simply
19  draws their weapon and shoots, that could be
20  reasonable?
21       A.  Yes.
22       Q.  And then let's look at the next
23  section, 1.3.3.
24       A.  Okay.

119

1        Q.  Rules regarding the use of deadly
2   force.  That first sentence there says the
3   policy stated above is the basis of the
4   following set of rules that have been designed
5   to guide officers.
6        And I just noted that you used the word
7   guide.
8        A.  Yes.
9        Q.  So these aren't black and white rules
10  that are going to apply across the board to
11  every situation?
12       MS. RAVEENDRAN: Objection, vague.
13       THE WITNESS:  Correct.
14  BY MS. WATKINS:
15       Q.  Use of deadly force is circumstantial,
16  is that right?
17       A.  Yes.
18       Q.  Let's look at Section 1.3.5 --
19  actually, strike that.
20       Is part of your duty as Deputy Chief to
21  identify areas where Markham officers need
22  additional training?
23       A.  Yes.
24       Q.  Since you have been Deputy Chief, how

120