# GENERAL ORDER 1.3/1.4

**Subject:** Use of Force                    **Issued:** 091511

**Supersedes:** All Previous Orders / Policies    **Revised:**

**By Order Of:** Mack Sanders, Chief of Police

---

## Policy:

This General Order shall establish clear procedures and provide guidance to officers governing the kinds and types of force to be utilized. Additionally, this order will define procedures for the reporting and notification of use of force incidents.

## DEADLY FORCE

Force which is likely to cause human death or great bodily harm or which creates a high degree of risk that a reasonable and prudent person would consider likely to cause death or great bodily harm. (See 720 ILCS 5/7-8)

## GREAT BODILY HARM

Bodily injury that creates a substantial risk of death, causes serious or permanent disfigurement, or results in long-term loss or impairment of the function of a bodily member or organ.

## REASONABLE BELIEF

When facts/circumstances an officer knows or should know are such as to cause an ordinary prudent person to act or think in a similar way under similar circumstances.

### 1.3.1   Use of Force

Sworn officers, acting under the authority granted in the 720 ILCS 5/7-5, will only use the amount and degree of force reasonably believed necessary, based upon the totality of circumstances as reasonably perceived by the officer at that time, to accomplish lawful objectives.

### 1.3.2   Deadly Force

Markham Prod. 0094

The Markham Police Department places its highest value on the life and safety of its officers and the public. The department's policies, rules and procedures are designed to ensure that this value guides police officer's use of firearms.

The citizens of Markham have vested in their police officers the power to carry and use firearms in the exercise of their service to society. This power is based on trust and therefore, must be balanced by a system of accountability. The serious consequences of the use of firearms by police officers necessitate the specification of limits for officer's discretion; there is often no appeal from an officer's decision to use a firearm. Therefore it is imperative that every effort be made to ensure that such use is not only legally warranted but also rational and humane.

The basic responsibility of police officers to protect life also requires that they exhaust all other reasonable means for apprehension and control before resorting to the use of firearms. Police officers are equipped with firearms as a means of last resort to protect themselves and others from the immediate threat of death or serious bodily injury.

Even though all officers must be prepared to use their firearms when necessary, the utmost restraint must be exercised in their use. Consequently, no officer will be disciplined for discharging a firearm in self-defense or in defense of another when faced with a situation that immediately threatens life or serious bodily injury. Just as important, no officer will be disciplined for not discharging a firearm if that discharge might threaten the life or safety of an innocent person, or if the discharge is not clearly warranted by the policy and rules of the department.

Above all, this department values the safety of its employees and the public. Likewise it believes that police officers should use firearms with a high degree or restraint. Officer's use of firearms, therefore, shall never be considered routine and is permissible only in defense of life and then only after all alternative means have been exhausted.

Officers will exhaust all reasonable, available means before resorting to the use of deadly force but may initially utilize deadly force as deemed reasonable by the individual circumstances of an incident. When deadly force is justified, officers will, when practical, give a verbal warning. (Example "Police Officer, Halt")

This General Order pertains to internal use only and does not enlarge an officer's civil or criminal liability in anyway. It should not be construed as the creation of a higher standard of safety or care in an evidentiary sense with respect to any claims.

### 1.3.3 Rules Regarding the Use of Deadly Force

The policy stated above is the basis of the following set of rules that have been designed to guide officers in all cases involving the use of firearms:

Rule 1: Police officers shall not discharge their firearms except to protect themselves or another person from imminent death or serious bodily injury.

Markham Prod. 0095

Rule 2: Police officers shall discharge their firearms only when doing so will not endanger innocent persons.

Rule 3: Police officers shall not discharge their firearms to threaten or subdue persons whose actions are destructive to property or injurious to them but which do not represent an imminent threat of death or serious bodily injury to the officer or others.

Rule 4: Police officers shall not discharge their firearms to subdue an escaping suspect who presents no imminent threat of death or serious bodily injury.

Rule 5: Police officers shall not discharge their weapons at a moving vehicle unless it is absolutely necessary to do so to protect against an imminent threat to the life of the officer or others.

Rule 6: Police officers when confronting an oncoming vehicle shall attempt to move out of the path, if possible, rather than discharge their firearms at the oncoming vehicle.

Rule 7: Police officers shall not intentionally place themselves in the path of an oncoming vehicle and attempt to disable the vehicle by discharging their firearms.

Rule 8: Police officers shall not discharge their firearms at a fleeing vehicle or its driver.

Rule 9: Police officers shall not fire warning shots.

Rule 10: Police officers shall not draw or display their firearms unless there is a threat or probable cause to believe there is a threat to life, or for inspection.

### 1.3.4 Prohibited Shooting

Warning shots will **NOT** be fired. **NO** shots will be fired from or at moving vehicles unless the situation becomes one of the immediate defense of human life.

### 1.3.5 Less Lethal Weapons

A. The less lethal weapons issued and/or authorized for use by Department personnel are the 21" or 26" ASP baton, oleoresin capsicum (O/C) spray, and Taser,.

B. Sworn officers may carry authorized less lethal weapons once a recognized instructor formally trains them in the use of the weapon.

C. Sworn officers will receive, at a minimum, biennial retraining with ASP baton, O/C spray, and Taser.

D. "Use of Force Continuum", starting with verbal commands and progressing to hand control, O/C spray, Taser, baton, and deadly force, is to be utilized, when necessary, to perform any authorized police action. Officers may begin the application of force at any level of the continuum deemed reasonable by the individual circumstances of the

Markham Prod. 0096

individual incident and may move higher in the continuum when it becomes necessary in the continuum to gain control of a suspect in the performance of their duties.

E. Less lethal weapons improperly applied can result in serious injury. Care must be exercised during their application. The following general guidelines will be adhered to during the use of any less-than-lethal weapons.

1. O/C spray may only be utilized, as trained, when an officer reasonably believes that a subject is a danger to any person and needs to be immediately controlled or refuses to submit to an arrest. In addition, O/C spray may be utilized, when necessary, in crowd control situations.

2. ASP and short straight batons may only be utilized, as trained, when an officer reasonably believes that a subject is a danger to any person and needs to be immediately controlled or refuses to submit to an arrest.

3. Tasers may only be utilized, as trained, when an officer reasonably believes that a subject is a danger to any person and needs to be immediately controlled or refuses to submit to an arrest. Additionally, Tasers may be used to control a dangerous or violent subject when deadly force does not appear to be justified or there is a reasonable expectation that it will be unsafe for employees to approach the subject.

F. The carrying or use of any weapon not specifically issued or authorized by the Department is strictly prohibited, except in those extreme situations where an officer has no other choice but to use any item available to prevent the immediate threat of human death or great bodily harm.

### 1.3.6 Use of Tasers

It is the policy of the Markham Police Department to use only that level of force that is reasonably necessary to achieve a lawful objective such as controlling and subduing a potentially dangerous or violent subject. The Taser may be used as a force option by authorized personnel who are successfully trained in the use of the Taser.

When using force as a lawful objective, officers must remain within the legal framework and be aware of legal precedence that governs use of force. When using force, the officer must have an understanding of current use of force standards; *Graham v. Connor* 109 S. Ct. 1865 May 15, 1989 which tells us that the use of force must be "objectively reasonable" and *Tennessee v. Garner* 471 U.S. 1(1985) which tell us that officers should give warning before using force and documenting that the warning was given or why it was not practical to do so.

Bryan v. McPherson F. 3d 2009WL 5064477(9th Cir.2009) which summarizes the Taser as an "intermediate" use of force where every trigger pull must be justified as a separate use of force. Officers must consider the totality of the circumstances and context is critical in determining the justification of the use of force.

Markham Prod. 0097

Officers should also be prepared to adjust the level of force applied as it may be necessary to move anywhere on a use of force continuum to gain control of the subject. Officers should also be prepared to immediately take measures to gain control rather than allow the subject time to regain the ability to resist or escape after some level of force was applied.

### 1.3.7 Definitions

| | |
|---|---|
| **Electronic Control Device (ECD):** *TASER* | A device designed to disrupt the sensory and motor functions of a subject's central nervous system by means of deploying battery powered electrical energy sufficient to create Neuro Muscular Incapacitation (NMI) and override an individual's voluntary motor responses. |
| *AFID (Anti-Felon Identification):* | Confetti-like pieces of paper that are expelled from the cartridge when fired. Each "AFID" contains an alpha-numeric identifier unique to the specific cartridge used. |
| *Drive Stun:* | A secondary feature of the TASER intended to make direct contact with the body after the air cartridge has been removed. |
| *Air Cartridge:* | A replaceable cartridge for the TASER which uses compressed nitrogen to fire two barbed probes on this connecting wires sending a high voltage/low current signal into a subject. |
| *NMI (Neuro Muscular Incapacitation)* | A temporary involuntary loss of muscle control caused by the successful deployment of a TASER ECD Air Cartridge. |

### 1.3.8 Training

Only those officers who are authorized and have successfully completed a department approved training course may carry and use a Taser as directed in this policy.

Training recertification will be completed annually providing budget and manpower permit. The recertification will require the officer to demonstrate successful loading, unloading, deploying and discharging the cartridge of the TASER ECD.

### 1.3.9 Storage and Inspection

Markham Prod. 0098

1. The device will be carried in an approved holster. Officers not assigned to uniformed patrol may utilize other department-approved holsters and carry the weapon consistent with department training. All TASER ECD's must be carried in the cross draw position on the weak hand side opposite their duty weapon.

2. Absent extraordinary circumstances, the device should be carried with a cartridge locked in place ready to be discharged, in SAFE mode, in preparation for immediate use when authorized. No cartridge, other than approved TASER ECD X26 cartridges is to be used in the Taser.

3. Officers authorized to use the Taser shall be issued a minimum of one spare cartridge as a backup in case of cartridge failure, the need for redeployment, multiple suspects, or in case the first cartridges leads break during engagement.

4. The spare cartridges shall be stored and carried in a manner consistent with training and the cartridges replaced consistent with the manufacturer's expiration requirements.

5. Officers certified and approved to carry the TASER ECD will notify the Shift/Watch Commander that they are carrying an approved TASER ECD at the beginning of the shift.

6. Officers will inspect the TASER ECD at the beginning and end of each shift to insure that it is operational/functional, and are required to return the TASER ECD to the Shift/Watch Commander at the end of the shift.

## 1.3.10 <u>Assignment</u>

1. Upon being issued or selecting a Taser, that officer will inform their supervisor of the Department-assigned Taser number.

2. Officers will not change Tasers and/or cartridges without informing their supervisor and insuring the change is documented.

3. Officers will not reconfigure the Taser nor hinder the proper functioning of the Taser such as covering, damaging or altering any part of the Taser where it does not operate as it is intended.

## 1.3.11 <u>Deployment</u>

Although the TASER ECD rarely fails and is generally effective in subduing most individuals, officers should be aware of this potential and be prepared with other options in the event of such a failure.

Markham Prod. 0099

Authorized personnel may use the TASER ECD when circumstances known to the individual officer at that time indicate the application of the TASER ECD is reasonable to control or subdue:

1. A violent or physically resisting subject, or

2. A potentially violent or physically resisting subject if:

   a. The subject has verbally or physically demonstrated an intention to resist; and
   b. Where possible the officer has given the subject a verbal warning of the intended use of the TASER ECD followed by a reasonable opportunity to comply; and
   c. Other available options reasonably appear ineffective or would present a greater danger to the officer or the subject.

3. Although not absolutely prohibited, officers should give additional consideration to unique circumstances involved prior to deploying the TASER ECD to any of the following individuals:

   a. On a handcuffed/secured prisoner, absent overtly aggressive behavior that renders TASER ECD deployment viable within the use of force policy.
   b. In any environment where an officer knows a potentially flammable, volatile, or explosive material is present (including but not limited to OC spray with volatile propellant, gasoline, natural gas, or propane).

4. The TASER ECD should not normally be used against visibly or known to be pregnant women, children or elderly subjects.

5. In any environment where the subject's fall could reasonably result in death (Such as in a swimming pool causing a risk of drowning or on an elevated structure resulting in a fall).

6. Person operating moving vehicle or machinery.

7. When the subject is holding a firearm.

8. In preparation for firing, the TASER ECD shall be pointed in a safe direction, put in ARMED mode, and aimed. Center mass of the subject's back should be the primary target where reasonably possible; in cases where back-targeting is not possible, frontal targeting should be lower center mass. Intentional deployments to the chest, groin or spine area should be avoided where possible.

9. The TASER ECD should not be aimed at the face or neck area unless deadly force is justified.

1-16

Markham Prod. 0100

10. If possible and if the situation allows, the deploying officer will shout "TASER" in a loud clear voice, prior to discharging, or otherwise alert other officers of the pending deployment.

11. Upon discharging the device, the officer shall energize the subject the least number of times and no longer than necessary to accomplish the legitimate operational objective.

12. The subject may be secured as soon as practical while disabled by TASER ECD power to minimize the number of deployment cycles.

13. Probe discharge, even at close distances, is preferred to "drive stun." The TASER ECD when used in contact or "drive stun" mode will be targeted to available or accessible body areas, and should only be used against the head, neck or groin area as a last resort.

The ECD shall be pointed at the ground or in a safe direction in SAFE mode during loading, unloading, or when handled in other than an operational deployment.

Assisting officers should apprehend the subject while he/she is disabled, using caution not to touch the wires, probes, or between the probes.

If a canine unit is present, the ECD should either not be utilized or the canine officer should be instructed to not release the canine while the ECD is being deployed.

The ECD may be used against vicious or aggressive animals that pose immediate danger to an officer, citizen or other domestic animals.

A TASER ECD must never be used to punish a subject.


## 1.3.12 Aftercare and Reporting

1. If feasible and or circumstances allow, subjects energized with the ECD may be evaluated by trained medical personnel to determine if transport to a hospital for further medical attention if necessary.

2. Only medical personnel or officers trained in the removal of probes will remove probes that have penetrated the skin. Subjects who have received a probe in a sensitive area (face, neck, genitals), as well as those who have experienced a probe/barb separation should be directly reviewed by appropriate medical professionals.

3. Photographs of the affected area should be taken by a supervisor or evidence technician after the probes are removed.

Markham Prod. 0101

4. When the device has been used operationally, an officer will, in accordance with the Markham Police Department Policy regarding evidence collection, collect the cartridge, wire leads, probes, and AFID's as evidence (Any probes that have penetrated the skin should be treated as a contaminated biohazard.)

5. Deployment of the ECD constitutes a use of force that must be documented in accordance with department policy.

6. The computerized information downloaded from the ECD will be collected by personnel trained in the download of Taser data which is to be collected by an available evidence technician and maintained for evidentiary purposes.

7. In the event that the Taser Coordinator, Shift/Watch Commander, or Range Master determines that an Officer is misusing the TASER ECD, the TASER ECD will be removed from the Officer. The incident will be immediately referred to the Deputy Chief of Police for Operations to be investigated.

There are three types of reportable TASER ECD Applications:

a) *Spark Display* – A non-contact demonstration of a TASER ECD's ability to discharge electricity. This is conducted only when the cartridge has been removed from the weapon. The purpose of this display is to convince the subject to comply with a lawful order and avoid the TASER ECD being deployed in either the drive stun or probe mode.

b) *Drive Stun* – Contact is made by pressing the front of the TASER ECD (cartridge removed or already discharged) into the body of a subject resisting lawful orders, and activating the TASER by depressing the trigger. The drive stun causes significant localized pain in the area touched by the TASER but does not have a significant effect on the motor or sensory components of the central nervous system. The drive stun does not incapacitate a subject unless it is used in conjunction with a partial probe strike to create two points of contact at optimal distance to create NMI.

c) *Probe* – The TASER ECD is most effective when the cartridge is fired and the probes make direct contact with the subject (with probe spacing of at least 10 inches) Proper application will result in temporary immobilization of the subject due to due to NMI. Optimum range for probe deployment is 7 to 15 feet with 21 feet being the maximum distance. Deployment of a TASER ECD at distances of less than three feet will not result in NMI and will present more similarly to the drive stun.

d) *Deployments for training purposes conducted by a certified TASER instructor during a scheduled department training do not need to be collected but should be identified and logged by the TASER instructor overseeing the training.* Each time the TASER ECD is deployed outside of training, the deploying officer should ensure that the

1-18

activity is logged per department policy. Any necessary paperwork including a use of force form must be filled out for every TASER ECD deployment other than training purposes.

**1.3.13 Supervisory Responsibility**

1. Note officers carrying Tasers and document Taser and cartridge numbers on the duty roster.

2. Upon notification of a deployment, supervise the aftercare of the subject, recovery and download of probes, wires, AFIDS and video data. Insure that Taser evidence is properly inventoried.

3. Submit a completed Supervisory Taser Use Report with assistance from the officer(s) who deployed the Taser.

4. See that this policy is adhered to by their subordinates and forward pertinent information though their chain-of command.

**1.3.14 Taser Coordinator**

The Taser Coordinator will be the highest ranking/senior Taser instructor, who will perform recommended retraining and certification. In addition, the Taser Coordinator will review and assist in completion of the Supervisory Taser Use Report, and will also fulfill the following responsibilities:

1. Review each use of a Taser deployment.
2. Oversee the Taser Training Program and equipment.
3. Coordinated and conduct training classes for basic user certification with
4. Oversight by the training commander.
5. Download and maintain records for the usage of each Taser unit.

**1.3.15 Medical Aid after Use of a Weapon**

A. If any person advises that they have suffered an injury and requires medical aid after the use of any level of force and/or after the use of any lethal or less lethal weapon by an officer, that officer will request that Paramedics be dispatched to the scene for the rendering of medical aid.

Personnel involved in an O.C. deployment on a person shall initiate aftercare procedures on that person as trained, as soon as it is practical. If a situation arises where personnel using O.C. spray are incapacitated and assisting personnel are aware of an O.C. deployment, then assisting personnel should assess the need for aftercare and initiate aftercare procedures.

Markham Prod. 0103

B. If any officer reasonably believes that any person will require medical aid due to that officer's observations, including indications of excited delirium, EMS will be requested and dispatched to the scene to further evaluate, treat and/or transport any person to an area hospital.

C. Additional emergency medical care is required for the following subjects upon whom the Taser has been deployed:

    1.  Subject exhibiting any signs of medical distress.

    2.  Subjects who are hit in sensitive area (face, head, female breast, genitals);

    3.  Subjects from whom officers have difficulty removing the probes (i.e. probe barb separations);

    4.  Subjects who do not appear to be fully recovered within 10 minutes after being hit;

    5.  Subjects who are vulnerable due to medical conditions known to officer present, such as women who are pregnant or persons who have pacemakers.

## 1.3.16 Reporting Requirements/Force Reports

Officers are required to file a Use of Force Supplemental Report in the following instances:

    1.  Discharge of a firearm other than in training or recreation
    2.  Actions resulting in injury or alleged injury or death to anyone
    3.  Force is applied through the use of a lethal or less lethal weapon
    4.  Force is applied by Department canine
    5.  Force is applied to any person by an officer using hands or feet
    6.  When requested to do so by any sworn supervisor

## 1.3.17 Incident Review

A. Whenever an employee files a Use of Force Supplemental Report in which there was an on or off-duty application of force, the on-duty supervisor approving the report will submit a copy to the Deputy Chief of Police for Operations for documented review. The Deputy Chief of Police for Operations will determine if additional investigation is needed. If needed, the Deputy Chief of Police for Operations will submit a copy of report recommendations to the Chief of Police for additional review.

B. If the circumstances warrant, the Chief of Police may choose to start an Internal Investigation or have another agency investigate the incident.

C. The Chief of Police will make a determination, based on the report submitted, if no action, additional police action, or disciplinary action should be taken.

Markham Prod. 0104

**1.3.18 <u>Use of Force Administrative Review</u>**

A. Employees involved in use of force incidents or any other action resulting in death or serious physical injury will be removed from line duty pending administrative review. These removals will not be interpreted as implying or indicating that the officer acted improperly.

B. Employees involved may be required to undergo a debriefing and/or counseling as deemed needed by a Department appointed counselor. The session(s) will be conducted, as soon as practical, after the incident. Any employee may be requested to participate in these services.

C. Employees involved in a use of force incident or any other action involving serious physical injury or death, may be required to submit to medical, psychological, physical or chemical blood substance testing, prior to returning to regular duty.

**1.3.19 <u>Weapons and Ammunition</u>**

Authorized primary on-duty handguns must meet the following criteria: Revolver (Double Action only) minimum caliber .38 or Semi-Automatic Pistol minimum caliber 9mm, .40 caliber, or .45 caliber.

The only authorized weapons are those which match the above specifications, and which are manufactured by the following: Glock, Smith & Wesson, Heckler & Koch, Sig Sauer, Springfield Arms, Beretta.

<u>Shotguns:</u> Only shotguns that have all of the following features will be approved by the department:

- 12 Gauge
- Slide (Pump) Action- movable forearm manually activated
- Cross-Bolt Safety
- Barrel Length- 18 to 20 inches and not modified

If an officer wants to carry a shotgun not currently approved by the department, he must submit his request in writing to the Chief of Police for approval.

**1.3.20 <u>Shotguns- Carrying in Vehicles</u>**

When issued, shotguns are to be carried in the racks provided and personnel are to insure that they are kept secured when not in use. Shotguns should be checked prior to duty tour for proper loading and cleanliness and for proper seal placement. All shotguns must be loaded with No. 00 or No. 1 buckshot.

All weapons are to be removed when the vehicle is left unattended for service or maintenance.

Markham Prod. 0105

No carbines or rifles of any type or configuration may be carried by officers assigned to any unit unless specifically authorized by the Chief of Police. No officer shall carry a fully automatic weapon unless such a weapon has been assigned to him by the department or the Chief of Police has authorized its use as part of the officer's job assignment.

### 1.3.21 Patrol Rifles

The Markham Police Department recognizes that violent subjects, who are armed, or potentially armed, pose an extraordinary level of danger to citizens and officers that require special training and equipment. It is therefore the policy of the Markham Police Department to train and certify officers in the utilization of Patrol Rifles to respond to these potentially violent confrontations.

Definition: A Patrol Rifle is a Department-authorized, magazine-fed rifle in .223 caliber.

Use of Patrol Rifles: Patrol Rifles may only be utilized by trained and certified officers during incidents involving armed subjects or in situations where there is a potential of encountering an armed subject.

Procedures: Only Department-authorized rifles and Department-authorized ammunition are authorized for use.

Training: To become certified in the use of the Patrol Rifle, officers must complete the Department-approved training course. To maintain certification, officers must pass a quarterly qualification course and participate in an annual training session.

Inspection and Storage: The Patrol Rifle should be inspected at the beginning of each shift to ensure that it is in functioning condition, has two loaded magazines, is fitted with a sling, and if equipped with a light that the light is functioning properly.

Storage: The Patrol Rifle will be stored in the squad car overhead rack or squad car trunk with the bolt forward on an empty chamber and the fire selector lever on safe. The weapon will be equipped with two magazines, each holding eighteen or twenty-eight rounds. One magazine will be marked "tactical" and will be loaded with 55 grain tactical loads. The second magazine will be marked "soft point" and will be loaded with 55 grain soft point rounds. The magazine marked "tactical" will be loaded into the magazine well and the magazine marked "soft point" will be inserted into the redi-mag device.

Personally-Owned Patrol Rifles: Officers who have been certified in the Patrol Rifle may carry and utilize a personally-owned Patrol Rifle while on duty. The Patrol Rifle must be an AR-15/M16 style in .223 caliber, and must meet the following criteria:

1. Manufactured by Colt, Bushmaster, DPMS, or Rock River Arms
2. Have a full or multi-position collapsible stock (no folding stocks are permitted)
3. Have a self-luminous front site post (night sight) or orange marking
4. Have a three-point tactical, or single point bungee-type sling
5. Equipped with the redi-mag attachment or similar device

1-22

Markham Prod. 0106

6. Equipped with iron sights
7. If equipped with optics, the optic zero must be verified and certified by a Department Rifle Instructor. The optics setting must be "painted in", and the optics mount must allow the simultaneous utilization of the iron sights.
8. Magazines must be high-quality, factory magazines, distributed by the weapon's manufacturer. No after-market magazines will be permitted.
9. Only twenty or thirty round magazines are authorized
10. Must be equipped with a mounted "sure fire" or similar light
11. Only Department-issued or authorized ammunition can be carried in the rifle
12. Must fit and be able to be secured in the squad car overhead rack or trunk mount
13. Officers transporting personally-owned Patrol Rifles to and from work in their private vehicles must secure the Patrol Rifle in a manner that would reasonably prevent theft and/or access by unauthorized persons
14. In addition to the officer being qualified and certified, the personally-owned Patrol Rifle must be inspected and approved by a Department Rifle Instructor

## 1.3.22 Ammunition

Only Department issued or approved ammunition will be carried in Department handguns or shotguns on duty. Officers carrying secondary or off-duty handguns will be responsible for purchasing ammunition for use as approved by the Chief of Police. The Chief of Police will maintain a list of approved ammunition for handguns and rifles.

Except upon approval of the Chief of Police, no officer shall carry any of the following types of ammunition in any weapon that he is authorized to use:

        a. Armor piercing
        b. Tracer ammunition
        c. Glaser safety slug
        d. Reloaded ammunition

## 1.3.23 Weapons Inspection

Annually during the first quarter of each calendar year, and during qualification shoots, officers are required to have their weapons inspected. Only currently authorized Department armorers or qualified manufacturer's personnel will inspect or perform maintenance on any Department-owned weapons. Inspection and maintenance records will be submitted to the designated Range Master and filed in the issued officer's range records.

When any weapon is deemed to be unsafe, in the opinion of the inspecting Range Officer, that weapon will immediately be removed from service and must be replaced with a safe weapon. In the event that the weapon deemed unsafe is personally owned, the officer will be responsible for obtaining an approved weapon to carry, following completion of a qualification with that weapon. The Deputy Chief of Police for Operations will be advised, by memo, whenever this occurs.

Markham Prod. 0107

**1.3.24 Secondary, Covert, and Off-Duty Weapons**

In addition to their primary on-duty revolver or semi-automatic pistol, officers may also carry a secondary concealed handgun while on or off-duty, or while in a covert capacity. These handguns must be either an approved (Double Action Only) revolver with a minimum caliber of .38 or a semiautomatic pistol of minimum .22 caliber, that is fully functional, in good working order, has a double action firing mechanism, and a firing pin block that will prevent discharge unless the trigger is fully engaged.  No such handgun will be carried until approved in writing by the Range Master and the Deputy Chief of Police for Operations or the Chief of Police and the officer has qualified with it as required in General Order 1.3.11.

**1.3.25 On-Duty Equipment**

Sworn officers assigned to patrol duties are required to wear the following listed leather or nylon belt and holster and additional equipment as part of their uniform:

1. Authorized on-duty holster and handgun- the holster must be of minimum level two retention design.
2. Plain velcro inner and outer black leather or nylon police belt
3. Plain velcro or snap dual magazine holder
4. Plain velcro or snap single or dual handcuff case holder
5. At least one pair of Department approved metal universal small keyed police handcuffs
6. Department issued portable radio and plain black leather or nylon holder
7. Plain black key or belt keepers are permitted but not required
8. Plain metal or plastic flashlight with plain holder is permitted

In the event that an Officer assigned to patrol duties chooses to purchase and carry an ASP baton or OC Spray, the ASP baton or OC Spray will be carried in a black leather or nylon holder.

Sworn officers will not be armed when:

1. Consuming alcoholic beverages
2. Taking prescribed medications that may impair them
3. On leave of absence from the Department (unless permitted to do so in writing  by the Chief of Police)
4. Relieved of duty

Officers may also be armed with Department owned and authorized or authorized personally owned shotguns, patrol rifles, or other weapons, as deemed necessary by the Chief of Police, or designee.  Officers must be properly trained and qualified in the use of these weapons prior to being authorized to use or carry them.

Full-time officers are authorized to be armed off-duty within or outside of the City of Markham.  Part-time police officers are authorized to be armed off-duty within the City

Markham Prod. 0108

and are not authorized to be armed off-duty outside of the City of Markham without written permission from the Chief of Police, or a designee.

The Office of the Chief of Police and the Range Master will maintain, in employee personnel files, the original record of each weapon approved for use.

### 1.3.26 Weapon Proficiency

Only authorized employees successfully demonstrating proficiency in the use of Department authorized weapons will be allowed to carry or use such weapons.

### 1.3.27 Use of Force and Weapon Qualifications

A. Sworn officers will annually receive training in the Department's use of force policies and demonstrate proficiency with any approved lethal weapon and electronic control weapons, which an officer is authorized to use. In addition, in-service training for other less lethal weapons and weaponless control techniques shall occur at least biennially.

B. All proficiency training must be documented and conducted by a certified weapons or tactics instructor.

C. If an officer is unable to successfully qualify or safely complete any practical course of fire after three attempts with any Department authorized weapon, the instructor will immediately provide that officer with remedial training. After remedial training, officers will again attempt to successfully complete the course of fire. If an officer is still is unable to qualify or safely complete any course of fire with any weapon the instructor will notify the on-duty Shift/Watch Commander and document this information. The Shift/Watch Commander will document the incident and notify the Deputy Chief of Police for Operations.

D. Officers unable to successfully qualify/re-qualify will be provided with additional training/retraining by the Department to assist an officer with training needs. Officers still not able to successfully qualify are subject to administrative action at the discretion of the Chief of Police.

E. Officers will complete, with their on-duty handgun, a minimum of two (2) qualification shoots per calendar year. In addition, Officers are also responsible to complete a minimum of one (1) qualification shoot each calendar year, with any approved off-duty or secondary handgun. Officers are encouraged to participate in practice shoots, utilizing personally-purchased ammunition, following approval of practice shoots by the Range Master or a qualified Range Officer.

F. Qualification and practical courses of fire for authorized weapons will be determined by the Range Master, subject to final approval by the Chief or Deputy Chief of Police. Officers must attain a passing score for qualification.

Markham Prod. 0109

G.  Retired officers wishing to carry firearms per federal statute will comply with all state and federal required regulations.

H.  The use of any neck restraint, or similar weaponless control techniques with potential for serious injury, is NOT authorized.

### 1.3.28 Distribution of Use of Force Directives

All authorized department personnel will be issued copies of and receive instructions in General Orders 1.3.1 through 1.3.5 before being authorized to carry any lethal or less lethal weapon.

### 1.3.29  Use of Force Analysis

Annually, the Deputy Chief of Police for Operations will conduct an analysis of Use of Force Supplemental Reports and will provide this analysis to the Chief of Police.

### 1.3.30  Firearm Security

A. Whenever a Department issued or personally owned firearm is not secured in a locked container or not being carried on an officer's person, it is REQUIRED that the weapon be properly secured.

B. When reloading firearms, officers will rotate "
compression damage of this round.  If ~                                    l advise a
sworn supervisor, who will replace

### 1.4.1 Assignment of Officers Inflic.

The Markham Police Department is co                            loyees
and wishes to assure all officers of the a\                        l as
the departments.

Special Duty Assignments

When an officer discharges his/her firearm, ·
death or serious injury to any person, the offi                    temporary
non-street duty by the Chief of Police for a mi                    . should the Chief of
Police determine that it is in the best interest o.                u the department, the Chief
of Police will order the officer relieved of all poli        ies.

In cases where an officer discharges his firearm and the discharge does not cause death or serious injury, special-duty status may be granted to the officer by the officer's division commander if the division commander believes such status would be in the best interests of the officer and the department.

1-26

Markham Prod. 0110

Guidelines and Regulations

If the officer's special-duty assignment is to be relieved of all duty, he will be required to remain at his residence during regular day-shift duty hours, except with the approval of the division commander in any of the following circumstances:

- A departmental investigation related to the incident
- A counseling session with Psychological Services
- An informational debriefing for future training purposes
- Special family considerations

When an officer is on special-duty assignment for this purpose, he/she shall not work any extra-employment jobs during the entire period of the assignment.

Counseling

When any officer, during the performance of his/her duties causes death or serious injury to any person, the officer's division commander shall contact

Psychological Services and schedule the officer for participation in a counseling session.

When any officer sustains a serious injury in the line of duty the Deputy Chief of Police for Operations  shall contact Psychological Services and schedule the officer for participation in a counseling session.

The officer will be allowed to attend such session(s) during his tour of duty. If the officer must attend the scheduled (session(s) during his off duty hours, he will be given overtime pay for the actual time spent in counseling.

Psychological Services will give the officer and Chief of Police written documentation of his or her attendance at each session.

If the psychologist determines that the officer should remain on special duty assignment it will be the psychologist's responsibility to immediately notify the Chief of Police or the Deputy Chief of Police for Operations.

Before returning an officer to active duty from special duty status, the Deputy Chief of Police for Operations will meet with the officer. If the Deputy Chief of Police for Operations determines the officer is fit to return to active duty he will notify the Chief of Police and recommend a change in the officer's status.

## 1.4.2 Reporting and Investigation of Firearms Discharges

All firearm discharges other than those for training or lawful recreational purposes shall immediately be reported to the Chief of Police. This Policy establishes procedures for performing such reports and investigations.

1-27

Markham Prod. 0111

Procedures

The following procedures pertain to the reporting and investigation of firearms discharges by Markham Police Department officers:

Whenever a firearm is discharged by an officer and the result is injury or death to any person, the Chief of Police and the Public Integrity Task Force will be notified immediately.

Whenever a firearm is discharged by an officer in the line of duty or while off-duty but without injury or death to any person, the Chief of Police will be notified immediately. (This section applies to all firearm discharges of any kind, except discharges of firearms for training or lawful recreational purposes.) Scene integrity should be maintained.

After an officer has discharged a firearm in the line of duty, he/she will notify a supervisor as soon as possible. If the officer is injured and unable to notify a supervisor himself, he will give that task to another person, if possible. His/her supervisor will complete a Discharge of Firearms report and forward it to the Chief of Police within 24 hours after the incident occurred.

The Chief of Police will evaluate the sufficiency of all investigations regarding the discharge of firearms and will determine whether departmental policies have been followed.

1-28

Markham Prod. 0112